## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## BANKRUPTCY DIVISION
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| JEFFREY J. PROSSER, | ) | Case No. 06-30009 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| JEFFREY J. PROSSER, | ) | Adv. Pro. 10-3001 |
| | ) | |
| Movant, | ) | |
| | ) | Related to Doc. Nos. 29, 30, 43 |
| v. | ) | |
| | ) | |
| TOBY GERBER; FULBRIGHT & JAWORSKI, | ) | |
| L.L.P.; JAMES J. LEE; VINSON & ELKINS, | ) | |
| L.L.P.; STAN SPRINGEL; JAMES P. | ) | |
| CARROLL; FOX ROTHSCHILD, L.L.P.; | ) | |
| GENOVESE, JOBLOVE & BATTISTA, P.A.; | ) | |
| PAUL BATTISTA; THERESA VAN VLIET; | ) | |
| ALVAREZ & MARSAL, LLC, | ) | |
| | ) | |
| Respondents.[1] | ) | |

---

[1] James P. Carroll, the Chapter 7 Trustee of the estate of Jeffrey J. Prosser, and the Chapter 7 Trustee's counsel, Fox Rothschild LLP, are no longer parties in this action. This Court's Memorandum Opinion and Order dated March 10, 2010, dismissed Fox Rothschild. *See* Adv. Doc. No. 63. As to the Chapter 7 Trustee, on March 15, 2010, Jeffrey Prosser filed his Notice of Voluntary Dismissal, Without Prejudice, and Otherwise Than Upon the Merits of his Motion Seeking Evidentiary Hearing to Determine Whether an Order Should be Entered Imposing Sanctions, Disqualification and/or Referral for Further Disciplinary Proceedings and Other Equitable Relief as Against the Chapter 7 Trustee James P. Carroll. *See* Adv. Doc. No. 78.

The evidence shows that Fulbright & Jaworski, L.L.P. ("F&J") was not involved in any way with the allegations discussed herein. We credit Gerber's testimony that he acted independently. Thus the Court will not include F&J in its reference to "Respondents."

In Jeffrey Prosser's Post-Hearing Reply Brief, he seeks to add Daniel Stewart and Byron Smyl as additional respondents. *See* Adv. Doc. No. 264, at ¶¶22-25. Although Movant's request to amend the pleadings to add Stewart and Smyl is denied, *see* discussion *infra,* because Stewart

(continued...)

1

_____)

## MEMORANDUM OPINION[2]

The matter before the Court is Jeffrey J. Prosser's Amended Motion Seeking Evidentiary

Hearing to Determine Whether an Order Should be Entered Imposing Sanctions, Disqualification

and/or Referral for Further Disciplinary Proceedings and Other Equitable Relief Adding Toby

Gerber as Respondent Per the Court's Order Entered March 1, 2010 (hereinafter "Amended

Motion for Evidentiary Hearing"). Adv. Doc. No. 43.[3] Prior to the filing of the Amended Motion

for Evidentiary Hearing, Jeffrey Prosser filed his original Motion for Evidentiary Hearing to

Determine Whether an Order Should be Entered Imposing Sanctions, Disqualification and/or

Referral for Further Disciplinary Proceedings Against Plaintiffs and/or Certain Attorneys and the

Supplement thereto. *See* Adv. Doc. Nos. 29 and 30. This action originated in the District Court

---

[1](...continued)
and Smyl are factually connected to the allegations discussed herein, and for purposes of clarity, the term, "Respondents" as used in this Opinion shall include both Stewart and Smyl.

Thus, the term "Respondents" as used in this Opinion, shall refer only to Toby Gerber; James J. Lee; Vinson & Elkins, L.L.P.; Stan Springel; Genovese, Joblove & Battista, P.A.; Paul Battista; Theresa Van Vliet; Alvarez & Marsal, LLC; Daniel Stewart; and Byron Smyl.

Also for purposes of clarity, the term "Principal Actors" herein shall refer to a smaller subset of Respondents, namely James J. Lee; Vinson & Elkins, L.L.P.; Stan Springel; Alvarez & Marsal, LLC; Daniel Stewart, and Byron Smyl. The Court finds Gerber's role to be minimal and will not include him among the Principal Actors. The Court also finds that Genovese, Joblove & Battista, P.A. and its attorneys acted properly at all times during the events leading to the allegations discussed herein and thus will be similarly excluded.

[2] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. Unless otherwise noted, references are to documents filed on the docket in the above-captioned adversary proceeding (Adv. No. 10-3001).

[3] Although this adversary proceeding was commenced by the filing of a complaint, the complaint has been stricken from the record by this Court's Order docketed on February 25, 2010. Adv. Doc. No. 28.

2

for the U.S. Virgin Islands on January 6, 2010, when Jeffrey Prosser filed the Motion for

Evidentiary Hearing and Supplement. *See* Case No. 10-cv-08, Doc. Nos. 3 and 8. On January 29,

2010, the District Court referred the matter to this Court for evidentiary hearing. *See* Case No.

10-cv-08, at Doc. No. 9.

For procedural reasons, this action is filed as an adversary proceeding related to Jeffrey

Prosser's bankruptcy case, despite the fact that it was commenced by way of a motion.[4] An

evidentiary hearing was held on May 24, 2010, to determine whether reasonable grounds exist to

make a referral to the United States Attorney's Office and/or an attorney disciplinary committee.

*See* Transcript of 05/24/10 hearing, Adv. Doc. No. 254 (hereinafter "Hearing Transcript"), at 13

(clarifying the purpose of the hearing). Closing arguments were heard on July 22, 2010.

At the outset, we note the highly contentious and litigious nature of the related

bankruptcy cases[5] involved in this action as is evident from numerous motions for sanctions,

contempt, and/or disqualification that have been filed in the main bankruptcy cases and related

---

[4] *See* Transcript of January 29, 2010, Case No. 06-30009, Doc. No. 2700, at 114:
> THE COURT: Yes, I think that would make sense. But I'm not going to require
> the service of a summons. I just think that it would be easier to open it as an
> adversary because obviously the discovery rules are going to apply. Everybody's
> going to want them to apply. So I might as well just open it that way.

*See also id.* at 116:
> THE COURT: All right. So when it's filed file it as an adversary, but no summons
> will be issued. And I'm giving you the pretrial conference date and the answer
> dates now since you're already aware of this. We're just basically documenting
> what's already been done, but so that we have a vehicle to handle this in the
> Bankruptcy Court. So Monday the motion and the attachments and the
> supplements will be filed as an adversary in Mr. Prosser's case. No summons need
> be issued.

[5] That is, Jeffrey Prosser's bankruptcy case as well as the three related corporate
bankruptcy cases. *See* discussion *infra*.

3

adversary proceedings since the cases commenced. The United States Attorney was made aware

of some of the allegations by counsel to Jeffrey Prosser and of those contained in the Amended

Motion for Evidentiary Hearing by the U.S. Trustee at the request of the Court.[6] The U.S.

Attorney was notified of the allegations set forth in the Motion for Evidentiary Hearing due to the

severity of those allegations alone. No findings were made by the Court at that time, and, in fact,

the trial had not yet commenced.

It is the responsibility of this Court to determine whether, based upon the evidence

presented, reasonable grounds exist to refer any or all Respondents for criminal investigation

and/or disciplinary proceedings. *See* 18 U.S.C. §3057. We have examined the documents

provided, assessed the credibility of the witnesses, and considered the totality of the evidence, the

arguments of counsel and the briefs. We find no basis upon which to make a referral as to the

enumerated alleged crimes or professional conduct violations. Although the conduct of certain

Principal Actors falls below the high standards expected by this Court, *see* discussion *infra*, a

---

[6] In Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, he notes, "At the March 11, 2010 Omnibus Hearing (the transcript of which was lost due to technical malfunction), this Court informed all parties that it had directed the United States Trustee to refer the motion to the United States Attorney for investigation." *See* Adv. Doc. No. 255, at 4, note 3. There is no transcript of that hearing as stated. However, to the extent Jeffrey Prosser asserts that the Court already ordered the referral of the allegations made by Jeffrey Prosser to the United States Attorney, that issue was clarified by the Court at the hearing on March 30, 2010:

> THE COURT: Okay. Well, Mr. Abood, first of all, I did ask the U.S. Trustee's Office, as you know, to refer this to the United State[s] Attorney.
> MR. ABOOD: Yes.
> THE COURT: But, I have said consistently that I did so only because the allegations are serious. And, frankly, I don't know what the outcome of those allegations will be. It may be that the request for this relief itself should be referred to the U.S. Attorney, and as a result I thought the U.S. Attorney should be aware of the entire complaint.

*See* Transcript of 03/30/10, Adv. Doc. No. 156, at 9.

stark contrast exists between the standards of behavior expected by this Court and a reasonable

basis to make a criminal or disciplinary referral. Respondents concede that errors were made.

Upon review of the evidence, what is lacking is an intent to violate the law and sufficient

evidence to warrant the relief sought.


Background

The genesis of these proceedings was the series of events that led to the January 12, 2010,

deposition of Arthur Stelzer ("Stelzer"), who served as a witness in a trial in June 2008 in Jeffrey

Prosser's bankruptcy case, and what followed. The deposition raised certain questions as to the

conduct of the Respondents.[7] The Respondents, in various capacities, have been involved in the

---

[7] On May 20, 2010, the Court entered its Order Sustaining Respondents' Joint Objection
to Jeffrey J. Prosser's Deposition Designations due to failure to comply with the Court's Order
regarding proper designation of depositions. *See* Adv. Doc. No. 225. Among the depositions was
the deposition of Arthur Stelzer which initiated this proceeding. *Id.* Jeffrey Prosser filed a motion
for reconsideration, which was denied by this Court's Order dated August 4, 2010. *See* Adv. Doc.
No. 271. However, at closing arguments on July 22, 2010, the Court noted:

> I've read that [Stelzer's January 12, 2010] deposition. To the extent that it isn't
> part of the record, I agree with you, Mr. Schoenbach, it certainly should be for part
> of this proceeding, because it is what generated the activity that followed. And so
> I can't disagree in that sense and I don't disagree in that sense.

*See* Closing Arguments, Adv. Doc. No. 270, at 12. *See also id.* at 43–44:

> THE COURT: . . . Mr. Stelzer's testimony is not relevant to certain of the parties
> in this proceeding, so I'm not attempting to admit -- to say that it is relevant as to
> everyone, but it is relevant to the process concerning what happened with Mr.
> Stelzer's fees and how it was revealed that this agreement was made. And I am
> going to consider it for that purpose. You folks can object, your objection's
> preserved. I'm considering it for that purpose, it's highly relevant.
> . . . .
> THE COURT: Yes, okay. I will consider the entire transcript. I think I said earlier
> on this record that I had read that transcript. I don't see a basis for thinking that
> Mr. Stelzer thought that there was a quid pro quo, and that appears at this point to
> be the issue.

(continued...)

bankruptcy case of Jeffrey Prosser, Case No. 06-30009, and three related bankruptcy cases of

Emerging Communications, Inc. ("Emerging" or "EmCom"), Innovative Communication

Company, LLC ("ICC-LLC"), and Innovative Communication Corporation ("New ICC"), Case

Nos. 06-30007, 06-30008, and 07-30012, respectively (collectively, "ICC Cases").[8]

New ICC, a management and holding company, formerly owned, directly or indirectly,

100% of the common stock of various operating subsidiaries that provide telephone, newspaper,

and other services to the citizens of the United States Virgin Islands and surrounding areas.[9] New

ICC is a wholly-owned subsidiary of Emerging, which, in turn, is directly and indirectly owned

by ICC-LLC. Jeffrey Prosser was Chairman of the Board, President, and CEO of New ICC and

sole member of its ultimate parent company, ICC-LLC.

Although there were prior filed involuntary bankruptcy cases then pending, on July 31,

2006, Emerging, ICC-LLC, and Jeffrey Prosser each filed voluntary petitions seeking relief under

---

[7](...continued)
We have considered the deposition of Stelzer to the extent provided herein and find no basis for referral based upon its contents. *See infra.*

[8] ICC-LLC and Emerging's bankruptcy cases are being jointly administered. *See In re Innovative Communication Company, LLC*, Case No. 06-30008, Doc. No. 661.

[9] The Court has approved the sales of three groups of assets: the Telecom and Non-French Cable Operations (Group 1 Assets), the French Cable Operations (Group 2 Assets), and Media Operations (Group 3 Assets). *See* Order Approving Sale of Group 3 Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests and Granting Related Relief, Case No. 07-30012, Doc. No. 668; Order (I) Approving Sale of Certain Estate Common Stock and Receivables Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing Trustee to Consummate Sale and Related Transactions; and (III) Granting Related Relief, Case No. 07-30012, Doc. No. 1053; and Final Order (A) Approving Sale of Group 1 Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief, Case No. 07-30012, Doc. No. 1883.

6

chapter 11 of the Bankruptcy Code, commencing Case Nos. 06-30007, 06-30008, and 06-30009, respectively. Subsequently, Jeffrey Prosser's case was converted to a chapter 7, and John Ellis was appointed as trustee. *See* Case No. 06-30009, Doc. No. 865. Mr. Ellis later resigned, and James Carroll ("Trustee Carroll") was appointed and continues to serve as Chapter 7 Trustee. Case No. 06-30009, Doc. No. 948.

On July 5, 2007, the Greenlight Entities[10] filed an Involuntary Petition against New ICC, commencing Case No. 07-30012. An Order for Relief was entered on September 21, 2007. *See* Case No. 07-30012, Doc. No. 60. Stan Springel ("Trustee Springel") was appointed Trustee in the Chapter 11 cases. Case No. 06-30007, Doc. No. 543, on March 15, 2007; Case No. 06-30008, Doc. No. 523, on March 15, 2007; Case No. 07-30012, Doc. No. 125, on October 4, 2007. Jeffrey Prosser's control of the Parent Debtors was severed when the Trustee was appointed in these bankruptcy cases. Thereafter, he was removed from the Board of Directors of New ICC.

As discussed in note 1, *supra,* nine Respondents remain in this proceeding. Jeffrey Prosser withdrew his claims against Trustee Carroll, and the Court dismissed Trustee Carroll's counsel, Fox Rothschild, from this action. Trustee Springel; his legal counsel in the corporate bankruptcy cases, Vinson and Elkins ("V&E"); and his financial advisors in the corporate bankruptcy cases, Alvarez & Marsal, LLC ("A&M"),[11] are parties to this proceeding. James Lee

---

[10] The Greenlight Entities include Greenlight Capital Qualified, L.P., Greenlight Capital, L.P., and Greenlight Capital Offshore, Ltd.

[11] A&M was engaged by Trustee Springel to assist in the administration of the three estates. *See* Testimony of Smyl, Hearing Transcript, at 298. A&M monitors New ICC's cash management system. *Id.* at 298-99. Byron Smyl ("Smyl") appeared at the evidentiary hearing as the representative for A&M. *See* Hearing Transcript, at 24-25. Smyl and Trustee Springel are managing directors at A&M. *Id.*; Testimony of Springel, Hearing Transcript, at 230.

7

("Lee"), a partner in the law firm of V&E, is lead trial counsel in connection with courtroom matters, trials, and hearings in the corporate bankruptcy cases, and he was individually named as a Respondent. *See* Transcript of hearing on 5/24/10, Adv. Doc. No. 254, at 28-29. Also named as Respondents are Fulbright and Jaworksi, L.L.P. ("F&J") and Toby Gerber ("Gerber"), a partner at F&J. *See* Hearing Transcript, at 47-48. F&J represents the Rural Telephone Finance Cooperative ("RTFC"), the largest creditor in the Prosser individual bankruptcy and in the related corporate bankruptcies. *See* Hearing Transcript, at 48, 265. The other respondents, Genovese, Joblove, & Battista, P.A. ("GJB"), and two individual attorneys at the firm, Paul Battista ("Battista") and Theresa Van Vliet ("Van Vliet"), are counsel to Stelzer, who, although paid through New ICC, was actually employed prepetition as Jeffrey Prosser's valet and personal assistant and was a witness in the Exemptions Trial.[12]

Stelzer testified and was released as a witness in the Exemptions Trial in June 2008. A year and a half later, in December 2009, Jeffrey Prosser filed a Notice of Oral Deposition of Arthur Stelzer in the Discharge Proceedings.[13] The Plaintiffs (both Trustees and the RTFC), in their respective adversary proceedings, filed emergency motions for a protective order in response. The Court permitted a limited deposition of Stelzer on January 12, 2010, at which the Court was present telephonically. *See* Order Denying in Part and Granting in Part Motions for Protective Order Regarding Jeffrey Prosser's Notice of Oral Deposition of Arthur Stelzer, Adv.

---

[12] Trustee Carroll, Trustee Springel, and the Greenlight Entities filed objections to exemptions claimed by Jeffrey Prosser pursuant to 11 U.S.C. §522. The trial, at which Stelzer testified, commenced in June 2008.

[13] The RTFC, Trustee Carroll, and Trustee Springel (in his capacity as Trustee of the estates of New ICC and ICC-LLC) filed adversary proceedings against Jeffrey Prosser asserting that he should be denied his discharge. *See* Adv. Nos. 07-3011, 07-3012, 08-3011, 08-3012.

8

No. 07-3011, Adv. Doc. No. 98; Adv. No. 07-3012, Adv. Doc. No. 92; Adv. No. 08-3011, Adv.

Doc. No. 41; Adv. No. 08-3012, Adv. Doc. No. 35.

When Stelzer was deposed on January 12, 2010, some of his responses to questions by

Jeffrey Prosser's counsel led to further inquiry and prompted Jeffrey Prosser to seek an

evidentiary hearing related to the retention of GJB by Stelzer and payment of GJB's legal fees on

Stelzer's behalf. In response to the inquiry, V&E revealed that it assured Battista that certain

work done by GJB for Stelzer would be paid by V&E. Subsequently, Daniel Stewart, a partner at

V&E, (on behalf of V&E), Gerber (in his individual capacity), and Trustee Springel (on behalf of

A&M) agreed to split the GJB counsel fees equally (referred to hereinafter as the "thirds

arrangement"). Although payment was made initially by New ICC, the Principal Actors contend

that payment was mistakenly made. New ICC was ultimately reimbursed pursuant to the thirds

arrangement. Based upon the evidence presented, Jeffrey Prosser contends that reasonable

grounds exist to investigate the Respondents for bribery, bankruptcy fraud, perjury, and ethical

violations.

We note that the manner in which this action developed on this Court's docket is curious.

Due to questions raised at the January 12, 2010, deposition of Stelzer, at the close of the

deposition, the Court instructed Lee "to find out, to the best of [his] ability, whether either the

company [New ICC]. . .or Vinson & Elkins is paying Mr. Stelzer's counsel." See 1/12/2010

Deposition of Stelzer, at 141-42. On January 15, 2010, Jeffrey Prosser filed an interlocutory

appeal of an Order entered by this Court commencing Case No. 10-cv-08. While this Court was

awaiting a report from Lee as to the issues raised at Stelzer's deposition, on January 26, 2010,

Prosser filed his Motion for Evidentiary Hearing on the District Court's docket in that appeal. See

9

Case No. 10-cv-08, Doc. No. 3. Thus, while this Court was aware of the issues raised, ordered an

inquiry by Lee, and planned to address the matter upon Lee's report, Prosser filed his motion with

the District Court. Then, on January 28, 2010, Prosser's counsel sent a letter to the U.S.

Attorney's Office containing the allegations of bribery and ethics violations. This Court was

informed of the filing of the Motion for Evidentiary Hearing at an omnibus bankruptcy hearing

on January 29, 2010. The District Court referred the Motion for Evidentiary Hearing to this Court

the same day. See Case No. 10-cv-08, Doc. No. 9.

It is unclear why Jeffrey Prosser notified the U.S. Attorney of the allegations in a letter

sent shortly after his Motion for Evidentiary Hearing was filed and yet continued to pursue the

motion.[14] In addition to being filed on the public docket, the allegations have been circulated

through press releases which, according to Lee, were prepared by Prosser in an apparent effort to

discredit counsel who have commenced proceedings against him in this case. *See* Hearing

Transcript, at 122. Because part of the Motion seeks a referral which had already been made, that

portion of the Motion seems to be unnecessary from the outset. Moreover, as the issue

concerning an unauthorized payment by New ICC, discussed in detail, *infra*, was pursued in the

District Court, not in the Bankruptcy Division, even though the allegations clearly lie within this

Court's supervisory function, the process employed by Movant is suspect. Nonetheless, the

District Court referred the matter here for evidentiary hearing and the allegations raise serious

concerns. Thus, we have spent considerable time analyzing the allegations, the evidence, the

briefs, and arguments. Based upon the review, we find insufficient evidence to warrant any

---

[14] Title 18 U.S.C. §3057 does not impose a requirement on debtors or their counsel to
report bankruptcy crimes to the U.S. Attorney. However, here, Debtor's counsel made a referral.

investigation as alleged by Prosser.

Jurisdiction

The District Court referred the evidentiary hearing to this Court. Jeffrey Prosser

challenges whether this is a core proceeding and therefore whether this Court has the authority to

issue a final order or whether it is constrained to issuing a report and recommendation to the

District Court. *See* Jeffrey J. Prosser's Post-Hearing Reply Brief, Adv. Doc. No. 264, at ¶¶16-21.

Jeffrey Prosser cites to *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228 (3d Cir.

1994), in support of his contention regarding jurisdiction. In that case, Phar-Mor sued its

auditors, Coopers, in state court for fraud and malpractice. Later the same day, Phar-Mor filed a

voluntary bankruptcy petition. Subsequently, Coopers removed the state action to the district

court pursuant to 28 U.S.C. §1452(a), as the cause of action was related to a bankruptcy case. In

*Phar-Mor*, the Third Circuit noted:

> [O]nce the district court found that removal was appropriate under §1452, it
> should have referred the lawsuit to the bankruptcy court . . . pursuant to the
> General Order of Reference of October 16, 1984. Such reference should have been
> automatic . . . . Thus, the case should have been docketed in the bankruptcy court
> . . . as an adversary proceeding and given an adversary proceeding number. *See*
> Fed.R.Bankr.P. 7010 Form 16(c). Afterwards, the district court could have
> withdrawn the reference for cause. 28 U.S.C. §157(d); *e.g., Rota v. Swindler*,
> 1991 U.S. Dist. LEXIS 1352, Bankr. No. 88-14333 S, 1991 WL 15293 (E.D. Pa.
> February 5, 1991) . . . .

*See Phar-Mor*, 22 F.3d at 1235, n.11. The portion of *Phar-Mor* cited by Jeffrey Prosser is the

continuation of this footnote, which provides as follows:

> For some reason, however, the district court simply retained the lawsuit on its
> docket. In a sense, then, the Phar-Mor/Coopers lawsuit is improperly before the
> district court. But when a district court retains a case that should have been

11

> referred to the bankruptcy court, <u>it is treated as if there had been a proper
> withdrawal of reference</u>. *See Anderson v. Federal Deposit Ins. Co.*, 918 F.2d
> 1139, 1142 (4th Cir. 1990) (<u>the local rule providing for automatic reference does
> not prevent the district court from exercising jurisdiction when it ignores the
> withdrawal of reference procedures</u>). By retaining jurisdiction, "the district court
> effectively withdrew [the] matter from the bankruptcy judge to whom it otherwise
> would have been automatically referred for disposition by blanket order"); *see
> also Cooper-Jarrett*, 726 F.2d at 96 (when interpreting the referral procedures in
> the Emergency Rule, we stated that when the district court did not follow those
> procedures and instead just held the case that it "should be considered a *sua
> sponte* withdrawal of reference"). <u>We therefore treat the Phar-Mor/Coopers
> lawsuit as if it had been referred to the bankruptcy court and then withdrawn by
> the district court under § 157(d).</u> (Emphasis added)

*See* Jeffrey J. Prosser's Post-Hearing Reply Brief, Adv. Doc. No. 264, at ¶19 (Emphasis supplied

in Post-Hearing brief).

It is evident that *Phar-Mor* and this case are inapposite. In this case, Jeffrey Prosser filed

the motion on the wrong docket (the District Court's docket) in the first place. The District Court

did not withdraw the reference and, in fact, referred the action to the Bankruptcy Court for trial.

Thus, the matter, which clearly arose in and has no existence outside of the bankruptcy case, is a

core matter.

Moreover, circumstances have changed since Prosser filed this action. The two motions

for evidentiary hearing filed on the District Court's dockets are no longer pending. The District

Court's Order referring this matter to this Court was entered on January 29, 2010, in Case No.

10-cv-08. *See* Case No. 10-cv-08, Doc. No. 9. That District Court case was closed in June 2011.

*See* Case No. 10-cv-08, Doc. No. 67.[15] On January 26, 2010, Jeffrey Prosser also filed his Motion

---

[15] *See also* Memorandum Opinion, Case No. 10-cv-08, Doc. No. 68, at 9:
   Finally, Prosser contends the District Court's referral of his motion for an
   evidentiary hearing to the Bankruptcy Court provides an independent basis to
   retain jurisdiction over this appeal, arguing this Court cannot dismiss the appeal
   (continued...)

for Evidentiary Hearing in his appeal of the Exemptions Opinion. See Case No. 09-cv-147, Doc.

No. 21. On September 30, 2010, the following entry was docketed by the District Court in that

case at Doc. No. 33: "AMENDED ORDER (CVG) denying 21 motion for hearing (This is a

TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (HDJ) (Entered:

09/30/2010)." Therefore, that motion is no longer pending in the District Court in Case No.

09-cv-147. This Court is unaware of any case where Jeffrey Prosser's motion for evidentiary

hearing is pending in the District Court. There was no retention by the District Court of this

matter on its docket and the District Court has not treated it as a withdrawal of the reference as

was the case in *Phar-Mor*. To the contrary, it referred this action to this Court.

The matter before the Court is a core proceeding concerning the administration of the

estate over which this Court has jurisdiction pursuant to 28 U.S.C. §157(b)(2)(A). We note that

"one of the inherent powers of any federal court is the admission and discipline of attorneys

practicing before it." *In re Congoleum Corp.,* 426 F.3d 675, 686 (3d Cir. 2005)(citing *In re Corn*

*Derivatives Antitrust Litig.*, 748 F.2d 157, 161 (3d Cir. 1984)).[16] This motion clearly falls within

---

[15](...continued)
until proceedings relating to the evidentiary hearing are concluded. This appeal,
however, concerns only the Bankruptcy Court's Summary Judgment Order.
See Notice of Appeal (identifying the Bankruptcy Court's January 13, 2010,
"Order Granting in Part and Denying in Part Motions for Summary Judgment in
the Discharge Proceedings" as the order being appealed). Because the Summary
Judgment Order is not a final order, and because leave to appeal has been denied,
this Court lacks jurisdiction over Prosser's appeal. The District Court's referral of
Prosser's motion for an evidentiary hearing does not change that fact.
Accordingly, the motion to dismiss is granted.

[16] *See also In re Meridian Auto. Systems-Composite Operations, Inc.*, 340 B.R. 740
(Bankr. D. Del. 2006)("Stanfield's [a creditor's] motion to disqualify Milbank [counsel to
committee of first lien lenders] is a core proceeding over which the Court has jurisdiction

(continued...)

13

the inherent power of the Court over the trustees, lawyers and their law firms representing parties

in the bankruptcy proceedings.


Request to Add Respondents

In addition to the named Respondents, Jeffrey Prosser seeks to have the pleadings

amended to conform to the evidence pursuant to Fed.R.Civ.P. 15[17] to add Daniel Stewart

("Stewart") and Byron Smyl ("Smyl") as respondents. *See* Jeffrey Prosser's Post-Hearing Reply

Brief Adv. Doc. No. 264, at ¶¶22-26. Fed.R.Civ.P. 15(c) provides as follows:

> (c) Relation Back of Amendments.
>   (1) When an Amendment Relates Back. An amendment to a pleading relates
> back to the date of the original pleading when:
>     (A) the law that provides the applicable statute of limitations allows relation
> back;
>     (B) the amendment asserts a claim or defense that arose out of the conduct,
> transaction, or occurrence set out--or attempted to be set out--in the original
> pleading; or
>     (C) the amendment changes the party or the naming of the party against whom
> a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period
> provided by Rule 4(m) for serving the summons and complaint, the party to be
> brought in by amendment:
>       (i) received such notice of the action that it will not be prejudiced in
> defending on the merits; and
>       (ii) knew or should have known that the action would have been brought
> against it, but for a mistake concerning the proper party's identity.

---

[16](...continued)
pursuant to 28 U.S.C. §157(b)(2)(A). *See, e.g., Century Indem. Co. v. Congoleum Corp. (In re
Congoleum Corp.)*, 426 F.3d 675, 686 (3d Cir. 2005)("One of the inherent powers of any federal
court is the admission and discipline of attorneys practicing before it."); *In re Johore Inv. Co.*,
157 B.R. 671, 674 (D. Haw. 1985)("[A] motion to disqualify counsel of a major secured creditor
is a matter integrally tied to the administration of the estate, and disposing of such a motion is
clearly a necessary function of the bankruptcy judge in presiding over the orderly administration
of the estate.")

[17] Pursuant to Fed.R.Bankr.P. 7015, Fed.R.Civ.P. 15 applies in adversary proceedings.

14

At V&E, Stewart is lead bankruptcy partner and partner in charge of the ICC Cases.

*See* Testimony of Lee, Hearing Transcript, at 29-30; Testimony of Stewart, Hearing Transcript, at

358. Stewart attended the evidentiary hearing as a representative of V&E. *See* Hearing

Transcript, at 21. Smyl appeared at the evidentiary hearing as the representative for A&M. *See*

Hearing Transcript, at 24-25. Smyl and Trustee Springel are managing directors at A&M. *Id.*;

Testimony of Springel, Hearing Transcript, at 230.

On March 9, 2010, this Court entered an Order Requiring Counsel for Jeffrey Prosser to

File a Statement Identifying the Respondents to his Motion for Evidentiary Hearing and

Supplement Thereto, providing:

> WHEREAS neither the Motion nor Supplement identify the Respondents in their captions; and
> WHEREAS the Amended Motion of Jeffrey Prosser, Adv. No. 10-3001, Doc. No. 43, lists the Respondents in its caption as "Toby Gerber, et al."; and
> WHEREAS this court's docket does not accurately reflect the parties who are respondents to the Motion and Supplement;
> IT IS ORDERED that counsel for Jeffrey Prosser file a statement on or before March 17, 2010, separately identifying (1) the Respondents to his Motion, Adv. Doc. No. 29, and (2) those additional Respondents listed in his Supplement, Adv. Doc. No. 30, so that the court can take appropriate steps to clarify the docket in this Adversary Proceeding.

*See* Adv. Doc. No. 56. In response to the March 9, 2010, Order, Jeffrey Prosser filed his

Statement Identifying Respondents to Motions for Evidentiary Hearing ("Statement"). *See* Adv.

Doc. No. 140. The Statement, filed on March 30, 2010, identifies neither Stewart nor Smyl. By

the time the Statement was filed, a trial on related issues, *see* discussion *infra*, had already taken

place on February 16, 2010, in the District Court before Judge Savage. At that trial, the facts

were extensively developed, and Stewart was called as a witness. Furthermore, even after

discovery and prior to the evidentiary hearing in this proceeding, Jeffrey Prosser did not seek to

add Stewart and Smyl as Respondents. Certainly, the failure to name Stewart and Smyl as Respondents was not due to a mistake concerning the proper party's identity.

However, as noted *supra*, serious allegations regarding the conduct of professionals whose retention was approved by this Court have been raised. Both Stewart and Smyl testified as witnesses in this proceeding, and Stewart is an officer of the court. Stewart and Smyl played large roles in events which led up to this evidentiary hearing, which are detailed, *infra*. In fact, a focal point of this proceeding is a payment, discussed in detail, *infra*, mistakenly authorized by Smyl and Stewart's subsequent failure to correct the error upon first receiving notice. However, even if Stewart and Smyl had been named as Respondents, we find referral is not warranted for the reasons stated herein.

Findings of Fact

Based on the allegations, a chronological recitation of the facts is helpful.

*Stelzer was called as a witness for the Exemptions Trial and was released as a witness on June 10, 2008.*

In June 2008, Stelzer was called as a witness by Trustee Springel during the first week of the Exemptions Trial. Hearing Transcript, at 31, 45. Stelzer testified as a fact witness in the Exemptions Trial on June 10, 2008, and was released with the consent of all counsel present.[18]

---

[18] "Since being excused from the Exemptions Trial on June 10, 2008, Stelzer has not testified at any hearing or trial before this Court, nor have any Respondents noticed his deposition." *See* Respondents' Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 245, at 34.

16

Upon leaving the courtroom, Stelzer was confronted by Mr. Weiss, who was, at the time, counsel for Mr. Prosser.[19] *See* Testimony of Lee, Hearing Transcript, at 45. A number of the Respondents in this proceeding either witnessed the incident between Weiss and Stelzer or were made aware of it shortly thereafter. Lee brought the matter to the Court's attention, and based on the facts recited at the time, all counsel were warned not to harass or intimidate witnesses. *Id.*

We credit the testimony of Trustee Springel, and Attorneys Lee, Stewart, and Gerber and find that Stelzer was intimidated by the confrontation. *See* Hearing Transcript, at 45 (Testimony of Lee), 233 (Testimony of Springel), 267,  279-80 (Testimony of Gerber), 371-72 (Testimony of Stewart).

*The Stelzers were served with deposition subpoenas in August 2008.*

Thereafter, on Friday, August 8, 2008, an email was sent from Robert Craig's office (also counsel for Jeffrey Prosser) indicating that subpoenas were being served on various third parties. *See* Testimony of Lee, Hearing Transcript, at 30, 132. Through this email, Lee was informed that Jeffrey Prosser's counsel intended to serve a deposition subpoena on Stelzer, whose testimony in the Exemptions Trial was complete, and his wife, Kathleen Stelzer, who had no involvement in the bankruptcy cases. *Id.* at 30, 132.[20] That evening, Lee called and left a message for Stelzer,

---

[19] Jeffrey Prosser is and has been represented by multiple attorneys throughout the bankruptcy cases. Mr. Weiss no longer represents him, however. Currently, Jeffrey Prosser is represented in his bankruptcy case by Robert Craig, Lawrence Schoenbach and Norman Abood. Jeffrey Prosser has several other counsel in actions pending in other courts, including, *inter alia*, Jeffrey Moorhead, who represents Mrs. Prosser in bankruptcy matters, and Alexander Angueira, who also represented John Raynor in a matter in the bankruptcy case.

[20] On August 8, 2008, Gerber also received notice from Craig's office of attempts to re-
(continued...)

17

informing him of the deposition subpoenas. *Id.* at 34.

On Saturday, August 9, 2008, Stelzer called Lee twice. *See* Hearing Transcript, at 32.[21] The first call was to inform Lee "that there were process servers outside of his door, that they had been leaving messages on his answering machine that, essentially, were suggesting he was obstructing justice and violating the law if he did not open the door and accept service of the subpoenas." Hearing Transcript, at 32. Although Stelzer contacted Lee for his assistance, Stelzer understood that Lee could not represent him but expressed that he did not know what to do. *Id.* at 32-33. Two men, both of whom were process servers and private investigators, served Stelzer and his wife with subpoenas: James Muller ("Muller") and James LaRiviere ("LaRiviere").[22] *See* Deposition Transcript of Muller, Adv. Doc. No. 199-6 (hereinafter "Deposition Transcript of Muller"), at 56, 108-09, 120-21; Deposition Transcript of LaRiviere, Adv. Doc. No. 199-5 (hereinafter "Deposition Transcript of LaRiviere"), at 9-10.[23] Stelzer called Lee again to inform

---

[20](...continued)
depose Stelzer. *See* Testimony of Gerber, Hearing Transcript, at 266.

[21] Smyl also received a call from Stelzer over that weekend informing him that he was served with process. *See* Testimony of Smyl, Hearing Transcript, at 307. Stelzer had Smyl's cell phone number as a contact for New ICC from the beginning of the case. *Id.* Although Stelzer was the personal valet for Jeffrey Prosser, New ICC was providing the payment for his services, and Smyl was the individual who informed Stelzer in October 2007 that payments would not continue. *Id.* at 307-08.

[22] LaRiviere, although the individual who confronted Stelzer with pages of his testimony from the trial transcript and did all the talking to Stelzer (see text, *infra*), is neither licensed to serve subpoenas in Florida nor is he a licensed investigator in that state. *See* Deposition Testimony of LaRiviere, at 13, 42, 48-49. "[Muller] was the local person who conducted the investigation." *Id.* at 42, 48-49.

[23] Muller testified that he left voicemail messages for the Stelzers identifying himself, notifying the Stelzers that he had subpoenas to serve, and stating that, if they failed to respond,

(continued...)

him that he had accepted service and then, on that same day, Lee received the following email

describing the circumstances surrounding service as Stelzer had described them to Lee in the

telephone conversation:

> From:        Kathleen & Arthur Stelzer [akstelzer@msn.com]
> Sent:        Saturday, August 09, 2008 2:39 PM
> To:          Lee, Jim
> Subject:     Saturday service of subpoena
> Jim:
> Process server & PI arrived 1:45 pm approx. Served Arthur & insisted on leaving
> Kathleen's also, based on both of us being domiciled at the same residence.
> Kathleen's is addressed to "Mrs Stelzer". Seems they don't have her first name.
> I'm deposed for 9:00 am Thursday Aug 14th @ Fox Rothschild, & Kathleen is at
> 11:30.
> Server was accompanied by Jim LaRiviere, who introduced himself as a private
> investigator. Business card company name is JGI Investigative Research Asset
> Protection, 1905 River Road, Maumee OH 43537. 419-891-3700. He did all the
> talking.
> Here's a few of the things he said: Wanted to make me aware of several things -
> came off as if he was neutral - said he knew I was a regular guy just caught in the
> middle. Said he had read both my original deposition taken in West Palm & the
> court proceedings from St. Thomas. "Sounds like you were doing your job as you
> were told. I know Jeffrey is a prick but that's the way it is. In the end you are
> going to get thrown under the bus by Vinson & Elkins & hung out to dry. If you
> think that Vinson & Elkins are going to admit to anything in the end, I'm here to
> tell you that's not going to happen."
> He said "I have something else to show you". Then he handed me 10 consecutive
> pages of my court transcript dated 6/10/08 . . . . Several lines are underlined in
> ink. He said you can look this over later.
> . . . .
> Then he made a lot of comments - I'm not remembering these in any particular
> order - but this is the gist of it.
> "You know of course that computer belonged to Mrs. Prosser.[24] Did you make a

---

[23](...continued)
they would be charged with obstruction of justice. *See* Deposition Transcript of Muller, at 114,
197, 199-200, 202-03.

[24] By way of background, at the Exemptions Trial, Arthur Stelzer testified that Jeffrey
Prosser directed him to erase the hard drive in both the laptop and desktop computers at the

(continued...)

copy of the hard drive, or did Vinson & Elkins? Somebody copied it - our IT guys can tell & do you a [sic] have another uncorrupted copy of it or does V & E? Did you get paid by V & E? Was it stolen? I think you can see where this is heading." I did not answer or respond. He suggested that it might be a good idea if I got my own personal attorney[25] because in the end you are going to be out there all alone. You don't think that Vinson & Elkins is going to help you in the end. Jim, I know this is repetition of the paragraph above, but he kept repeating this.

"Just my suggestion, but you might want to talk to Bob Craig [counsel for Mr. Prosser] about this & try to clean up this whole matter before it goes any further." Jim, I need to assure you again that this was a totally one-sided dialogue. I never said yes, no or nodded or shook my head. I just said it's a free world - you can talk all you want. He was very determined to have this speech with me. I was out there for 15 minutes & he talked all the time. I didn't see their car, but I have to assume that the process server & LaRiviere came together, so the PI could be guaranteed the opportunity to get in front of me to deliver his speech & hand me the pieces of transcript & to see how I might respond to the idea of making a deal with Craig. There's no other way he could have got to talk to me.

Kathleen is freaked out by this & the implications that this guy was making - insinuating that Arthur could be charged with theft & God knows what else they dream up. All they have to do is charge me & it's going to cost us tens of thousands of dollars in legal fees, because you know better than anyone that Jeffrey [Prosser] loves to file motions & would love to hurt me.[26,27]

---

[24](...continued)

Prossers' home in Palm Beach. See Exemptions Opinion, Case No. 06-30009, Doc. No. 2613, at 30. In the Exemptions Opinion, the Court found that "Mr. Prosser ordered the destruction of computer hard drives located at the Palm Beach Property in an effort to conceal information, records, and documents from the Trustees." Id. 29-35. This was one basis upon which the Court granted the motion for denial of Jeffrey Prosser's exemptions. Numerous other findings, unrelated to Stelzer and his testimony, were also made in support of denial of Jeffrey Prosser's exemptions.

[25] In fact, the day after serving the subpoena, the two men called and left messages for Stelzer encouraging him to meet with an attorney named Norman Abood. See Respondents' Exhibit 11; Testimony of Lee, Hearing Transcript, at 39. Norman Abood was counsel for Jeffrey Prosser.

[26] Lee was asked why he believed Stelzer chose to contact him regarding these events when Stelzer knew that Lee could not represent him. Hearing Transcript, at 33-34. Lee testified that it could have been the fact that Lee called Stelzer to advise him of the service of the deposition subpoenas or simply Lee's involvement in the case. See id. at 34. It is clear from the letter that Stelzer believes that Lee would understand ("know better than anyone") his

(continued...)

> Please don't leave me alone with this rattling around in my head - Kathleen & I
> feel lost in the middle of this.
> Arthur

*See* Respondents' Exhibit 8 (emphasis in original); Hearing Transcript, at 32-33. The email

clearly expresses the Stelzers' concern over the circumstances surrounding the service of the

subpoenas, most notably by the implication that Stelzer would need counsel to defend himself.

Further, Stelzer described the encounter as "extremely intimidating" such that he and his wife

were frightened. *See* Stelzer Deposition Transcript, Movant's Exhibit 5, at 125-27. In response to

Stelzer's phone call and description of events, Lee offered to identify a licensed Florida attorney

for the Stelzers. *See id.* at 125-27; Testimony of Lee, Hearing Transcript, at 57-58.

The involvement of Muller and LaRiviere was not limited to the service of the subpoenas

on the Stelzers.[28] Muller conducted surveillance of the Stelzers both at their home, and at times,

followed them to other locations. *See* Deposition Testimony of Muller, at 66-67. Muller's

surveillance began on or about August 1, 2008. *Id.* at 104. On a couple of occasions, both Muller

---

[26](...continued)
predicament due to Lee's familiarity with Jeffrey Prosser and the bankruptcy proceedings.

[27] In fact, Stelzer's predictions proved to be true. Jeffrey Prosser did sue Stelzer.
*See* discussion of Case No. 09-cv-00065 *infra*. Jeffrey Prosser also successfully sought to have
criminal charges filed against Stelzer by the West Palm Beach Police Department. Muller and
LaRiviere provided Detective Menitti with information to open an investigation into Stelzer.
*See* Deposition Transcript of Muller, at 133-35; Deposition Transcript of LaRiviere, at 70. The
charges were all dismissed. *See* discussion *infra*.

[28] Stelzer was asked what he discussed with counsel at V&E in the phone call he made
after being served: "Just about the encounter and the private detectives and that we were
frightened, being followed by private detectives. They were harassing me. I was getting phone
calls. They were at my door. They followed me the next day, the day after the service. One
approached me in a parking lot and scared me to death." *See* Transcript of 1/12/10 Deposition of
Stelzer, at 125-26.

and LaRiviere would drive to the Stelzers' residence to "check in, see what was going on, see if

[Stelzer] was home, see if there were any cars there that we may not have seen before . . . ." *Id.* at

105-06. LaRiviere was retained by counsel to Jeffrey Prosser to investigate Stelzer around late

July or beginning of August 2008 and concluded his work approximately a month later.

Deposition Testimony of LaRiviere, at 31-32. LaRiviere traveled to Florida for a couple of weeks

to assist Muller in his investigation. *Id.* at 49.[29]

On the morning of Sunday, August 10, 2008, Lee forwarded the email from Stelzer

describing service of the subpoenas and the Stelzers' concerns to Trustee Springel, Smyl,[30] and a

number of his colleagues at V&E, including Stewart, with the following message:

> All,
> I need to update you on developments with the Bob Craig subpoenas to the
> Stelzers. It is pure harassment and witnesses [sic] intimidation.
> Bob has hired a PI, who has threatened Arthur with criminal prosecution for
> stealing Dawn's hard drive, encouraged Arthur to speak with Bob Craig,
> attempted to have Arthur hire a lawyer on their recommendation, and is staking
> out their home and constantly calling them even today.
> [REDACTED FOR PRIVILEGE]
> Rich[ard London], let's confer first thing tomorrow.
> This has crossed the line.

*See* Respondents' Exhibit 13. Later that morning, Lee emailed Bob Craig (and copied several

V&E colleagues, including Stewart) regarding what Lee viewed to be harassment.

*See* Respondents' Exhibit 16. That email reads:

---

[29] Muller billed approximately $11,000 relating to his work on this matter at a rate of
$500 per day. *See* Deposition Testimony of Muller, at 84-85. LaRiviere billed approximately
$8,000 at the same per day rate. Deposition Testimony of LaRiviere, at 25.

[30] It was Lee's practice to include his client (Trustee Springel) and Smyl (representative of
A&M, financial advisor to his client) in emails to keep them informed of developments.
Testimony of Lee, Hearing Transcript, at 45-46.

At the end of last week you issued subpoenas to Arthur Stelzer and his wife, to which we will be objecting in due course.

In connection with the service of those subpoenas yesterday, the process server and private investigator who accompanied him used intimidation and the threat of criminal prosecution by the Prossers against Arthur. The private investigator, Jim LaRiviere[,] presented himself as working with you and sought to have Arthur speak to you in order to get himself out of his troubles. He also confronted Arthur with a transcript of his testimony during the Exemptions trial (presumably acquired from your offices or your co-counsel) and suggested that Arthur allow for LaRiviere to put him in touch with an attorney that LaRiviere knows who would assist Arthur.

In spite of having affected service of the deposition subpoenas on Saturday, LaRiviere and the process server, a Jim Miller [Muller],[31] are constantly calling and harassing the Stelzers, with LaRiviere encouraging Arthur to speak with a Norman Abood, an Ohio attorney, to represent him (smacks of barratry).[32]

Moreover, Mr. [Muller] has staked out the Stelzers['] residence and is sitting in their parking lot as I type this email. Having accomplished service, there can be no reason for this but harassment and intimidation. He was retained by your offices and you need to have him cease and desist immediately. In similar fashion, you need to have your PI back off.

Be assured that this matter will be promptly brought to the attention of the Bankruptcy Court.

Jim

Respondents' Exhibit 16, at V&E 02216-17.[33] Lee forwarded a copy of this email to Smyl,

Stewart, and Trustee Springel, among others. *Id.* at V&E 02216. Stewart forwarded the email

chain to Gerber on August 10, 2008. *Id.* at V&E 02215.

---

[31] Jim Miller was later identified as Jim Muller.

[32] Muller confirmed that he attempted to contact the Stelzers even after service was accomplished. *See* Deposition Transcript of Muller, at 124-26, 158-59.

[33] Mr. Craig responded that Mr. LaRiviere was to effect service but that he was not retained by his office. In addition, he stated that he did not know of a Mr. Miller, later identified as Jim Muller. Furthermore, he claimed to have no knowledge of any intimidation, harassment, or threat of criminal prosecution. Mr. Craig then identified Mr. Abood as an attorney working with Jeffrey Prosser. *See* Respondents' Exhibits 30 and 34 (email chains between Mr. Craig and Lee regarding the retention of Mr. LaRiviere and continued contact with the Stelzers after service was accomplished).

Based upon these emails, it is clear that contemporaneous in time with the events surrounding service of the subpoenas, Lee viewed the actions of Muller and LaRiviere as highly inappropriate and identified an ulterior purpose behind the deposition subpoenas. Lee confirmed this reaction in his testimony at the evidentiary hearing. *See* Testimony of Lee, Hearing Transcript, at 31, 44-45. Stewart's handwritten notes from August 10, 2008, also confirm that, in his opinion, the circumstances surrounding the service of the subpoenas were evidence of an intent to intimidate the Stelzers. *See* Respondents' Exhibit 12. Gerber, who was aware of the incident with Weiss following Stelzer's June 2008 testimony and familiar with the events that transpired during this case, also viewed the actions taken toward Stelzer to be a form of harassment. *See* Testimony of Gerber, Hearing Transcript, at 275-76.[34] We credit their testimony and find that they perceived the activities directed at the Stelzers to be a form of harassment.

Lee sent an email to Mr. Craig to the same effect. This finding is also supported by the content of emails between the Principal Actors. In addition, Stelzer reported his concerns to Lee both telephonically and by way of email. Stelzer's email was circulated by Lee to Smyl, Trustee

---

[34]

Q    What's it [Gerber's understanding of whether Stelzer has been harassed] based on?

A    It's based on the filings that Mr. Prosser made. It's based on the press releases that Mr. Prosser's attorneys issued. It's based upon Mr. Prosser's behavior with respect to other individuals. It's based on a lot of things really, and not based on things that other people have told me. It's based on my observations of Mr. Prosser's behavior.

Q    So, is it a way of getting back at Mr. Prosser, as opposed to helping Mr. Stelzer?

A    No. It's not a way. There's nothing to get back at Mr. Prosser. I don't hold any animosity towards Mr. Prosser. What I do is, I believe that Mr. Prosser is acting badly and trying to retaliate against Mr. Stelzer, and I believe Mr. Stelzer's not in a position to protect himself, so I offered to help out.

*See* Testimony of Gerber, Hearing Transcript, at 275-76.

Springel, and Stewart, among others. Respondents' Exhibit 13. Furthermore, the fact that

Kathleen Stelzer was served with a deposition subpoena despite the fact that she had no

involvement in the case led Lee to conclude that the subpoenas were for an ulterior purpose. See

Testimony of Lee, Hearing Transcript, at 31. We find that this stream of events at the time of

service of the subpoena in August 2008 led the Principal Actors to the reasonable conclusion that

Stelzer was being harassed and intimidated.[35] We note that no explanation has been offered as to

why "surveillance," or driving to the Stelzers' residence to "check in, see what was going on, see

if [Stelzer] was home, see if there were any cars there that [they] may not have seen before....", or

confronting Stelzer in the parking lot after the subpoena was served, was necessary before or

after service of a deposition subpoena. We find that the actions of Muller and LaRiviere were

intended to and did convince Stelzer that he was in need of legal counsel. We further find their

actions did harass and frighten the Stelzers.


*Lee identified a licensed Florida attorney (Battista) for the Stelzers in connection with the*

*subpoenas issued by a Florida court.*

Stelzer sought assistance from Lee, due to Lee's familiarity with Jeffrey Prosser and the

nature and circumstances of the bankruptcy cases, and stated that he did not know an attorney to

---

[35] Whether the process servers/private investigators, either independently or in
conjunction with or at the direction of counsel, harassed and intimidated a former witness is not
the matter currently before the Court. However, these, like the issues raised in Jeffrey Prosser's
Amended Motion for Evidentiary Hearing, are troubling allegations which call into question the
conduct of the private investigators and the counsel with whom they were associated.

contact. *See* Testimony of Lee, Hearing Transcript, at 57.[36] Lee recognized Stelzer's need for a licensed Florida attorney as the deposition subpoenas had issued from a Florida court and offered to identify counsel for Stelzer.[37] *See* Testimony of Lee, Hearing Transcript, at 57. Over the weekend that service was made, Lee was in contact with his litigation team to move to quash or for protective orders. *See* Testimony of Lee, Hearing Transcript, at 57. Smyl, who is from Florida, informed Lee that he would be able to recommend some attorneys he knew in the area. *Id.* at 58.

In the morning, on Monday, August 11, 2008, Lee met with Stewart regarding finding a referral for the Stelzers. Testimony of Lee, Hearing Transcript, at 59. Stewart recalled that another V&E partner, Paul Heath, was familiar with an attorney in the Miami area, with whom he had worked on another case and with whom he was impressed. *Id.* Paul Heath joined the conversation and recommended Battista, an attorney at the firm of GJB. *Id.* As promised, V&E

---

[36] Also at this time, Stelzer expressed concerns about his inability to afford representation. *Id.* This is consistent with the concerns he expressed in his email to Lee. Respondents' Exhibit 8.

[37] When serving the subpoena, LaRiviere also suggested that Stelzer was in need of counsel. When Muller was deposed, he recalled the conversation with Stelzer as follows:

A    . . . . I do remember when LaRiviere was talking to [Stelzer], that he was telling him that he needed to talk to somebody.

Q    All right. You have too many pronouns floating around there. If you could use proper names.

A    LaRiviere was telling Stelzer that in order to protect himself, it might be a good idea for him to, you know, contact somebody else.

Q    And your understanding was that Mr. LaRiviere wanted to, wanted Mr. Stelzer to contact Mr. Abood, is that correct?

. . . .

A    THE WITNESS: Yeah.

See Deposition Transcript of Muller, Adv. Doc. No. 199-6, at 185. We note that no one identified Abood to Stelzer as an attorney for Jeffrey Prosser.

did get back in touch with Stelzer regarding his request for assistance relating to the service of

the subpoenas, and he was informed that Battista would either contact him or that he should

contact Battista. *See* Transcript of 1/12/10 Deposition of Stelzer, at 127. We find that V&E

identified Battista (of GJB) as counsel for Stelzer in connection with the deposition subpoenas in

response to Stelzer's request for assistance.

<u>*Lee assured Battista that his legal fees would be paid.*</u>

On the morning of August 11, 2008, Stewart mentioned in passing to Lee the possibility

of seeking to have Battista appointed as special counsel to deal with the Stelzer subpoenas as an

expense of administration. Testimony of Lee, Hearing Transcript, at 151-52. Lee contacted

Battista that same day. *Id.* at 59. During that conversation, Lee assured Battista that his fees

would be paid, as Lee understood that "there's always a concern when you don't know the client,

and you're going to do a lot of work in a short period of time, that you're going to get paid. And

so, [Lee] wanted to assure Mr. Battista that in one form or another his legal fees would be

covered . . . ." *Id.* at 61; *see also id.* at 147. Lee describes the conversation with Battista regarding

fees as follows:

> A    I told Mr. Battista that there was no decision yet made as to who or how it
>      would be paid, but that we had considered possibly retaining them as
>      special counsel, and there were other matter -- I mean, other options that
>      were being discussed, but that at that point in time I did not have an
>      answer, but I will -- I assured him that Vinson & Elkins would backstop
>      their legal fees, meaning that Genovese's legal fees, while it was resolved
>      who or how the payments were going to be made. So, in other words,
>      don't worry, one way or the other if it comes down to Vinson & Elkins,
>      we'll backstop it if no one else pays it.
>
> Q    And what was the scope of the legal work you understood that assurance
>      would apply to when you spoke to Mr. Battista on Monday, August 11,

2008?

A    It would deal with the subpoenas that had been served on Mr. and Mrs. Stelzer, and to the extent that the deposition was not quashed and went forward, appearance at the deposition on behalf of those witnesses.

Hearing Transcript, at 61-62. Despite the fact that the idea of retaining Battista as special counsel was mentioned, "that concept dropped right out of the box[,]" meaning that by the time arrangements had been made to introduce Battista to Stelzer the idea had been abandoned:

> [B]ecause everybody envisioned that this was going to be a very short, matter of days exercise, and you couldn't even get the papers prepared, the motion filed, the matter before Her Honor in a timely fashion for a deposition set three days later. So, the concept was abandoned on a practical basis almost immediately before anybody thought further.

*Id.* at 153.[38] Lee's discussions regarding V&E's backstop assurance were never with Stelzer, only with Battista. *Id.* at 62.[39] Although Lee presumed that Battista would relay to Stelzer the fact that V&E committed to backstop the legal fees, Lee did not know what Battista would tell Stelzer. Testimony of Lee, Hearing Transcript, at 155.[40] We find that Lee, on behalf of V&E, assured Battista that his legal fees would be paid for his representation of the Stelzers in connection with

---

[38] The service of the subpoenas was made on August 9[, 2008] and they were returnable on Thursday, August 14[, 2008]. *See* Testimony of Stewart, Hearing Transcript, at 398. Therefore, the work done by Battista was needed on an immediate basis. *Id.*

[39] Lee's testimony is consistent with Stelzer's deposition testimony on January 12, 2010:

Q.    How did you come to the understanding, what led you to the understanding that you wouldn't have to pay for your attorney fees?

A.    Mr. Battista.

Q.    Did you ever confirm that with Mr. Lee or anyone from Vinson & Elkins?

A.    No.

Stelzer Deposition Transcript, Movant's Exhibit 5, at 128.

[40] "I would assume that [Battista] would at least convey that Vinson & Elkins is going to be there because I presume that Mr. Stelzer was concerned about hiring him and having to pay him directly. So, yes, I would presume he did that. And, yes, I would presume whatever Mr. Battista said was truthful." *See* Testimony of Lee, Hearing Transcript at 155.

28

the deposition subpoenas in August 2008.

_The Stelzers chose to retain Battista as their counsel and entered into an agreement with GJB._

After V&E identified Battista in response to Stelzer's request for assistance, Battista

emailed Lee confirming that the Stelzers chose to retain GJB as their counsel. _See_ Testimony of

Lee, Hearing Transcript at 60. We find that V&E did not hire Battista or make the decision that

the Stelzers would retain Battista. _Id._ at 60-61.

Mr. Battista's first contact with Stelzer was on August 11, 2008. _See_ Testimony of

Battista, Hearing Transcript, at 343. Subsequently, a written engagement was entered into by

GJB and the Stelzers. The letter was emailed by Battista to the Stelzers on August 12, 2008, and

signed by Battista using his "slash S slash signature." Respondents' Exhibit 35 (email with

Engagement Letter attached); Testimony of Battista, Hearing Transcript, at 342.  GJB's

engagement letter dated August 12, 2008, was signed by the Stelzers. Respondents' Exhibit 99

(Engagement Letter signed by Stelzers). The second page of the Engagement Letter provides the

following statement regarding payment:

> Even though our Firm requires a retainer for all new clients, we are willing to
> waive that requirement in this matter. We understand that Vinson & Elkins will
> attempt to have our fees and expenses paid through the bankruptcy estate of
> Innovative Communication Corporation. If they are not able to accomplish such
> payment through the bankruptcy estate, then we understand that they have agreed
> to pay our fees on your behalf.

_See_ Respondents' Exhibits 35 and 99. Included with the Engagement Letter were the "Standard

Terms and Conditions of Engagement" explaining that, despite the agreement of another party to

pay a client's legal fees, the "client remains primarily liable for payment of all fees and costs."

*Id.*

We credit Lee's testimony and find that, although Lee made the backstop assurance to Battista on behalf of V&E, the first he learned of the existence of a written engagement between GJB and the Stelzers was on January 12, 2010, and therefore he did not assist or provide input for the drafting of that agreement. *Id.* at 63-64. Upon reading the Engagement Letter in January 2010, Lee did not believe that it represented accurately the assurance that he provided on behalf of V&E to Battista:

> Q   Was that language consistent with your memory of any -- of what you had said to Mr. Battista on August 11, 2008 about the assurance that you gave?
> A   It was not.
> Q   How is it different?
> A   Well, it's different because it's an either/or statement as I read it, which is fees are going to either be paid through the bankruptcy estate or they're going to be paid by Vinson & Elkins. And I never had that discussion, nor did I represent that to Mr. Battista.
> Q   Okay. And is there, though, some commonality between the language in those two sentences and your recollection of anything that you had said in the assurance?
> A   Yes, there is.
> Q   What -- explain what that linkage is?
> A   Well, I had, as I mentioned a moment ago, when I initially spoke to Mr. Battista about possibly being retained on behalf of Mr. Stelzer, and wanted to give him assurance as to payment of his legal fees, I mentioned that under consideration – remember, this was a brand new issue, but under consideration was, among other things, could we apply to the estate and retain his firm as special counsel, and that other methods of payment were also being considered, but that ultimately if we couldn't come up with something I wanted him to understand that Vinson & Elkins would make sure he got paid.
> Q   Okay. Do you know if anyone else at Vinson & Elkins talked to Mr. Battista during August 2008 about the assurance you gave Mr. Battista about backstopping the legal fees?
> A   On that particular topic to my knowledge no one else had a discussion with Mr. Battista.

*See* Hearing Transcript, at 66-67. *See also*, Testimony of Lee, Hearing Transcript, at 150:

Q       So, is it your testimony that the way the retainer agreement is written is --
        reflects a misunderstanding, a mistake if you will, by Mr. Battista as to
        what you were telling him?
A       It is my belief that Mr. Battista, if he thought it was an either/or, which is
        how I read the language of that agreement, that, yes, it was a
        misunderstanding.
Q       A mistake?
A       Your term.
Q       Do you disagree with --
A       I've used misunderstanding, I believe, to Her Honor, and I give Mr.
        Battista the benefit of the doubt that it was a misunderstanding rather than
        a mistake. I'm sure he knew what he was putting in the agreement when he
        drafted it.
Q       Okay. So, by mistake you're making the distinction that he didn't write --
        he didn't reflect in the retainer agreement what he understood to be -- he
        didn't inaccurately reflect what he understood the agreement to be?
A       I'm not suggesting that Mr. Battista thought it was one thing and wrote
        another in his agreement. That's why I'm trying to make the distinction.

Battista explained why he drafted the Engagement Letter as he did:

Q       Let me direct your attention to Page 2 of that retainer letter and ask you if
        you can tell the Court, please, what that says.
A       Well, the second -- the first full paragraph discusses, of course, the
        payment of the fee and indicates, as I indicated, that the firm does require a
        retainer for all new clients, but we are willing to waive that requirement in
        this matter, and I describe what I understood to be the agreement by
        Vinson & Elkins to attempt to either have our fees paid through the
        bankruptcy estate, and by that, in my mind, I meant by becoming special
        counsel, and if that was not able to be done, then we understood that
        Vinson & Elkins had agreed to pay our fees.
Q       And that -- you drafted that as a result of your conversation with Mr. Lee.
A       I did, and I included those two -- I distilled our discussion -- my discussion
        with Mr. Lee down to those two options in the engagement letter to my
        client.

*See* Hearing Transcript, at 342-43. At the outset, however, Battista understood the unlikelihood

of being appointed as special counsel the same week the Engagement Letter was sent to the

31

Stelzers. *Id.* at 345.[41]

We find Lee's testimony to be credible. Despite the fact that Lee was the representative from V&E who assured Battista that he would receive payment for his legal services, we find that Lee did not discuss the payment of legal fees with the Stelzers or review the engagement letter and, in fact, did not know of its existence until January 2010. Furthermore, we find that the engagement letter reflected Battista's understanding of Lee's representations regarding payment on August 11, 2008. We find that the idea of appointing Battista as special counsel was short-lived, and Battista did not expect the estate to pay his legal fees despite the mention of that option on August 11, 2008.

*Stewart's discussions with Gerber regarding the perceived harassment and intimidation of Stelzer led to Gerber's commitment to contribute to payment of Battista's legal fees in connection with the deposition subpoenas in what ultimately became known as the "thirds arrangement."*

On Monday, August 11 and Thursday, August 13, 2008, Stewart spoke with Gerber about a variety of issues, including the events surrounding the service of subpoenas on the Stelzers. *See* Testimony of Stewart, Hearing Transcript, at 361-64; Exhibits 12 (Stewart's handwritten

---

[41] Battista testified, "[G]iven the tight time frame, I knew that it would be difficult for them to get that approval filed and obtained by the Court. There's always the possibility that you could seek approval later on and have a nunc pro tunc back to the original application, but in this case the initial fees and scope of work were relatively small, and so relatively shortly after sending the engagement letter I knew that the ICC estate was not going to pay our fees." *Id.*

In fact, in an email from Battista to his litigation partner on August 11, 2008, regarding the motion to quash deposition, Battista wrote "Vinson & Elkins will be paying our fees." Respondents' Exhibit 41.

notes) and 19 (Stewart's desk calendar). Stewart informed Gerber that Stelzer felt harassed and

that Stelzer "was concerned about his ability to defend himself regarding the subpoenas and that

[Stelzer] . . . didn't know of an attorney and didn't have the financial capability to afford an

attorney to respond to the subpoenas." Testimony of Gerber, Hearing Transcript, at 267. Stewart

also informed Gerber that V&E intended to defray costs in connection with the subpoenas, and

Stewart inquired as to whether F&J would be willing to assist. *Id.* at 268. Stewart further stated

his intent to discuss with Trustee Springel the possibility of additional assistance from A&M,[42]

and he proposed an agreement whereby each would pay one-third of the legal fees associated

with the subpoenas. *Id.*; *see also* 270-272 (testifying that it was his (Gerber's) understanding that

V&E agreed to "backstop", that is, guarantee, payment of Battista's legal fees but Stewart was

seeking assistance from F&J and would seek assistance from A&M also).[43] At this time, Gerber

personally committed to payment of a one-third share, as he stated he did not have the authority

to commit on behalf of F&J. *Id.* at 268. The agreement with Gerber was not conditioned upon the

participation of A&M in paying a one-third share, but it was assumed that Trustee Springel

---

[42] The testimony established that Stewart intended to, and later did, solicit Trustee Springel's participation in payment of Battista's legal fees, an obligation which Stewart's firm had already accepted on its own. Thus, Stewart sought his client's cooperation in the fee arrangement. The Court is troubled by such a request by counsel of his client, especially one appointed as a trustee in bankruptcy cases, and notes the inappropriate pressure placed on a client to comply with counsel's request.

[43] In order to understand the "thirds arrangement" (the agreement of V&E, A&M, and Gerber to share equally in payment of Battista's legal fees), the V&E agreement with Battista (the backstop assurance) must be understood. Testimony of Stewart, Hearing Transcript, at 365. Initially (at least during August 2008), Lee was the only one from V&E dealing with Battista as to V&E's assurance to backstop legal fees. *See* Testimony of Lee, Hearing Transcript at 67. However, Stewart was the "point person" with respect to the thirds arrangement. Testimony of Stewart, Hearing Transcript, at 365. The thirds arrangement developed independently of the backstop assurance. *Id.* at 365-66.

would commit to the thirds arrangement. Testimony of Stewart, Hearing Transcript, at 366.

Trustee Springel recalls that, in or around August 2008, he had general discussions with Stewart

regarding a willingness to contribute and share in the payment of GJB's fees with V&E.

*See* Testimony of Springel, Hearing Transcript, at 234-35. The thirds arrangement was discussed

more definitively between Stewart, Gerber, and Trustee Springel in September 2008. *See*

discussion *infra.*

During the week of August 11, 2008, Stewart also had a conversation with Guy Gebhardt

("Gebhardt") from the Office of the United States Trustee, informing him of the circumstances of

the service of the subpoenas on the Stelzers. *See* Testimony of Stewart, Hearing Transcript, at

374. At this time, Stewart informed Gebhardt that V&E assisted Stelzer in obtaining counsel and

that V&E was going to "stand good for the Battista firm fees as it related to the need to quash . . .

these subpoenas on behalf of Mr. Stelzer, because the Court had already released him as a

witness." *Id.* at 374-75. *See also* Respondents' Exhibit 44 (email sent by Stewart on August 13,

2008, to Trustee Springel, Smyl, and Lee noting that Stewart discussed matters relating to Stelzer

with Gebhardt). Stewart also informed the U.S. Trustee about the thirds arrangement in the time

period between August 2008 and September 2009. *See* Testimony of Stewart, Hearing

Transcript, at 377-78. *See also* note 61, *infra.*

We find that Gebhardt was informed that V&E committed to Battista that the V&E firm

would be responsible for payment of the fees associated with motions to quash or protective

orders relating to the subpoenas served on the Stelzers. We find that during the week of August

11, 2008, Stewart received a commitment from Gerber to assist in the payment of GJB's fees.

*A "de bene esse"*[44] *deposition notice was served on Stelzer after protective orders were granted relating to the deposition subpoenas served on August 9, 2008.*

Trial in Adversary Proceeding 07-3010 ("Turnover Proceeding") and three related adversary proceedings (consolidated for the purposes of discovery and trial) was scheduled to commence at the conclusion of the Exemptions Trial.[45] *See* Scheduling Order, Adv. No. 07-3010, Adv. Doc. No. 390. Despite the fact that Stelzer had been deposed in relation to the Turnover Proceeding in February 2008 and he testified and was excused as a witness in the Exemptions Trial in June 2008, in August 2008, Attorney Craig, counsel for Jeffrey Prosser, issued the subpoenas under discussion in the matter at bench and noticed the second deposition of Stelzer and the first deposition of Stelzer's wife. Both depositions were scheduled on August 14, 2008.

On August 13, 2008, Trustee Springel filed an Expedited Motion for Protective Order Regarding Jeff Prosser's Notices of Oral Deposition of Mr. and Ms. Stelzer in the Turnover Proceeding. *See* Adv. No. 07-3010, Adv. Doc. No. 425. At the hearing on August 19, 2008, counsel for Jeffrey Prosser withdrew the subpoena and notice of deposition of Mrs. Stelzer. *See* Protective Order dated 8/22/08, Adv. No. 07-3010, Adv. Doc. No. 467. On August 22, 2008, the Court granted the Expedited Motion for Protective Order as to Stelzer for failure to comply with Fed.R.Civ.P. 30(a)(2)(A)(ii), made applicable to adversary proceedings pursuant to

---

[44] "De bene esse" is defined as "conditionally allowed for the present; in anticipation of a future need." *See* BLACK'S LAW DICTIONARY (9th ed. 2009).

[45] The objections to exemptions were tried by the Court on June 9-12, 2008, August 25-28, 2008, September 8-9, 2008, and October 2-3, 2008. Trial in the Turnover Proceeding commenced in November 2008.

Fed.R.Bankr.P. 7030.[46] *See* Adv. No. 07-3010, Adv. Doc. No. 467.

On August 22, 2008, immediately after this Court granted protective orders regarding the depositions, Jeffrey Prosser's counsel immediately served another (i.e., a third) set of deposition notices in the Turnover Proceeding. *See* Testimony of Lee, Hearing Transcript, at 71. The deposition notices sought "de bene esse deposition testimony." *Id.* These deposition notices were served on the eve of the resumption of the Exemptions Trial, which was beginning its second week. *Id.* In response, Trustee Springel filed his Emergency Motion for Second Protective Order Regarding Jeff Prosser's Notice of Oral Deposition of Mr. Stelzer on August 22, 2008. *See* Adv. No. 07-3010, Adv. Doc. No. 476. To the extent that Battista would need to get involved, Lee understood that this most recent round of deposition notices would be covered by the backstop assurance he made to Battista. *See* Testimony of Lee, Hearing Transcript, at 71-72. The Emergency Motion for Second Protective Order was granted. *See* Adv. No. 07-3010, Adv. Doc. No. 525.

We find that V&E viewed the de bene esse deposition notices as simply a continuation of prior activity and intended the backstop assurance made to Battista as to the August 8, 2008, deposition subpoenas to apply to the newest round of deposition notices. *See* Hearing Transcript, at 71-72,167-69.

---

[46] Fed.R.Civ.P. 30(a)(2)(A)(ii) provides when a party must first obtain leave of court before a deposition may be taken:
(a) When a Deposition May Be Taken.
(2) With Leave. A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(2):
(A) if the parties have not stipulated to the deposition and:
(ii) the deponent has already been deposed in the case[.]

*As a witness at the resumption of the Exemptions Trial, Trustee Springel testified that he knew of*

*no agreements between himself or anyone in his employ and Stelzer.*

At issue herein is a portion of the August 27, 2008, testimony of Trustee Springel during

the Exemptions Trial.[47] Trustee Springel was asked whether he knew of agreements or

understandings between himself as the Chapter 11 Trustee, or the people working for him, and

Arthur Stelzer, among others:

Q     And, Mr. Springel, if you look at the top of Page 277 [of the August 27, 2008, Exemptions Trial transcript]. Are you there?
A     Yes.
Q     Let's go back to Page 276. I believe that's where you have the exchange with regard to Ms. Joseph [former executive secretary to Jeffrey Prosser at New ICC].
A     Yes.
Q     Okay. First on Line 14 on Page 276. Question.
      "Q With regard to -- well withdrawn. Is there any agreement verbal or written or understandings between Ms. Joseph and you as trustee of ICC for her to testify in this court?
      "A No, there is no agreement.
      . . . .
Q     Reading on Line 19.[Counsel reading from Exemptions Trial transcript:]
      "Q Is there any agreement whatsoever other than an employment agreement?
      "A There are no agreements.
      "Q And when I say you I'm talking about the broad you meaning you specifically and the people working under your direction or control.
      "A Right.
      "Q No agreements whatsoever?
      "A None at all.
      "Q What about Anthony Paul,[48] same question, any agreements understandings?

---

[47] Counsel for Jeffrey Prosser read a portion of Trustee Springel's Exemptions Trial testimony into the record at the evidentiary hearing in this proceeding. *See* Hearing Transcript, 242-46 (quoting Exemptions Trial testimony of Trustee Springel).

[48] Anthony Paul was the messenger at New ICC. *See* Exemptions Trial Transcript of 08/27/2008, Case No. 06-30009, Doc. No. 2096-2, at 271.

"A I think I just -- Mr. Lee, asked and answered -- Mr. Schoenbach, all
right fine.

"Q Nicholas Stokes,[49] any agreements or understandings?

"A No.

"Q No? Okay. The same question. What about Arthur Stelzer, any
agreements or understandings between you as trustee of Chapter -- I'm
sorry -- of ICC and Arthur Stelzer?

"A No.

"Q Now when I say you I'm referring to you specifically and you generally
meaning those people working in your employ or under your direction.

"A Right.

"Q You know of no agreements whatsoever?

"A Know of no agreements.

. . . .

Q      . . . . Do you recall those questions and answers?

A      Yes.

Q      Did yo[u] understand Mr. Schoenbach? Were those answers true when you
       gave them?

A      Yes.

Q      And at the time you gave them you knew that Vinson & Elkins had a
       payment arrangement for Mr. Stelzer's legal fees?

A      Again I was responding to whether there were any agreements with regard
       to the testimony that was given by Ms. Joseph and Mr. Stelzer in the June
       hearing.

Q      But you knew that Mr. Stokes had not testified whatsoever, correct?

. . . .

A      Mr. Stokes had not testified.

Q      And you knew that Mr. Paul had not testified in the exemptions trial,
       correct?

A      Yes.

Q      Okay. So you knew that the questions that immediately preceded the
       question about Mr. Stelzer, it didn't have anything to do with testimony
       did they because they hadn't testified?

A      They hadn't been called to testify, no.

Q      So you knew the questions didn't have anything to do with them testifying,
       correct?

A      I interpreted the question that Mr. Schoenbach asked to have to do with the
       testimony that was given in June and that Mr. Stelzer had already been
       released from testifying.

Q      And you certainly didn't offer any explanation that there was some

---

[49] Nicholas Stokes is the husband of Eling Joseph, Prosser's former executive secretary.
*See* Exemptions Trial Transcript of 08/27/2008, Case No. 06-30009, Doc. No. 2096-2, at 271.

38

agreement with regard to Mr. Stelzer's legal fees, right?

A     I did not.

Hearing Transcript, 242-46 (quoting Exemptions Trial testimony of Trustee Springel). Although Trustee Springel was asked questions about Mr. Stokes and Mr. Paul who did not testify at the Exemptions trial, he stated that he interpreted the questions relating to Ms. Joseph and Stelzer to relate to whether there were any agreements with regard to the testimony that was given in June during the first week of the Exemptions Trial. *Id.* at 246. In fact, Trustee Springel was specifically asked as to Ms. Joseph whether there was any agreement for her to testify in court and later questions referred back to that question. *See* Hearing Transcript, at 242. Thus, the questions were not models of clarity and we find that Trustee Springel's understanding of the question is reasonable.

Moreover, there has been no evidence presented of an agreement made by Trustee Springel, or people in his employ, or under his direction with Stelzer and we find there was no such agreement. At the time of his testimony, Trustee Springel was aware of the backstop assurance made by *V&E* to *Battista* for work done by the GJB firm for the Stelzers relating to the subpoenas that were served in August 2008. Testimony of Springel, Hearing Transcript, at 240-41. Further, Lee did not discuss the payment of legal fees with Stelzer, but with Battista alone. Hearing Transcript, at 67; *see also* Deposition Testimony of Stelzer, Movant's Exhibit 5, at 128. Therefore, regardless of the timing of the backstop assurance given by Lee or the subsequent development of the thirds arrangement (among Gerber, Trustee Springel, and Stewart), neither is evidence that Trustee Springel or anyone in his employ had an agreement *with Stelzer.* In August 2008, Lee was the only one from V&E dealing with Battista as to V&E's assurance to backstop

39

legal fees. *See* Testimony of Lee, Hearing Transcript at 67. That assurance was made by Lee, on

behalf of V&E, to Battista. Negotiated separately from the backstop assurance was the thirds

arrangement, of which Stewart was the "point person." Testimony of  Stewart, Hearing

Transcript, at 365. The thirds arrangement, which did not involve Lee, developed  independently

of the backstop assurance made by Lee to Battista. *Id.* at 365-66. Neither agreement was an

agreement with *Stelzer*.[50]

Movant placed much emphasis on the timing of the backstop assurance and the thirds

arrangement in relation to Trustee Springel's August 2008 testimony in his efforts to establish

that the Respondents' actions should lead to a criminal investigation for bribery and other

offenses. Trustee Springel, Stewart, and Gerber testified that the thirds arrangement was not

finalized with Trustee Springel until *after* his testimony at the Exemptions Trial. Trustee

Springel did agree to the thirds arrangement, but according to the three parties to the

arrangement, his commitment was slower to evolve as Trustee Springel was tending to another

matter in California at the time. Testimony of Stewart, Hearing Transcript, at 367. In September

2008, Trustee Springel recalls having a meeting with Stewart and Gerber in Pittsburgh before an

omnibus hearing, at which time he definitively committed to the thirds arrangement. Testimony

of Springel, Hearing Transcript, at 235. However, as of September 2008, Trustee Springel had

not decided whether the payment would be made personally or whether A&M would pay the

one-third share. *Id.* at 235-36. Ultimately, however, he determined that A&M would cover the

---

[50] Moreover, the engagement letter clearly states that ultimate responsibility for the payment of GJB's fees remained with Stelzer: "Sometimes another party to a transaction agrees to pay our client's legal fees. . .However, in such case our client remains primarily liable for payment of all fees and costs." *See* Respondents' Exhibit 99, at V&E_00637.

cost. *Id.* at 236.

Movant contends that Stewart's previous testimony regarding the timing of the thirds arrangement is inconsistent with his testimony in this proceeding and that the inconsistency is significant. On February 16, 2010, an evidentiary hearing raising many of the same questions addressed herein (but for a different purpose) was held by Judge Savage in a civil suit brought by Jeffrey Prosser against Arthur Stelzer. *See* discussion *infra.*[51] Although Stewart was not involved in that proceeding as a party or as counsel, pursuant to Judge Savage's February 8, 2010 Order scheduling a hearing on February 16, 2010, "all attorneys having knowledge of the facts raised in the motions shall attend the hearing and be available to testify[.]" *See* Case No. 09-cv-65, Doc. No. 38. Stewart testified before this Court that his recollection of the timing of the thirds arrangement was not clear at the time he testified in that proceeding before Judge Savage. Since that time, his recollection has been refreshed through discovery:

> Q    Okay. Now you may recall your testimony before Judge Savage on February 16, [2010,] your testimony about timing on the reaching of the thirds agreement was somewhat different from what you've just testified to.
>
> A    Well, it was, and I must admit the -- I compressed time in my response in Judge Savage's court on this topic saying I -- words to the effect that shortly after, within days after the weekend of August 9 and 10 --
>
> Q    Yes, sir.
>
> A    -- we had reached an accord on the -- on A&M and Toby Gerber participating, but after the hearing in Judge Savage's court -- and I must say, if I could, that -- I should say after the hearing in Judge Savage's court I've had an opportunity to go back and really look at the documents, the e-mails, my notes, and put it all in context. The hearing in Judge Savage's court, where I was called to testify, came up on such short notice. Apparent -- we're not involved in that case, but that Moorhead law -- or

---

[51] The motions before Judge Savage were Jeffrey Prosser's motion to disqualify Stelzer's counsel and his motion for waiver of conflicts hearing. *See* Case No. 09-cv-65, Doc. Nos. 31 and 33. Ultimately, both motions were denied. *See* Order, Case No. 09-cv-65, Doc. No. 57.

> Jeffrey Moorhead lawsuit in Judge Savage's court where Prosser versus Stelzer there had been a hearing of some nature. We're obviously not participants in it, before Judge Savage down in the Virgin Islands, and we were notified that Judge Savage, because of what had transpired at the hearing on a motion to disqualify, said everybody who knows anything about this needs to be in my courtroom in Philadelphia in ten days. At that time I was in Mexico with a -- we had a time share for a week. I got back on Friday night, and Sunday I came to your office in Philadelphia without the benefit of reviewing any of my notes, my calendars, my records, or my time sheets.

Q   And, in fact, they were still being gathered. Isn't that correct?

A   And that is correct. So --

Q   Okay.

A   -- that was just based entirely on recollection at that time.

Q   Okay, and is it fair to understand that your recollection has been somewhat refreshed since?

A   It has.

Q   Okay. All right. With regard to the thirds arrangement, did you document that agreement in any kind of formal way with Mr. Gerber, with potentially Mr. Springel?

A   There's some e-mail traffic --

Q   Okay.

A   -- but other than that --

Q   Right.

A   -- nothing more formal than that.

Q   Okay, and why not?

A   V&E was standing good for it.

Q   Right.

A   If they wanted to participate with us, because they were of a like mind in terms of the propriety in doing so, the wisdom in doing so, the desire to do so, that was fine by us.

Hearing Transcript, at 367-69.[52] *See also* 402-08. Despite Movant's contention to the contrary,

---

[52] Movant takes issue with Stewart's claim that he was unable to recollect details of the development of the thirds arrangement:

> A review of Mr. Stewart's billing records from February 1-16, 2010, the two weeks preceding the hearing before Judge Savage, shows that Mr. Stewart billed the ICC estate 56.50 hours for work just on Prosser's Motion for an Evidentiary Hearing. On February 15, 2010 alone (the day before the hearing), he billed 13.0 hours of which 6.5 hours are described specifically as "preparation for hearing in Judge Savage's court." The billings were filed by Mr. Stewart after the

(continued...)

we find the timing is not material. Trustee Springel did not make an agreement with Stelzer

regarding the payment of Battista's legal fees and neither did anyone in Trustee Springel's

employ. The retention agreement between Stelzer and his counsel, Battista, was drafted and

signed without the knowledge of Trustee Springel or his counsel. The Trustee's agreement,

arrived at separately and without Stelzer's involvement, was with Stewart at V&E. It involved an

arrangement for reimbursement to V&E. Rather, we find, as confirmed by the emails of the

---

[52](...continued)
May 24, 2010 hearing under a separate V&E billing category. See V&E Billing
Records, Doc 1726-3, Filed 06/04/10, Entered 06/04/10 17:16:14, Desc[ription]
Exhibit A-2, at Pages 8-15. Mr.Stewart's billing includes an average of two (2)
hours each day on this matter, i.e. the Motion for an Evidentiary Hearing, while
Mr. Stewart was "in Mexico."

See Jeffrey Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law,
Adv. Doc. No. 255, at 47. An entry of thirteen hours on February 16, 2010, (included in the fifty-
six and one-half hours) is comprised of early morning preparation and the entire day of the
hearing before Judge Savage and evening conferences. See Case No. 06-30008, Doc. No. 1726-3,
at 15. A number of the time entries include conference calls and meetings. Others simply report
work on Prosser litigation matters. At closing arguments, counsel for V&E argued that these
billing records are outside of the evidentiary record. See Closing Arguments, Adv. Doc. No. 26-
32, 40-42. Furthermore, the billing records, though filed after the evidentiary hearing, were not
sought by Movant in discovery. Stewart was not asked about and did not have an opportunity to
explain his time entries in his billing records. See id. at 28-29. Moreover, the fact that Stewart
was working on matters involving Adv. No. 10-3001 is not necessarily the same as the
preparation required for the hearing before Judge Savage.

No one has produced evidence to establish that while Stewart was away from his office
working on the Motion for Evidentiary Hearing that he was reviewing, or even had access to, his
emails and notes from 2008. His unrebutted testimony is that the records were still being
gathered prior to the hearing before Judge Savage. See Hearing Transcript, at 369. We find that
Stewart's inability to recall the specific timing of an event that occurred two years prior to his
testimony before Judge Savage, on short notice, in a case in which he was not involved, without
the benefit of his notes, calendars, and emails to refresh his recollection is plausible. In no way
do we condone the fact that he testified without having made that review or at least explaining
clearly to Judge Savage that he was unable to do a review. Such conduct by lead counsel to the
Trustee is, to be sure, a poor exercise of judgment. Nonetheless, we find the timing to be
irrelevant because there is no evidence of an agreement by Trustee Springel or his employees
with Stelzer.

43

Principal Actors at the time of the events, that the arrangement resulted from the "surveillance," method of service of the deposition subpoenas and related events that led to Stelzer's need for counsel *after* he had already completed his testimony during the trial.

*As a result of information provided by private investigators retained by Jeffrey Prosser's counsel, an investigation into Stelzer was commenced by a detective at the West Palm Beach Police Department.*

During September or October 2008, Lee was contacted by Battista to inform him of a new development relating to Stelzer. Testimony of Lee, Hearing Transcript, at 72-73. A detective by the name of Larry Menitti from the West Palm Beach Police Department contacted GJB indicating that Stelzer was the target of complaints filed by Jeffrey Prosser. *Id*. Jeffrey Prosser met with Detective Menitti at the police department where Prosser submitted a signed complaint against Stelzer. *See* Deposition Transcript of Prosser, Adv. Doc. No. 199-7 (hereinafter "Deposition Transcript of Prosser"), at 49-50. According to Muller, the investigation was commenced based upon information provided to the West Palm Beach Department by Muller and LaRiviere, who continued to check up on the status of the investigation:

Q      Okay. How many times did you talk with the police officer?
A      Well, Jim [LaRiviere] and I spoke with him together and then I spoke to
       him again I believe after LaRiviere left.
Q      The second time?
A      Yeah.
Q      Why did you have the follow-up conversation with Mr. Menitti?
A      Just to find out how his investigation was going.
Q      Okay. So to your understanding, based on the information that you shared
       with him, he began an investigation, he opened an investigation?
A      I believe so, yes.

44

*See* Deposition Transcript of Muller, at 133-34.[53]

The nature of Jeffrey Prosser's complaints related to matters which had arisen during the

bankruptcy proceedings, and Lee described the investigation as follows:

A We -- the way it was described to me it had to do with use of an American
Express credit card, and then there had previously -- you will recall from
Mr. Stelzer's e-mail of August 10th or 11th, I can't remember the exact
date, describing what he was confronted with involving the theft of Mrs.
Prosser's hard drive and other stuff. I knew that it had to do with those
activities.

Q Did that quickly become the subject of a motion to disqualify and possibly
other motion practice in the bankruptcy cases, as well?

A On -- at the beginning of the second week of trial testimony in the
exemptions matter the Prosser team filed a motion to disqualify against
me, that was August 25th, based on that activity.

*See* Hearing Transcript, at 73-74. Battista inquired as to whether the backstop assurance by V&E

would extend to GJB's involvement in this new matter on behalf of Stelzer. *Id.* at 73-75. Lee

confirmed with Stewart that V&E's previous assurance would apply to the fees relating to this

investigation by the West Palm Beach Police Department to the extent of representation

described by Battista at that point. *Id.* at 75, 169. Lee was specifically asked the extent to which

V&E committed to pay for Battista's legal fees as to this matter:

Q Okay. And then your firm agreed to cover the Battista firm's legal fees for
the -- related to the 2008 Mannetti [sic] investigation, correct?

A To a point.

Q Was there ever an e-mail sent by Vinson & Elkins that said -- that put a
cap on the fees that would be paid?

A It was done a little differently. Mr. Battista sent me an e-mail where he
approximated what the fees would be and then said of course if he gets
charged [with a criminal offense] it could be another matter. And we were
agreeing as I appreciated it only to what he had put in his e-mail.

---

[53] Abood also contacted Detective Menitti. *See* Deposition Transcript of Abood, Adv.
Doc. No. 199-1 (hereinafter "Deposition Transcript of Abood"), at 32-33.

*Id.* at 169.

We find that, based upon allegations made by Jeffrey Prosser, an investigation was commenced against Stelzer by the West Palm Beach Police Department. Later, the charges were all dismissed.[54] We further find that Lee represented to Battista that legal work done on behalf of Stelzer in connection with the investigation would be covered by V&E's backstop assurance.

*GJB's Invoices were sent to Lee at V&E, and both New ICC and V&E wrote out checks for payment of the invoices, resulting in duplicate payments to GJB.*

On October 25, 2008, Battista emailed Lee inquiring about additional costs and prior invoices. *See* Respondents' Exhibit 58. Two days later Lee responded that he had not yet seen any invoices from GJB. *Id.* Battista discovered that the invoices had been sent only to Stelzer, and Battista then emailed the August and September bills to Lee. *Id.* Lee forwarded the email chain to Stewart, Trustee Springel, and Smyl. *Id.* According to Lee, he forwarded the email to these individuals for two reasons. Hearing Transcript, at 80. First, he kept them apprised of virtually everything in the case. *Id.* Second, at this point in time, Lee was aware of "what had ultimately come to pass on the backstop agreement[,]" that is the development of the thirds arrangement. *Id.* Lee sent the invoices to Stewart, as the negotiator of the thirds arrangement and as he was the partner in charge and billing attorney on file. *Id.* At the time Lee forwarded the

---

[54] In Respondents' Proposed Findings of Fact and Conclusions of Law, Respondents note: "Nolle Prosse, filed April 16, 2010, *Florida v.* Stelzer, Case No. 2010CF003310AMB Div. 'U' in the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida . . . ." See Adv. Doc. No. 256, at 14, n.59. Black's Law Dictionary defines "nolle prosequi" as "[t]o abandon (a suit or prosecution); to have (a case) dismissed by a nolle prosequi . . . . Often shortened to nolle pros; nol-pros; nol-pro." *See* BLACK'S LAW DICTIONARY (9th ed. 2009).

invoices, he understood the thirds arrangement to be among V&E, A&M (negotiated through

Trustee Springel and Smyl[55]) and F&J (although it was actually Gerber, personally). *Id.* at 80-81.

Lee testified that his purpose in forwarding the email to Smyl and Trustee Springel was to keep

them informed and that he did not expect them to do anything with the invoices at that time. *Id.*

at 81. No one at V&E took any action with respect to the two invoices by late October or early

November 2008, and neither did Smyl or Trustee Springel at that time. *Id.*

On November 18, 2008, Battista sent Lee the latest bill for Stelzer and wrote, "Please let

me know if there are any updates on payment." Respondents' Exhibit 66. Upon receiving

invoices in an email from Battista in mid-November, Lee circulated the email in the same

manner that he circulated the previous email. Testimony of Lee, Hearing Transcript, at 81-82; *see*

*also* Respondents' Exhibit 60 (email string showing that Lee forwarded the email to Stewart,

Trustee Springel, and Smyl on November 18, 2008, the day it was received).[56]

When Smyl received the email with the attached invoices, he sent them to accounts

payable of New ICC for processing. *See* Respondents' Exhibit 60; Testimony of Smyl, Hearing

---

[55] Although Lee assumed Smyl was aware of the thirds arrangement, Smyl actually was
not a party to the negotiations, and it is apparent based upon a number of emails involving Smyl
that he was unaware of the thirds arrangement until early December 2008. *See* discussion *infra.*

[56] Trustee Springel recalls receiving the invoices in an email from Lee, but he took no
action as to these invoices "because . . . the agreement was that V&E would take care of
whatever the bill that was going to be paid and that we would be reimbursing V&E." *See*
Testimony of Springel, Hearing Transcript, at 237-38. Consistent with this understanding, on
December 17, 2008, a V&E check in the full amount of the invoices due at that time was sent to
GJB. *See infra.* It was Stewart's responsibility to solicit payment pursuant to the thirds
arrangement that he negotiated. *See* Hearing Transcript, at 83; Respondents' Exhibit 67.

Transcript, at 301, 319.[57] Smyl explained the circumstances surrounding his receipt of the

invoices and, ultimately, the payment made by New ICC:

> Q   Mr. Smyl, when you received Mr. Lee's e-mail on November 18, 2008, the
>     one in the middle here of Respondents' Exhibit 60, did you know what the
>     invoice, the attached invoice, from the Genovese firm was for?
> A   Yes.
> Q   Did anyone tell you on or before November 18, 2008 what you were
>     supposed to do with invoices from the Genovese firm?
> A   No.
> Q   Had you discussed with anyone, on or before November 18, 2008 what
>     you were supposed to do with any bills you might get from the Genovese
>     firm?
> A   No.
> Q   And on November 18, 2008 when you forwarded the invoice on to New
>     ICC, did you have any understanding regarding who was responsible for
>     paying invoices from the Genovese firm related to the Stelzers?
> A   No, it was not clear.[58]
> Q   So, Mr. Smyl, why did you send this invoice to be paid by New ICC?
> A   I don't know. It was a mistake. I apologize to everybody for that. I had a
>     lot of stuff that was going on at that time, and when I got the invoice I just
>     quickly forwarded it off to payables assuming that it was an appropriate or
>     legitimate estate expense.

*See* Hearing Transcript, at 302-03. Smyl did not notify Trustee Springel, Stewart, or Lee that he

forwarded the invoices to accounts payable, and that consequently a payment by New ICC would

be made. *See* Testimony of Smyl, Hearing Transcript, at 325-26. In fact, in December 2008**,**

---

[57] Movant has made much of the fact that Smyl was copied on Lee's emails with the attached GJB invoices as though this in and of itself is evidence that Lee sent the emails intending to have New ICC pay Battista's legal fees. The assertion is unsupported by the evidence. To the contrary, the evidence established that Lee regularly copied Smyl on emails.

[58] At that time, Smyl knew that the invoices were with regard to services for Stelzer, and Smyl testified that he was not aware of the thirds arrangement. Hearing Transcript, at 315-16, 319. Lee did not send instructions when he forwarded the email on November 18, 2008. *See* Testimony of Smyl, Hearing Transcript at 315; Respondents' Exhibit 60. However, Smyl did not attempt to contact Lee to inquire about the email. Testimony of Smyl, Hearing Transcript, at 316. According to Smyl, he wrongly assumed that he could forward the invoices to be entered into the accounts payable of New ICC and he did so.

48

Smyl continued to participate in email conversations regarding payment as though action still had

to be taken regarding payment of the GJB. *See id.* at 326; *see also* discussion *infra*. However, a

check dated November 25, 2008, was issued by New ICC in payment of the invoices.

*See* Testimony of Springel, Hearing Transcript, at 254. Smyl's authorization for payment by the

estate went unnoticed until January 2009. *See* discussion *infra.*

Lee was out of the office around the holiday, and when he returned, he started pressuring

Stewart about the status of payment to Battista. Testimony of Stewart, Hearing Transcript, at 382.

On December 3, 2008, Lee forwarded, for the second time, the email to Stewart, Springel, and

Smyl. Respondents' Exhibits 60 and 67. This time, he included the following message: "Just

following up on this. Where do we stand? What should I tell Paul [Battista]?" *See* Respondents'

Exhibit 67. Lee forwarded the email to Stewart because he understood that Battista still had not

been paid, and payment of the invoices was Stewart's responsibility. *See* Hearing Transcript, at

82-83. Lee forwarded it to Trustee Springel, his client, and Smyl, as the representative of his

client, for their information only. *Id.* at 83. Lee considered it to be Stewart's responsibility to

solicit payment pursuant to the thirds arrangement. *Id.* 83. On the same day that the email was

forwarded for a second time, Trustee Springel replied to all, "Jim - This is in Dan[] [Stewart's]

court to talk to Toby [Gerber]. A+M will pay a third." Respondents' Exhibit 67. Although Smyl

was a recipient of this email, he did not respond that he previously forwarded the invoices for

payment by New ICC. He did respond to the email on December 3, 2008, asking, "Who is

supposed to pay?" *See* Respondents' Exhibit 72. On December 8, 2008, Stewart responded to

Smyl's inquiry, "1/3 each from us [V&E], Stan [Springel] and Toby [Gerber]. I talked with Toby

late last week and he confirmed immediately that he is good for 1/3." *Id.* According to Smyl, this

was the first he learned of the thirds arrangement and he inquired further. Testimony of Smyl,

Hearing Transcript, at 304. In response to his inquiry, Smyl was informed that payment by the

estate would not be appropriate. *Id.* at 305.[59] According to Smyl, however, he did not recall at

this time in December what action he had taken with respect to the emails he received the

previous month with the GJB invoices attached. Testimony of Smyl, Hearing Transcript, at 305-

06.

On December 3, 2008, GJB received New ICC's check in payment of the invoices.

Battista, however, was unaware that the firm received this check in satisfaction of the invoices

and continued to contact Lee to seek payment. *See* Testimony of Battista, Hearing Transcript, at

346-48.[60] On December 8, 2008, Battista sent Lee another email inquiring about payment, which

---

[59] Smyl did question what benefit A&M would receive from payment of Battista's legal
fees and he believed that the true beneficiary was the estate. *See* Testimony of Smyl, Hearing
Transcript, at 322-23, 327. Therefore, it was Smyl's suggestion that New ICC pay Battista's legal
fees. *Id.* at 324. Trustee Springel recalled Smyl's inquiry and his response:

   Q      Did anyone from Alvarez & Marsal raise any question regarding who
          ought to be responsible for paying those invoices?

   A      Yes. I remember Byron Smyl sending me an invoice questioning whether
          this could be an estate charge and I told him in a phone call that, no, it
          could not be an estate charge, that the Genovese Firm was not representing
          the estate in any way and hadn't been hired by the estate.

*See* Testimony of Springel, Hearing Transcript, at 238. Moreover, regardless of whether Smyl
personally felt that payment by A&M was appropriate, it was not his decision. Trustee Springel
was confident that A&M would pay the fees as he requested. *See id.* at 253. Furthermore, if
A&M chose not to honor the thirds arrangement, that decision would not affect the independent
assurance made by V&E to Battista. Rather, A&M's failure to pay its one-third share would
simply result in V&E paying a two-thirds share.

[60] At GJB, Battista would not have received a copy of the check in his capacity as the
billing partner on this account. *Id.* at 353. Members of the Executive Committee, however,
receive a copy of checks and list of deposits either daily or every other day. *Id.* As Battista is a
member of that committee, he is a recipient of the list, but he reviews the list less than half the
time because he is not the managing partner and does not have administrative responsibility for

(continued...)

provides, in relevant part:

> Can you let me know what you have decided on the fees for the work that we have
> been doing for Arthur [Stelzer] in connection with the Prosser matter? The issue
> with the State Attorney is on hold for now, but could heat up. I think that is in a
> different category than the discovery disputes that we had in connection with the
> Prosser litigation. Please let me know.

Respondents' Exhibit 77. Lee responded that day that payment was in the works and should be

soon. *Id.* On December 12, 2008, Stewart (in a reply to Lee's December 3, 2008, email inquiring

about payment) emailed Lee, Trustee Springel, and Smyl: "I am processing. After we [V&E] cut

check and Jim [Lee] sends, I will let you [that is, Smyl and Trustee Springel for A&M] and Toby

[Gerber] know about your one-third shares." Respondents' Exhibit 80; *see also* Testimony of

Stewart, Hearing Transcript, at 385. Again, Smyl did not respond that on November 18, 2008, the

invoices had been forwarded to accounts payable. Testimony of Stewart, Hearing Transcript, at

385. Rather, Smyl responded to Stewart's email: "Who is paying? Us personally?" *See* Exhibit

82. In response, Stewart confirmed with "Yes...at this time." *Id.* In an email on December 13,

2008, directly from Trustee Springel to Smyl, the Trustee wrote, "Byron [Smyl] - I'm charging

this off against the project. There isn't any reason for us to pay personally in my view." *Id.*[61] That

---

[60](...continued)
the firm. *Id.* Furthermore, the report does not tie the checks received to the particular accounts
for which they are payment. *Id.*

[61] *See* Testimony of Springel, Hearing Transcript at 249-50:
Q     And you indicate in that email that you're charging this off against the
      project. There isn't any reason for us to pay personally in my view. That's
      what you wrote to Mr. Smyl?
A     Yes.
Q     The this you're talking about is the payment of the Stelzer legal fees to the
      Battista Firm, correct?
A     For the A&M portion of it, yes.

(continued...)

is, Trustee Springel confirmed to Smyl that A&M would pay the one-third share.

On December 17, 2008, a V&E check dated December 16, 2008, was sent to GJB in the amount of $13,197.17 in payment of the invoices. *See* Respondents' Exhibits 84 and 106, at V&E_00657; Testimony of Lee, Hearing Transcript, at 91. The check was issued despite the fact that a payment in that amount had been made in November 2008 by New ICC in satisfaction of the same invoices. *See* discussion *supra.*

The email traffic among the Principal Actors evidences, and we find, that Lee, Stewart, and Trustee Springel did not intend New ICC to make the November 25, 2008, payment to GJB. Furthermore, we find the testimony of these Principal Actors to be credible and find they were unaware that the payment had been made by New ICC on that date. As Battista continued to seek payment of the same invoices paid by New ICC, we find that he was unaware of New ICC's payment. Further, he did not send an invoice to New ICC. He sent it to Stelzer and V&E. Thus, the credible evidence establishes that he did not intend to seek an unauthorized payment from the

---

[61](...continued)

Q      And you're charging it off against the project, that's the ICC project, correct?

A      That would be the internal code for internal Alvarez & Marsal code for the ICC project.

Q      And you go on to say there isn't any reason for us to pay personally in my view, is that correct?

A      Yes.

Q      So you had decided at that point in time at least that we're going to charge it against the project because you didn't want to pay personally and you didn't want Mr. Smyl to pay personally?

A      That the firm would pay for it.

The statement that the one-third share would be charged off against the project referred to "the internal Alvarez & Marsal code for the ICC project." *See* Response of Chapter 11 Trustee Stan Springel and Alvarez & Marsal North America, LLC to Prosser's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 260, at 8-9. The purpose of the billing code was to ensure that A&M could properly account for its expenses. *Id.* at 9.

estate.

We further find that, at the time Smyl forwarded the invoices to New ICC's accounts payable, he did not recognize that his action would result in an unauthorized payment. Smyl never timely realized that the payment was not authorized. V&E intended to, and did, send a check from its own account, payable to GJB for the same invoices. Smyl, as a participant in the email conversations, did not attempt to stop V&E from making payment. Smyl should not have hurriedly approved payment of GJB's invoices as he did. Rather, he should have clarified the status with Lee, Stewart, or Trustee Springel as to the appropriate action to take. Nonetheless, he did not intend to cause New ICC to make an unauthorized payment. Furthermore, the amount was repaid when Smyl was made aware of the error. *See infra.*

*Lee and Stewart were informed of the payment made by New ICC to GJB in January 2009.*

Lee first learned that a check had been issued by New ICC to GJB during the first week of January 2009. Lee received a phone call from an employee in the accounting department of GJB, who informed him that, although GJB received the V&E check, the invoices related to that check had been cleared. *See* Testimony of Lee, Hearing Transcript, at 92-94. Lee was asked whether GJB should return the V&E check, and Lee responded that she should do so. *Id.* A few days later, Lee received a letter and enclosures from GJB. *Id.* at 94. The enclosures were the V&E check and a copy of the New ICC check. *Id.* The letter explained that the New ICC check paid the invoices. *Id.* This is the first Lee learned of the payment by New ICC to GJB. *Id.* At this point, he walked to Stewart's office, handed the letter to him, and asked if he knew about the payment. *Id.* at 95. As Stewart was the billing attorney, Lee turned the matter over to Stewart to

53

address:

Q    Okay. And why did you, for lack of a better term, hand that issue off to Mr. Stewart?

A    As I've been indicating, he was the billing attorney on the file, it was only he who could have authorized the check be cut in the first instance by Vinson & Elkins and placed into that accounting system, and he had been the individual who had, I said negotiated, entered the agreement, whatever the right term is, with Mr. Gerber and Mr. Springel, so I just assumed he was the right person to deal with that.

Q    Okay. And did he deny that he was?

A    No. He said, "I'll look into it."

Q    Okay. To your knowledge when were you next aware of what happened or did not happen with regard to that New ICC check?

A    The best I can remember the next I knew about what ultimately happened with that New ICC check was after Mr. Stelzer's deposition in January [2010] when Her Honor asked that I make some inquiries, and I went back and started digging. I asked Mr. Stewart. Mr. Stewart got accounting records pulled, etcetera, and then from there we discovered what had happened.

*Id.* at 95-96.[62] We find that Lee first learned of the payment by New ICC in January 2009 when

he received the letter from GJB's accounting department. Furthermore, we find Lee's testimony

credible that Stewart was the appropriate person to address the payment, and once Lee advised

---

[62] Lee took no other steps regarding this matter until the issue regarding payment of Stelzer's counsel's fees was raised in January 2010:

A    It was after January 12th. If you're asking me if in the time period immediately following receipt of the check in January of '09, if I'm aware of anyone taking steps to do that, no, I'm not --

Q    Did you take --

A    -- other than me asking, you know -- advising Mr. Stewart that somebody needs to look into this.

Q    And did you take any steps to follow up with Mr. Stewart after that initial contact?

A    Regrettably no, I did not. I had other matters on my plate and quite frankly I just forgot about it.

*See* Testimony of Lee, Hearing Transcript, at 196. The uncashed V&E check was cancelled. *See* Exhibit 106. Although Lee stated his regret for not following up on the New ICC payment, Lee reported the payment to Stewart, the billing attorney, who represented to Lee that he would handle the matter and who should have handled the matter.

54

Stewart of the New ICC check and provided him with the letter from GJB, Lee reasonably

concluded that the error would be corrected.

In January 2009, when Lee handed GJB's letter and the V&E check to Stewart, Stewart

gave the check to his secretary to send to accounting then telephoned Smyl to determine how it

came about that the New ICC check had been issued. *See* Testimony of Stewart, Hearing

Transcript, at 387, 413-14. Although Stewart left a message for Smyl, Stewart failed to follow up

with Smyl to inquire into the error and have it corrected. *Id.* at 413. Stewart's recollection of

events is consistent with Lee's recollection:

| Q | You heard Mr. Lee's testimony about receiving that letter and the attached V&E check that was being returned as well as a copy of the New ICC check. Is that correct? |
|---|---|
| A | I did hear that testimony. |
| Q | Is that testimony consistent with your recollection about how that happened? |
| A | Yes, it is. |
| Q | And he testified that he handed that off to you. Is that a fair -- |
| A | That's a fair -- |
| Q | -- understanding? |
| A | That's -- that's what happened. |
| Q | Mr. Stewart, what happened? |
| A | We were -- Jim [Lee] gave it to me, I recollect at my secretary's desk, looked at it, just did not focus on it, gave it -- it was a live check, gave it to my secretary thinking you know, go, you know, take care of the money. Put it in the  -- back in the account or have accounting cancel the check, and I need to call Byron [Smyl] and find out what the heck is going on here. |
| Q | Why did you need to call Byron [Smyl]? |
| A | Because there had been a check I saw issued by New ICC in November 25[, 2008] or in or about that time frame. |
| Q | Did you call him? |
| A | I think I called him and left a message. |
| Q | Are you sure? |
| A | Quite sure. |
| Q | Okay. What happened then on this topic? |
| A | I didn't get a return call that I remember, and it slipped through the cracks |

--
Q       How did that happen?
A       -- of my day.
Q       Yes --
A       I --
Q       -- how did that happen?
A       You know, I've turned it over in my mind a thousand times these last
        hundred days, but darn if I know. It's not like me, but it is what happened.
Q       Now you know --
A       When I got that, I must, for whatever reason -- it's clear today what
        happened, but at the time it never registered with me, and I wasn't focused
        and did not follow up.
        .

Testimony of Stewart, Hearing Transcript, at 386-88. Stewart further testified as follows

regarding the steps he took after the deposition of Stelzer in January 2010 when the issue of New

ICC's payment came up again and he realized that he had failed to take the appropriate steps in

response to GJB's letter in January 2009 to correct the payment made by New ICC:

A       Well, in January of this year [2010], after Judge Fitzgerald's directive to
        counsel to go check your records and let's really find out what happened,
        we did that, and we determined the facts as Mr. Lee described, and the
        oversight became apparent. The embarrassment was overwhelming. I
        called Mr. Gebhardt. Indeed talked to Mr. Gebhardt and his colleague, Ms.
        Resnick, told them what had happened. First thing they asked was have
        you put, you know, made it right? Have you put the money back? And the
        answer was yes, we had, because –- so that it must have been the 26th or
        the 27th when I called them. And I said, you know, I blew it, I messed up,
        and I can't explain why other than been too busy.
Q       Was it intentional Mr. Stewart?
A       It was absolutely not intentional. Again, I'm embarrassed about it. I'm
        embarrassed for having had all these people spend all this time. I'm
        embarrassed about Your Honor having had to rearrange your calendar and
        your schedule. I'm sorry we had to delay the discharge trial as a result. I
        think this was all on the eve of the February 1 discharge trial. But it is
        what it is.
Q       Was there ever any intent?
A       There was never any intent.
Q       Were [sic] New ICC to pay any portion of legal fees incurred for the
        matters that we talked about today?
A       The legal fees were undertaken to be paid by Vinson & Elkins and later by

56

Gerber & [sic] Alvarez on a sharing basis, period.

*Id.* at 389-90. Stewart acknowledged that correcting the mistaken payment was inadvertently overlooked when it was first brought to his attention by Lee in January 2009.[63]

We find**,** as he has conceded, that Stewart failed to take the proper steps once he was notified that an unauthorized payment was made by the estate. The failure to follow up, however, was unintentional.

*The Monthly Operating Report ("MOR") for November 2008 reflected New ICC's payment to GJB.*

On February 3, 2009, the Trustee's Monthly Operating Report ("MOR") for the month of November 2008 was filed on the docket of the New ICC bankruptcy case. Respondents' Exhibit 85. The New ICC check to GJB is listed in the November MOR as a line item. *Id.* at 14. Monthly Operating Reports ("MORs") are basically a summary of what the checkbook looked like in a given month. *See* Testimony of Lee, Hearing Transcript, at 120. MORs are prepared by the staff

---

[63] Jeffrey Prosser commenced a civil suit against Stelzer in District Court, and at a proceeding before Judge Savage regarding motions to disqualify counsel and waiver of conflicts hearing, *see* note 45, *supra*, Stewart testified that he "didn't realize that the disbursement had been made at [the time the New ICC check was issued]. I didn't realize the disbursement had been made until 2010." *See* Hearing Transcript, at 420 (testimony from Judge Savage's hearing read into the record). Stewart explained his prior testimony to this Court as follows:

> I said I did not realize the disbursement had been made until 2010. And that is, I think, accurate and consistent with what I've been saying here. That is there's no doubt having seen the discovery, which I did not have the ability to have seen prior to testifying in Judge Savage's court on almost zero notice or opportunity to review records, that it's clear I had notice of it. I did not realize, I did not focus on it, I did not in my use of the term, have knowledge of it until 2010 when Mr. Lee came back with the advice of what Judge Fitzgerald had directed and we looked at our records.

Hearing Transcript, at 421-22.

of New ICC. *See* Testimony of Stewart, Hearing Transcript, at 390. The MORs are forwarded to

V&E for filing, but V&E does not work on them as they are accounting reports. *Id.* at 391.[64]

Even though the payment should not have been made, because it was made, it was listed on the

MOR. *Id.* at 392.

Neither Lee nor Stewart was aware at the time the MOR was filed that the New ICC

check to GJB was listed. Testimony of Lee, Hearing Transcript, at 120; Testimony of Stewart,

Hearing Transcript, at 391. Although Trustee Springel's electronic signature was affixed to the

MOR, he testified that he did not personally review it:

> Q    And you knew at the time that that MOR was signed -- first of all, that
>       MOR was signed by you, correct?
> A    Electronic signature, yes.
> Q    Under penalty of perjury, correct?
> A    Yes.
> Q    And did you review that, whatsoever, before you allowed your electronic
>       signature to be affixed to it?
> A    No, I did not.
> Q    Is it your habit to have documents filed under your electronic signature
>       with no review by you, whatsoever?
> [Objection overruled]
> A    No, it would just depend on the document.
> Q    What about MORs, do you ever review them?
> A    In the case of the MORs, once the MOR system was set up in the early
>       parts of this case, which I reviewed first several months of them, then I
>       relied on my staff to complete them and to file and -- review and file
>       them.[65]

---

[64] Testimony of Stewart, Hearing Transcript, at 391 ("Well, [the MOR] is an accounting report. We're not the accountants for the estate. We don't –- part of our job description is not to audit or check the operating disbursements, the payroll account, the balancing of the checkbook, things of that nature. That's what the financial advisors and the accountants do, or the company's accounting staff under the supervision of the financial advisors do.")

[65] The Court notes its concern that the Trustee permits his signature, under penalty of perjury, to be affixed to a document filed with the Court without any review thereof. Had the

(continued...)

Testimony of Springel, Hearing Transcript, at 254-55.

The fact that the MOR included this information substantiates the Principal Actors' contention that the payment was, in fact, a mistake. The evidence supports the proposition that, had the Principal Actors' intent been to conceal the payment, it would not have been included in a publicly filed document.

### *Jeffrey Prosser commenced a civil suit against Stelzer in the fall 2009.*

In September 2009, Jeffrey Prosser commenced a civil lawsuit against Stelzer. Hearing Transcript, at 75.[66] Throughout the fall of 2009, Lee was not very involved in the New ICC case as he was actively working on another bankruptcy case. *See* Testimony of Lee, Hearing Transcript, at 76. Lee received an email from his secretary while he was on a call regarding the unrelated bankruptcy case informing him that Stelzer called. *Id.* Lee asked his colleague, Richard London ("London"), to return Stelzer's call. *Id.* Due to the other bankruptcy case, Lee did not have a discussion with Battista during the fall of 2009 regarding whether the backstop agreement

---

[65](...continued)
Trustee reviewed the MOR, this error would have been discovered, disclosed, and corrected. The Trustee will be ordered to personally review every operating report filed and to be filed in the three estates in which he serves as Trustee.

[66] The complaint was filed on September 17, 2009, commencing Case No. 09-cv-00065. The case was assigned to Judge Timothy J. Savage. Pursuant to the District Court's Order, dated September 24, 2010, the case was dismissed with prejudice based upon the settlement reached by the parties. *See* Case No. 09-cv-00065, Doc. No. 124. A Joint Stipulation of Dismissal with Prejudice was filed on September 24, 2010, providing that the parties "jointly stipulate to dismiss this case with prejudice, each party to bear their own fees and costs in this matter. In support of their Joint Stipulation of Dismissal, the Parties state that they have settled this action." *See* Case No. 09-cv-00065, at Doc. No. 125. A settlement was not docketed.

would apply to this new Stelzer issue as he had handed it over to London. *Id.* at 77.[67]

On September 28, 2009, Stewart and Trustee Springel had a conference call with

Gebhardt informing him that they were going to pay the fees of GJB for the lawsuit relating to

Stelzer as well. *See* Testimony of Stewart, Hearing Transcript, at 376-77; Exhibit 12, at V&E

02168 (Stewart's handwritten notes from 9/28/09).[68]

---

[67] Lee testified as follows:

| | |
|---|---|
| A | Okay. And then after that when I was involved in other matters the lawsuit was filed in September of '09 against Mr. Stelzer by Mr. Prosser. And as I told you I was not involved in those discussions. I was not involved in reaching the agreement. I later learned but had forgotten as I sat in this [January 12, 2010] deposition that I had been informed it was the same, a third, a third, a third in a cryptic email from Mr. Stewart that was like one line. I did not remember it at the time. I was refreshed when we went through the discovery. |
| Q | Well the fact of the matter is, Mr. Lee, that you knew about the Prosser v. Stelzer lawsuit in September 2009, correct? |
| A | I learned the suit had been filed. |
| Q | Mr. Stelzer actually called your firm about it didn't he? |
| A | He called for me. I never spoke to him. It was handled by Mr. London. But, yes, he called the firm. |

*See* Testimony of Lee, Hearing Transcript, at 215.

[68] Stewart spoke with Gebhardt on a number of occasions and did advise him of the thirds arrangement:

| | |
|---|---|
| Q | Were there any conversations involving Mr. Gebhardt where you discussed anything else about Mr. Stelzer that you can currently recall that happened between that August 11 week 2008 call and this late September, 2009 call? |
| A | I definitely -- I had -- because Mr. Gebhardt is the United States Trustee's representative assigned to the case, we have periodic discussions regarding administrative matters, [etcetera], and I definitely had advised him during this interim period, that is from August of '08 to September of '09, regarding the fact that along the way we had reached an accord or the one thirds arrangement, which, even though we were standing behind it all together and didn't -- it wasn't conditioned on it being a thirds, but nevertheless, because each of Mr. Gerber and Alvarez & Marsal had agreed to pick up one third of at least those initial fees of the Battista firm |

(continued...)

London forwarded the complaint and related documents to Battista on October 1, 2009.

Respondents' Exhibit 89. Battista forwarded them to Van Vliet, noting that V&E would be

responsible for the fees and expenses for representation of Stelzer in this matter as well. *Id.*; *see*

*also* Respondents' Exhibit 91 (email chain between Battista and Van Vliet).

We find that Lee's involvement in the Prosser case declined during the fall of 2009 as he

was handling matters in an unrelated bankruptcy case. During that time, London from V&E,

rather than Lee, was in contact with Battista. We find that V&E agreed to cover the legal fees for

representation of Stelzer in the civil suit filed against him by Jeffrey Prosser in the fall of 2009.

Furthermore, we find that the U.S. Trustee's Office was informed of the expanded scope of the

agreement to pay GJB's fees.

<u>Stelzer was deposed on January 12, 2010, in connection with the Discharge Proceedings.</u>

In December 2009, Jeffrey Prosser filed his Notice of Oral Deposition of Arthur Stelzer

in the Discharge Proceedings.[69] In response, the Plaintiff (Trustee Springel, RTFC, and Trustee

---

[68](...continued)
> relative to the summer and fall work in '08, I had had that interim
> discussion with Mr. Gebhardt.

Hearing Transcript, at 377-78. *See also* Testimony of Springel, Hearing Transcript, at 236;
Testimony of Gerber, Hearing Transcript, at 269.

[69] The Discharge Proceedings consist of four adversary proceedings. *See* Adv. Nos. 07-
3011, 07-3012, 08-3011, 08-3012. Two of the adversaries were commenced by the Chapter 11
Trustee, one in his capacity as the trustee of the bankruptcy estates of ICC-LLC and EmCom and
the other as the trustee for the bankruptcy estate of New ICC. Another adversary was commenced
by the Chapter 7 Trustee ("Trustee Carroll"). The final adversary was filed by the RTFC. The
adversaries are being tried together. Trial began in the Discharge Proceedings in February 2010
and is scheduled to resume and conclude January 30 through February 7, 2012. The resumption
of trial was on hold pending resolution of an appeal by Jeffrey Prosser.

Carroll) in each of the adversary proceedings objecting to Jeffrey Prosser's discharge filed in

their respective adversary proceeding an Emergency Motion for Protective Order Regarding Jeff

Prosser's Notice of Oral Deposition of Arthur Stelzer. On January 12, 2010, a deposition of

Stelzer was taken in the pending Discharge Proceedings.

At the deposition, Stelzer was asked several questions which resulted in this evidentiary

hearing. Counsel for Jeffrey Prosser inquired about Stelzer's previous testimony and about his

counsel:

> Q.    Mr. Stelzer, in any of the meetings that you had with the trustees, the other
>        parties to the case, their representatives, was there ever in your mind, any
>        understanding of a quid pro quo; in other words, you cooperate with them,
>        they'll cooperate with you?
> A.    No.
> Q.    When you were asked to testify, were you told that you would be
>        compensated for your testimony, for your time?
> A.    No.
> Q.    Were you compensated for your time?
> A.    No.
> . . . .
> Q.    Do you have a fee agreement with [your attorneys, Battista and Van
>        Vliet]?
> A.    Do I have a fee agreement with them?
> Q.    With your lawyers.
> A.    Yes.
> Q.    How much are you paying them per hour?
> A.    I don't know.

Stelzer Deposition Transcript, Movant's Exhibit 5, at 118-20. This led counsel for Jeffrey Prosser

to inquire as to who was paying Battista's legal fees:

> Q.    I'm talking about here today. Who is paying your legal fees for your legal
>        representation in this case? I don't care about some other case. Let me
>        make that clear. I'm asking about this case. Do you understand that?
> A.    Today?
> Q.    Today in this case and with regard to any involvement with the Prosser
>        bankruptcy, where anytime you have used an attorney relative to the

| | | Prosser or the corporate bankruptcies, my question to you is: Who paid for your lawyer? |
|---|---|---|
| | A. | My understanding is either, I used the word ICC, the entity, the company, or Vinson & Elkins. |
| | Q. | They're paying for your lawyer? |
| | A. | I didn't say that. I don't know whether it is the company or -- |
| | Q. | -- Vinson & Elkins? |
| | A. | I don't know, |
| | Q. | So to your understanding, just what you think, not what some document might say, I'm just asking you right now about what you think, okay? It is either the company or Vinson & Elkins that is paying for your lawyers relative to this case? |
| | A. | To the best of my knowledge. |
| | Q. | And that's true for not just today but whatever prior use you had of attorneys relative to this case and the Prosser bankruptcy, the ICC bankruptcies, is that correct? |
| | A. | I think that holds true. You just gave me a big balloon. |
| | Q. | Yes. It is a lot of different things, Let me ask you this, have you personally paid for any of your attorneys either for today or any of the prior proceedings in these cases? |
| | A. | No. |
| . . . . | | |
| | Q. | To the best of your knowledge, when was that arrangement made? The arrangement I'm talking about is the arrangement that either Vinson & Elkins or the ICC companies would pay for your lawyer or lawyers. |
| | A | When I was first served documents by a process server and a private investigator, I reached out. |
| | Q. | That would have been August of 2008, when you got served a subpoena? |
| | A. | I was served a subpoena, I believe -- |
| | Q. | -- from me? |
| | A. | From you. |
| | Q. | I'll represent to you that was about August of 2008. |
| | A. | okay. |
| | Q. | Who did you reach out to? |
| | A. | I reached out to the only people I had ever spoken to, Vinson & Elkins. |

*See* Movant's Exhibit 5, at 122-24 (Transcript of 1/12/10 Deposition). According to Stelzer, he came to the understanding that Battista's legal fees would be paid by V&E through a conversation with Battista, and he never confirmed that with V&E. *Id* at 128. Mr. Abood further inquired as to what was expected of Stelzer in exchange for payment of Battista's fees:

Q.      Okay. What is your understanding of what you're to do in exchange for
        them paying for your fees?
A.      Just --
Q.      -- provide testimony?
A.      Well, if I'm called for whatever, just to come tell the truth.
Q.      And provide testimony?
MS. VAN VLIET: Objection, asked and answered.
MR. LEE: Objection, mischaracterization of the witness's testimony.
MR. ABOOD: It is a different question.
MR. LEE: You're putting words in his mouth.
MR. ABOOD: I am. It is a leading question.
THE COURT: The witness's answer is that if he's called, he's to come and testify
and tell the truth. That's the answer to the question. Is there a new question?

*Id.* at 130-31. At the conclusion of the deposition, Mr. Abood sought clarification as to who was

paying Battista's legal fees:

BY MR. ABOOD:
Q.      What is your understanding as to who is paying your legal fees in that
        other case?
A.      The company or Vinson & Elkins.
MR. ABOOD: I have nothing further, your Honor.
MS. VAN VLIET: He'll read.
MR. ABOOD: Your Honor, at this point in time, I would ask for a representation
from Mr. Lee or Mr. McFaul as to who is paying Mr. Stelzer's legal fees.
MR. LEE: I'm not in a position to make such a representation because I don't
know.
MR. ABOOD: Mr. McFaul, do you know?
MR. McFAUL: No.
MR. ABOOD: Your Honor, without the necessity of formal written discovery, can
we have an understanding that the Court will expect that information be provided?
THE COURT: If the trustee can provide it. Mr. Lee, is there information that
indicates that your firm will somehow have access to who is paying the fee?
MR. LEE: I can make inquiry, your Honor. I'm willing to do that. I'll do whatever
the Court instructs.
THE COURT: All right. I'm instructing you to find out, to the best of your ability,
whether either the company, whoever that is, or Vinson & Elkins is paying Mr.
Stelzer's counsel.
. . . .
MR. ABOOD: Your Honor, given the testimony – and understand I'm just
reacting to it. It has all just come out, interestingly, for the first time. I would like
the Court to make an inquiry of Mr. Lee as to how it is that he doesn't know what

this legal fee arrangement is, given Mr. Stelzer's testimony that it was discussed with either him or Mr. London, and Mr. Lee is lead counsel on this for the debtor estates.

THE COURT: I don't have an understanding of that. Mr. Lee?

MR. LEE: That was not his testimony. His testimony with respect to me and Mr. London was that he made contact when he was being harassed by the investigators in the process of being served with the subpoena, and then we said that we would get back to him, and then Mr. Battista called him or he called Mr. Battista. That's independent of the arrangement on the fees, and I personally have not had any involvement in that, and I can't confirm or deny exactly what the witness said, and I don't intend to, unless I have made an investigation and can speak from fact.

THE COURT: Okay.

*Id.* at 141-42, 146-47. Accordingly, Lee sought the opportunity to inquire as opposed to answering the questions posed to him at the deposition for several reasons. First, Stelzer's deposition testimony in 2010 was inconsistent with Lee's understanding of his discussion with Battista in 2008 regarding payment of Battista's legal fees: "I could not respond to what Mr. Stelzer had described as being the arrangement because that was news to me. And that's why I said I need to go inquire. The first time I heard it was at that deposition." Testimony of Lee, Hearing Transcript, at 174. Lee further testified as follows regarding his understanding of the questions posed to him at Stelzer's deposition:

> Q    On Page 146 starting at Line 6 I ask the Court again to make an inquiry of you as to how it is that you don't know what the legal fee arrangement is given Mr. Stelzer's testimony that it was discussed with either him or Mr. London and Mr. Lee his lead counsel. The Court made an inquiry and you answered indicating that what you told him what we said -- I'm referring to line 21 -- and then we said that we would get back to him and then Mr. Battista called him or he called Mr. Battista. Do you see that?
>
> A    I see the excerpt that you read, yes.
>
> Q    Yes. Now that part, you're referring to August 2008, correct?
>
> A    Well --
>
> Q    That's what you're talking about there?
>
> A    No, that's not right.
>
> Q    Well isn't that when Mr. Stelzer called you and you told him you would get back to him --

A        Well --

Q        -- and then Mr. Battista called, correct?

A        But it's only partially right because there's a reference to Mr. London
         which tees off of what I believe to have been your mischaracterization that
         you didn't read that was in the lines before that. Because there were
         separate conversations with me at the time in August of '08 and then with
         Mr. London in September of '09. And they were being combined together
         here and you in fact represented, Your Honor, given the testimony it has
         all just come out interestingly for the first time and I'd like the Court to
         make an inquiry of Mr. Lee as to how it is that he doesn't know what this
         legal fee arrangement is given Mr. Stelzer's testimony that it was
         discussed with either him or Mr. London. And Mr. Lee is lead counsel.
         That was inaccurate. If you look at Page 128 Mr. Stelzer expressly says he
         never talked to anybody at V&E about the legal fees. So my response was
         that was not his testimony. His testimony with respect to me and Mr.
         London was that he had made contact and he was being harassed by the
         investigators in the process and being served and then we said we would
         get back to him, [etcetera]. That's all Mr. Stelzer testified to. And I then
         went on and said that's independent of the arrangement on the fees which
         is the conversations that had been between me and Mr. Stelzer and Mr.
         London and Mr. Stelzer. We never discussed these with him. And I said I
         had personally not had any involvement in that and I can't confirm or deny
         exactly what the witness said. Just like I testified a moment ago, when Mr.
         Stelzer testified it was either the company or it was Vinson & Elkins. I
         couldn't confirm what the witness said because I didn't know but it was
         contrary to my understanding.

Q        Well it wasn't contrary to your understanding because you knew in fact
         that ICC had paid.

. . . .

Q        Isn't that correct?

A        That is not correct because as I said --

. . . .

A        As I sat in this deposition on January the 12th of this year I had been under
         the mistaken impression that that matter had been rectified, number one
         and, number two, I knew that the agreement had never been for ICC to pay
         the fees. Number three -- I'm sorry.

. . . .

A        -- I had never heard of until this deposition on January the 12th, this either
         or arrangement of it with Vinson & Elkins or the company. So that was
         what I said. I can't therefore confirm or deny what the witness had said.
         That's exactly my language, I just read it to you.

Q        Well you said I personally have not had any involvement in that, right?

A        In that --

66

| Q | You used the word any, right? |
|---|---|
| A | Yes. |
| Q | And the fact of the matter is you had some involvement in the fee arrangement didn't you? |
| A | The fee arrangement I was asking because you skipped over from 141, but the fee arrangement that was under discussion was the <u>Prosser v. Stelzer</u> lawsuit and the deposition of January the 12th. You asked the predicate question. |
| Q | That's your interpretation. |
| . . . . | |
| A | That's my understanding at the time the question was posed. |

*Id.* at 209-13. As Lee was involved in an unrelated bankruptcy case when Prosser filed his civil

suit against Stelzer in 2009, Lee could not speak at the time of the 2010 deposition to whether the

agreement regarding fees, as he understood it back in 2008, applied to the Stelzer matters which

had developed since that time:

> THE COURT: I understand what the deposition transcript says. What I don't know is whether your answer today here on the stand --
> A    Okay.
> THE COURT: -- is related to that specific Prosser v. Stelzer lawsuit that you knew about the third, the third, and the third payment but you had forgotten or is it just a general answer that yes you knew generally that there was this agreement about the third, and the third, and the third but you had forgotten.
> A    No. I had known about the one in '08 but that as far as I was concerned had come and gone. There was apparently a new agreement reached after the lawsuit was filed against Mr. Prosser -- I mean against Mr. Stelzer by Mr. Prosser in September of '09. I had not been involved with that but I later learned that I had received a copy of an email or a response to an email that had said the same a third, a third, a third was going to apply.
> THE COURT: All right. Now I understand.
> A    But I did not recall that at the time of the deposition. So I'm just trying to say as I sat in this deposition and answered I had no recollection of that but I was refreshed when we did discovery and somebody showed me that email.

*See* Testimony of Lee, Hearing Transcript at 208-09.

We find that there was never any quid pro quo in connection with Stelzer's cooperation

with the Trustees or their representatives. Stelzer explicitly stated as much at the deposition.

When a direct question was posed to Stelzer as follows:

> Q.  Mr. Stelzer, in any of the meetings that you had with the trustees, the other
> parties to the case, their representatives, was there ever in your mind, any
> understanding of a quid pro quo; in other words, you cooperate with them,
> they'll cooperate with you?
> A.  No.
> Q.  When you were asked to testify, were you told that you would be
> compensated for your testimony, for your time?
> A.  No.
> Q.  Were you compensated for your time?
> A.  No.

Stelzer Deposition Transcript, Movant's Exhibit 5, at 118-19. The transcript of the deposition

does not establish an admission by Stelzer of a quid pro quo agreement with the Principal Actors.

Further, Stelzer confirmed that he never discussed the arrangement with anyone other than his

lawyer, Battista. Thus, although the record does not affirmatively show how Stelzer came to the

understanding that he should "come and tell the truth," the record clearly establishes that the

basis of his understanding was not from communications with any of the Respondents except his

counsel, Battista. Assuming, without deciding, that Battista was the source of Stelzer's

understanding, it is certainly within the professional obligation of an attorney to advise his client

that, if called as a witness, he must appear and tell the truth.

We find Stelzer's testimony was completed and he was released as a witness in June

2008, before the following events occurred: contact that Stelzer took as intimidation outside the

courtroom when he left the witness stand in June 2008; surveillance and service of the subpoenas

in August 2008; notice of de bene esse depositions shortly thereafter; investigation by the West

Palm Beach Police Department in 2009; and Jeffrey Prosser's civil suit against Stelzer in 2009.

We find that there is no way that the Principal Actors could have promised to pay for Stelzer's

counsel's fees in exchange for his testimony at trial, where Stelzer's need for counsel arose only

*after* his testimony was concluded and he was excused as a witness (with all counsel, including

Prosser's, agreeing) in June 2008.

We find that there was no quid pro quo offered to or accepted by Stelzer in exchange for

the payment of Battista's legal fees. Stelzer's understanding of his obligation to "come and tell

the truth" did not derive from any communication with any Respondent other than his legal

counsel because there was no such communication. Stelzer's testimony to that effect was

reinforced by Lee, Gerber, and Trustee Springel and we credit the testimony. *See* Hearing

Transcript, at 62, 242-46, at 265.

As to Lee's lack of a clear recollection of the details of the V&E backstop assurance (first

made in August 2008), the thirds arrangement negotiated by Stewart, the expanded scope of the

V&E backstop assurance as new matters arose, Lee's involvement in an unrelated case as matters

relating to Stelzer continued to develop, and the assumed reimbursement of estate funds, Lee

sought an opportunity to inquire before answering the questions posed to him. We found that to

have been a reasonable request and we granted that opportunity. Therefore, we draw no adverse

inference from the lack of recollection.

*The deposition of Stelzer resulted in an inquiry regarding payment of Battista's legal fees and*

*reimbursement to the estate.*

After the deposition, Lee commenced an inquiry regarding Stelzer's deposition testimony.

The day following the deposition, Lee emailed Stewart and copied other counsel at V&E, Smyl,

69

and Trustee Springel:

> Dan [Stewart],
> I have contacted Theresa [Van Vliet] for a copy of the retainer agreement.
> Regardless of what it provides, I have to report to the court re who is paying
> [Battista's] legal fees. This raises the question of whether any fees have been paid
> to date and, if so, by whom? I am copying Byron [Smyl] to see what he knows, as
> well.

Respondents' Exhibit 97, at A&M00012. Smyl responded that he was planning to pay A&M's

portion of the most recent invoices in the next couple of weeks, and Lee responded: "I assume

this means that no payment has been made to date? Please confirm and please do not do anything

pending further discussion." *Id.* at A&M00011. Smyl replied, "I have to check to see if we paid

the prior invoices. I remember asking for the payment but I can't say that I know for sure if

payment went out. I will confirm." *Id.*  According to Lee, he was asking these questions based

upon a statement made by Van Vliet at the deposition:

> A    Well, at Mr. Stelzer's deposition the day before, Ms. Van Vliet had
>      indicated that to her knowledge she wasn't sure that any of the legal fees
>      had been paid. I had been out of the loop on this matter for some time. My
>      involvement was back in that August/September/October time period of
>      '08, and this is January of '10. So, I obviously was trying to find out
>      whether or not there had been payments made and what the situation was.
>      At the time I had recollected that we had sent a check, but remember that I had
>      never heard whatever happened with that, and I quite frankly just wanted
>      to make sure that I asked everybody and didn't go on my own recollection,
>      and that's what I was trying to find out.
> Q    And when you had last talked to Mr. Stewart about the return of the V&E
>      check, and the receipt of the copy of the New ICC check, what had you
>      understood was supposed to happen?
> A    What I presumed was going to happen was is [sic] that Mr. Stewart was
>      going to take steps to reimburse that check because it was never intended
>      to have been paid by ICC.
> Q    But as of January 13, 2010, did you have any at least then current
>      recollection of ever having learned what had happened, in fact?
> A    I did not have such a recollection, which is why I was asking these
>      questions.

70

Testimony of Lee, Hearing Transcript, at 98-99.

After Stelzer's deposition, Lee also inquired as to GJB's engagement letter with Stelzer, which he did not know existed until that day. Hearing Transcript, at 63, 112, 217-218. *See also* discussion *supra*. After the deposition, Lee asked Van Vliet to send him a copy of GJB's retainer agreement with the Stelzers, and she did so on January 19, 2010. *Id.* at 113-114; Respondents' Exhibit 99. Lee did not want to make representations to the Court at the deposition regarding payment of Battista's fees, because he had been "out of this loop" for awhile and did not have a clear understanding as to the current status of the fee arrangement. *See* Testimony of Lee, Hearing Transcript, at 110-11.

On January 26, 2010, at the conclusion of Lee's inquiry and in response to Mr. Abood's email dated January 21, 2010, regarding "outstanding questions," among which were those related to Battista's legal fees, Lee replied to Mr. Abood and copied a number of parties, including the Court:

> Mr. Abood,
> Attached is a copy of the executed retainer agreement between the Stelzers and their counsel which I secured from Ms. Van Vliet following Mr. Stelzer's recent deposition. My inquiries reveal that neither New ICC, the Chapter 11 Trustee, or V&E had any involvement in the negotiation of the retainer agreement, nor were they aware of its specific terms until Mr. Stelzer's recent deposition and the subsequent receipt of the agreement. My inquiries further reveal that payment of the Stelzers' legal fees with respect to the matters referenced in this retainer agreement are made pursuant to an oral agreement between Vinson & Elkins, Alvarez & Marsal and Fulbright & Jaworski,[70] with each paying 1/3rd.
> Jim Lee

---

[70] Subsequently, the Court was informed that F&J was not a party to the thirds arrangement, but rather Gerber personally committed to the thirds arrangement. At the January 29, 2010, omnibus hearing, Gerber asked Mr. Greendyke (also counsel from F&J) to advise the Court that Gerber individually committed to the thirds arrangement, not F&J. *See* Testimony of Gerber, Hearing Transcript, at 292-93.

71

*See* Respondents' Exhibit 111. This email in response to "outstanding questions," attached a

copy of the retainer agreement (entered into between GJB and the Stelzers), addressed the thirds

arrangement (entered into by V&E, A&M, and Gerber separately), and did not address the fact

that initially New ICC made the payment that should have been made pursuant to V&E's

backstop assurance and the thirds arrangement. Lee testified as follows:

> Q   Okay. Let's go on to the next, the last sentence. My inquiries further reveal
> that payment of the Stelzer's legal fees with respect to the matters
> referenced in the retainer agreement are made pursuant to an oral
> agreement between V&E, Alvarez & Marsal, Fulbright & Jaworski, with
> each paying one third. Do you see that?
> A   I do see that.
> Q   In fact when you wrote that you knew that payment had in fact been made
> by New ICC of the whole bill, isn't that correct?
> A   At the time that I wrote this it had been corrected. I insisted --
> . . . .
> Q   Had it in fact been corrected as of January -- the date and time of your
> email?
> A   I was assured that it had been corrected or the check was in the mail if you
> will.
> Q   Okay. So you chose not to disclose to the Court that New ICC had made
> the payment, correct?
> A   Mr. Abood, this wasn't a disclosure to the Court, this was a response to
> your email that I provided a copy to Her Honor because she had wanted to
> see the retainer agreement and that's what I did. This was addressed to you
> in response to many questions you asked me.

*See* Testimony of Lee, Hearing Transcript at 220-22. On the date of Lee's email, he was

informed that reimbursement would be made that day. *See* Testimony of Lee, Hearing Transcript,

at 201.

   As a result of the questions raised at the deposition and Lee's subsequent inquiry, the fact

that reimbursement to New ICC had not been made was again brought to Stewart's attention for

the first time since his earlier message to Smyl regarding the letter from GJB explaining V&E's

72

duplicate payment. *See* Testimony of Stewart, Hearing Transcript, at 388-89. On January 25,

2010, a V&E employee, Kerri Curtis, sent an email to Stewart informing him that V&E issued a

check in the amount of $13,197.17 to Battista on December 16, 2008, and then cancelled the

check on January 14, 2009. *See* Respondents' Exhibit 105. Stewart responded, "OK....thanks.

Did we cancel it before mailing, etc.....I just don't recall. Does anyone recall?" *Id.* Kerri Curtis

replied:

> I found the original check. Looks like we did indeed mail it but that the
> Accounting Manager at Battista returned it to Jim Lee's attention with a letter
> dated 1/8/09. This letter states that it was previously paid by Innovative
> Communication Corp. and there is even a copy of the check issued by Innovative.
> Let me know if you need a copy of the letter or the check.

*Id.*; *See also* Respondents' Exhibit 106 (V&E's cancelled check). On January 26, 2010, a check

request was made by Stewart for a "rush" check payable to New ICC in the amount of $8,798.12.

*See* Respondents' Exhibits 109 and 112.[71] In order to expedite the process, V&E wrote a check

for a two-thirds share of the reimbursement, which included Gerber's one-third share. Testimony

of Lee, Hearing Transcript, at 201.[72]

---

[71] The box on the check request form indicating "charge client" is marked. However, V&E represented that the check does not appear in any fee application and the estate was not nor will it be charged for the amount of the check. *See* Respondents Vinson & Elkin LLP and James J. Lee's Response Brief to Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 263, at 11; Testimony of Stewart, Hearing Transcript, at 393. At closing arguments, Attorney Walker, counsel for V&E and Lee, stated, "Internally these things have to be charged somewhere, and that's exactly what they did. But it gets charged and then written off and it's never been reflected in a fee application. It would have been reflected, it was paid in January, it would have been reflected in the January fee application, the fee application for that period of time, which have already been filed with this Court. They are not, it is not reflected in there anywhere. It's not going to be." Transcript of Closing Arguments, Adv. Doc. No. 270, at 88-89.

[72] Gerber first became aware of the payment by New ICC after Stelzer was deposed in

(continued...)

After the January 12, 2010, deposition and the inquiry that resulted, Trustee Springel first became aware of the fact that New ICC made a payment to GJB for Battista's legal fees, and he instructed Smyl to fix the mistake. *See* Testimony of Springel, Hearing Transcript, at 238-39, 256, 262. On January 26, 2010, A&M wrote out a check in the amount of $4,399.06 to reimburse the estate for A&M's share of GJB's legal fees. *See* Respondents' Exhibit 110, at A&M00246. V&E reimbursed the rest, knowing that it would collect Gerber's share. A total of $13,197.18 was deposited to reimburse the estate on January 28, 2010. Respondents' Exhibit 110, at A&M00247. Reimbursement was made without interest.

On either January 26 or 27, 2010, Stewart and Trustee Springel contacted the U.S. Trustee's Office and spoke with Mr. Gebhardt and his colleague, Ms. Resnick, and informed them of the payment made by New ICC and of the reimbursement. *See* Testimony of Stewart, Hearing Transcript, at 389; Testimony of Springel, Hearing Transcript, at 262.[73]

---

[72](...continued)
January 2010, and during the first week of February 2010, Gerber wrote a check to V&E as reimbursement for V&E advancing his one-third share. *See* Testimony of Gerber, Hearing Transcript, at 269, 295.

[73] The Court, however, was not informed at this time of the payment made by New ICC in November 2008. Stewart believed he had an obligation to inform the U.S. Trustee, but he did not understand there to be a need to inform this Court:

> [A]s the Court had not authorized or been asked to authorize the employment. This was an administrative matter in the bankruptcy proceeding. [Stewart] called the administrative agency, which is charged with the supervision of administrative matters in bankruptcy cases to advise them of the foul-up. And they said just be sure you get the money put back in there. [Stewart] said it's already been done.

*See* Testimony of Stewart, Hearing Transcript, at 422.

Jeffrey Prosser contends that "[i]nforming the U.S. Trustee of their unilateral decision to pay Stelzer's legal fees is the essence of 'plausible deniability,' i.e., that one day, if called to account for their conduct, the Principal Actors could claim that they informed someone in apparent authority. The U.S. Trustee was in no legal position to approve or disapprove their

(continued...)

We find that, as a result of questions raised at the deposition of Stelzer and Lee's

subsequent inquiries, New ICC was reimbursed, without interest, for the payment Smyl caused to

be made in November 2008. We find that the U.S. Trustee's Office was contacted to inform its

personnel of the payment and subsequent reimbursement.

*Jeffrey Prosser filed a motion for evidentiary hearing in the District Court, and the matter was*

*referred to this Court.*

---

[73](...continued)
conduct. Only this Court had that authority." *See* Jeffrey J. Prosser's Post-Hearing Brief and
Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 255, at 12. Certainly, had the
Principal Actors intended to compensate GJB using estate funds, notice to and approval by the
U.S. Trustee would be insufficient authorization. We find the Principal Actors did not intend to
compensate GJB with estate funds. The fact that the Principal Actors notified the U.S. Trustee of
(1) the backstop assurance, (2) the thirds arrangement, and (3) the mistaken, and subsequently
reimbursed, payment was in recognition of the role of the U.S. Trustee:

> The primary role of the U.S. Trustee Program is to serve as the "watchdog over
> the bankruptcy process." As stated in the USTP Mission Statement:
>> The USTP Mission is to promote integrity and efficiency in the
>> nation's bankruptcy system by enforcing bankruptcy laws,
>> providing oversight of private trustees, and maintaining operational
>> excellence.

*See* http://www.justice.gov/ust/eo/ust_org/index.htm#FT1 (citing House Report No. 989, 95th
Cong., 2d Sess. at 88 (reprinted in 1978 U.S. Code Congressional & Admin. News at 5787,
5963, 6049) and USTP Mission Statement.

Furthermore, pursuant to 28 U.S.C. §586(a)(3)(F), the U.S. Trustee's duty to report to the
U.S. Attorney any conduct which might constitute a crime is even broader than that set forth in
18 U.S.C. §3057, requiring a judge, trustee, or receiver to report bankruptcy crimes or crimes
relating to insolvent debtors. The U.S. Trustee saw no need to report the matter. That being said,
we do not condone the decision not to inform this Court. Although the arrangement to
"backstop" GJB fees is collateral to the bankruptcy case, had V&E, Trustee Springel, or A&M
brought this to the attention of the Court, the entire matter could have been vetted and clarified
without the time, delay and expense associated with this Motion for Evidentiary Hearing.
Further, a report of New ICC's payment once it was discovered would have permitted a speedy
resolution of the error without calling into question the action of Smyl in issuing the payment or
the judgment of Stewart, who failed to take immediate steps in January 2009 to reimburse the
estate.

On January 26, 2010, counsel for Jeffrey Prosser filed a motion for evidentiary hearing in the District Court. *See* Case No. 10-cv-008, Doc. No. 3.[74] On January 29, 2010, the District Court entered an Order referring the matter to this Court. *See* 10-cv-08, Doc. No. 9.

At the January 29, 2010, omnibus hearing, upon review of the retention agreement entered into between the Stelzers and GJB, the Court inquired:

> THE COURT: Mr. Lee, there was something in the retention agreement that I do want to inquire about, and if you don't know the answer, that's fine, I'll give you an opportunity to find out this answer. But there was something in the agreement that indicated that there may be some request or some effort to have Innovative Communication, I don't think it was otherwise identified, pay these fees.
>
> MR. LEE: I think it might have even said the company. I'm not sure, Your Honor. I can tell you what I've been able to determine, and obviously this is, you know, reporting on hearsay. What apparently happened was is [sic] that Mr. Battista negotiated the agreement with Mr. and Mrs. Stelzer and Mr. Battista drafted the agreement with no input from anyone on behalf of the company, or the trustee, or us. And so, it was his misunderstanding, quite frankly, Your Honor, I believe that led to that language. I saw it when the agreement was produced, but that was not the agreement.
>
> THE COURT: All right. Well, I did go back to take a look at fee applications, and I could find nothing in any of the fee applications submitted so far that I could identify as having been reimbursing anything of Mr. Stelzer's fees. What I want to be sure is that there isn't some hidden thing in these fee applications that I can't identify that would somehow be a disbursement to Mr. Stelzer's counsel from these companies because obviously Mr. Battista and his firm are not retained counsel in these cases. So, I just want all parties who have filed fee applications to go back and review to be sure that in fact no part of the fee applications has involved a payment to a professional or to the trustees in the case that would somehow or other have been the result of payments out to Mr. Battista or his firm.
>
> MR. LEE: We will obviously undertake that exercise, Your Honor, but it's my understanding that there has been one invoice paid, and that that invoice was paid by the three parties identified --
>
> THE COURT: All right.
>
> THE COURT [sic]: -- which I now understand to have been – as I understand it, I think Vinson & Elkins paid a check for two-thirds, and I've since learned that that

---

[74] On January 28, 2010, counsel for Jeffrey Prosser also sent a letter to the U.S. Attorney's Office containing allegations of bribery and ethics violations. Hearing Transcript, at 122.

was to be reimbursed by Mr. Gerber personally, not by Fulbright. So – and as I understand it, consistent with what Ms. Van Vliet said, none of the other invoices has been processed. And the invoice that was processed was primarily with respect to the motion to quash, and those things occurred in August and thereabouts of '08.

THE COURT: Okay. I just want to be sure that no portion of the fees paid to anybody is as a result of that action.

MR. LEE: I think, again, it was just a misunderstanding by Mr. Battista when he drafted it. In fact, his office had sent invoices to the Stelzers, and we only learned several months later that they were unpaid because they had never been sent to us.

THE COURT: All right. Okay. I don't know. I know that's reviewing quite a few fee applications, but sometime between either the next omnibus or the one after that, if you can't get it done by February based on everything else that's going on in this case, I expect to have that report by March from everyone who has filed fee applications who was somehow or other involved in this agreement with Mr. Stelzer or Mr. Stelzer's counsel I think is the appropriate way to say it.

MR. LEE: And, Your Honor, I think it should be pretty easy, quite frankly, because I think the aggregate payment was something like thirteen, $14,000, so I think we can probably trace backwards from that to be able to do the exercise. I'm hoping it won't be that difficult.

Movant's Exhibit 10, Transcript of 1/29/10 Omnibus Hearing, at 81-84. At the Evidentiary

Hearing, counsel for Jeffrey Prosser sought additional explanation as to the representations Lee

made to the Court at the omnibus hearing:

| | |
|---|---|
| Q | And you answered indicating that you have been able to determine some things and you indicated in your answer on Page 81 starting at Line 3 what apparently happened is that Mr. Battista negotiated the agreement with Mr. and Mrs. Stelzer and Mr. Battista drafted the agreement with no input from anyone on behalf of the company or the trustee or us. Do you recall making that statement? |
| A | I see it here in the transcript. |
| Q | Okay. And the fact of the matter is that you did have input with Mr. Battista, isn't that correct? |
| A | Not with respect to the retainer agreement. |
| Q | With respect to a fee agreement? |
| A | I had indicated to him as I've testified that I told him we would back stop the fees. |
| Q | And you chose in making this answer to make a distinction between this -- you chose at the time you made this answer not to disclose to the Court that you had discussed this fee agreement with Mr. Battista, isn't that |

correct?

A I did not. I understood the Court's question to be that she had looked at the retainer agreement I had provided her with the email and she asked questions about the same language we had been talking about, the either/or, the company or Vinson & Elkins paying. And that's what I was trying to address and that's what I understood her to be asking.

Q You understood the Court to be concerned that the bankruptcy estates would somehow be paying the Battista Law Firm's fees, isn't that correct?

A What I understood the Court to be asking it goes on starting at Line 10 and continues is that she was concerned that there not be any fee splitting or fee sharing. And she talks specifically about having reviewed the fee applications that were submitted and instructing all of us who filed fee applications to go back and do a review. That's what I understood her to be asking.

Q And at the time you made these answers you knew that New ICC had in fact made the payment, we've established that, right?

A At the time did I know that the payment had been made and then corrected? I did.

Q And you didn't disclose that whatsoever to the Court did you?

A I did not raise that to Her Honor in this exchange because I didn't understand that to be the question. But what I did tell her is -- well actually she raised it as you can read in Line 4 and continuing on Page 82, about the third, a third, a third.

Q So it's your testimony that the Court's inquiry about the retainer agreement and the Court's inquiry about fee splitting had nothing to do with whether or not the bankruptcy estates had in some how, some way made payment on this account, is that correct?

. . . .

A Your Honor, again to try to be clear. There was never any intent to mislead the Court. In hindsight I so regret that I didn't stand up with banners and raise the fact that this mistake in payment had been made.

. . . .

A I don't want to be trite and use the term no harm, no foul, but it was a small amount of money that error had been  identified and corrected immediately and it was never the intent as demonstrated by among other things the fact we cut the check for the full amount. It was never the intent for the estate to pay. It was -- so that was not at the forefront of this in my mind. I was trying to respond to your inquiry after you and I both had just seen this retainer agreement and it was inconsistent with what I understood. I appreciated the Court's inquiry to be concerned about fee splitting which I was sensitive to. And we did in fact make the inquiries you asked us to and you had already begun. There was no intent to mislead. Do I regret not having said something? Absolutely. Was I

|   | intending to hide it? No. |
|---|---|
| Q | Well, Mr. Lee, in fact you were intending to hide it. |

. . . .

| Q | Mr. Lee, would you take a look at Line 24 on Page 81? |
|---|---|
| A | I'm there. |
| Q | Okay. That's your answer to the Court, correct? |
| A | To the inquiry about the fee applications. |
| Q | Okay. |
| A | Right. |
| Q | And you say, I quote, we will obviously undertake that exercise, Your Honor, but it's my understanding that there has been one invoice paid and that that invoice was paid by the three parties identified. Do you see that? |
| A | That's exactly right. |
| Q | That's exactly what you told the Court. |
| A | That is and then that -- |
| Q | And the fact of the matter is that that invoice was paid by New ICC, isn't that correct? |
| A | On the date that I made the statement that had been corrected. |
| Q | No, that's not my question, Mr. Lee. Answer my question please. |
| A | It was three invoices I've learned, not one. It was erroneously paid by ICC originally, that is correct. I have  said that repeatedly, Mr. Abood. I've never denied it. |
| Q | And so it's not correct to say that the invoice was paid by the three parties, correct? |
| A | As I stood there today on the 29th it had been rectified. And in my -- |

. . . .

| Q | In fact you knew that it had been paid by New ICC, you knew that after it got disclosed on January 12th that you took steps to get it repaid, and you weren't going to tell the Court -- you didn't tell the Court about that whatsoever did you? |
|---|---|
| A | At this point in time I did not inform the Court, only the U.S. Trustee's Office. |
| Q | And you agree that was a mistake in hindsight? |
| A | To inform the U.S. Trustee's Office? |
| Q | No, to not inform the Court? |
| A | I absolutely regret not having informed the Court. |
| Q | Do you agree that was a mistake? |
| A | Call it a mistake, call it an error, call it a blunder, call it poor judgment, I would agree to all of those. I wished I had. Believe me. |

Testimony of Lee, Hearing Transcript, at 224-29.

We find that Lee did not act with bad intent by not disclosing the payment by and

subsequent reimbursement of New ICC at the January 29, 2010, omnibus hearing.

Conclusions of Law

Based upon the foregoing, Movant asserts that reasonable grounds exist in support of a referral for investigation by the United States Attorney or the appropriate attorney disciplinary authority and sanctions should follow. *See* Jeffrey J. Prosser's Post-Hearing Brief, Adv. Doc. No. 264, at ¶¶2-3. This Court will not make such a referral lightly. We note that Movant suggests that the Court make certain leaps from the facts to assumptions which we will not make. On the other hand, the Principal Actors, while admitting a series of mistakes and oversights, assert that reimbursement has been made and the estate has been made whole. However, this is not a "no harm, no foul" situation. The reimbursement over a year later to the estate was without interest. An extraordinary amount of time has been spent by all parties involved and by this Court sorting out these facts. The apparent lack of attention to detail by Springel, Smyl and Stewart, in particular, evidences a lack of professional judgment and falls below the high standard of conduct required of a Trustee, his employees, and counsel. Although Smyl and Stewart were not named as Respondents, their conduct was truly the focal point of the evidentiary hearing, and we examined their testimony and the entire record.  Their involvement in the issues at bench have been fully examined and, as stated herein, from the credible evidence of record, we find that, the record is full and complete and even if they had been included as Respondents, referral is not warranted.

Despite being listed as Respondents to the Motion for Evidentiary Hearing, Jeffrey Prosser includes no basis in his Post-Hearing Brief and Proposed Findings of Fact and

Conclusions of Law in support of referral and/or sanctions against Battista, Van Vliet, or GJB.[75]

_____

[75] At closing arguments, Attorney Moscowitz noted this fact: "The movants [sic] here have asked for no finding of fact or conclusion of law implicating [GJB, Battista, or Van Vliet] in any wrongdoing. They haven't said that they should be sanctioned in any way and they weren't mentioned in this morning's presentation." *See* Closing Arguments, Adv. Doc. No. 270, at 61.

Initially, in his Motion for Evidentiary Hearing, Jeffrey Prosser alleged improper solicitation by GBJ of Stelzer as a potential client. *See* Adv. Doc. No. 29, at 32-33. Rule 7.3 provides:

> (a) A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted:
>
>> (1) is a lawyer; or
>> (2) has a family, close personal, or prior professional relationship with the lawyer.
>
> (b) A lawyer shall not solicit professional employment from a prospective client by written, recorded or electronic communication or by in-person, telephone or real-time electronic contact even when not otherwise prohibited by paragraph (a), if:
>
>> (1) the prospective client has made known to the lawyer a desire not to be solicited by the lawyer; or
>> (2) the solicitation involves coercion, duress or harassment.
>
> (c) Every written, recorded or electronic communication from a lawyer soliciting professional employment from a prospective client known to be in need of legal services in a particular matter shall include the words "Advertising Material" on the outside envelope, if any, and at the beginning and ending of any recorded or electronic communication, unless the recipient of the communication is a person specified in paragraphs (a)(1) or (a)(2).
>
> (d) Notwithstanding the prohibitions in paragraph (a), a lawyer may participate with a prepaid or group legal service plan operated by an organization not owned or directed by the lawyer that uses in-person or telephone contact to solicit memberships or subscriptions for the plan from persons who are not known to need legal services in a particular matter covered by the plan.

Based upon the circumstances described by Lee, Battista and Stelzer regarding the identification of GJB and ultimately the retention of GJB by the Stelzers, we find no violation of Rule 7.3. Furthermore, we note that, in Prosser's case filed against Stelzer in the District Court, Prosser filed a motion to disqualify GJB as counsel based upon alleged violation of Rule 7.3 and that motion was denied by Judge Savage. *See* Case No. 09-cv-00065, Doc. No. 57.

Also, in Movant's Evidentiary Hearing Brief filed prior to the evidentiary hearing, Jeffrey Prosser asserted that GJB was the recipient of an unlawful payment in violation of 18 U.S.C. §152(5). *See* Adv. Doc. No. 197, at ¶¶45-50. The section provides that "A person who knowingly

(continued...)

In reviewing the evidence, we find there is no reasonable grounds for referral of GJB or individual counsel from GJB. Furthermore, there is no evidence of sanctionable conduct by these three Respondents.

We turn now to the allegations made by Jeffrey Prosser to explain why no reasonable basis for referral exists.

### Bribery Allegations

Jeffrey Prosser asserts that a referral should be made pursuant to 18 U.S.C. §201(c)(2) and (3).[76] Those subsections provide:

> (c) Whoever--
> (2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;
> (3) directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom; shall be fined under this title or imprisoned for not more than two years, or both.

In his Proposed Conclusions of Law, Jeffrey Prosser asserts that Stelzer, as a fact or lay witness,

---

[75](...continued)
and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11 shall be fined under this title, imprisoned not more than 5 years, or both." We find no such intent or knowing and fraudulent receipt based upon the facts. The allegation is not repeated in Movant's Proposed Findings of Fact and Conclusions of Law.

[76] 18 U.S.C. § 201(c) is the "illegal gratuity" subsection of the bribery statute. *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999).

admitted that in return for payment of his legal fees by either the bankruptcy estate or V&E he

was to testify truthfully thereby violating 18 U.S.C. §201(c)(3). *See* Adv. Doc. No. 255, at 58.

Jeffrey Prosser correspondingly contends that Lee, Stewart, Gerber, and Trustee Springel offered

something of value (i.e., payment of his legal fees) to Stelzer "for or because of" his testimony in

violation of 18 U.S.C. §201(c)(2).[77] *See* Adv. Doc. No. 255, at 58-59.

With respect to 18 U.S.C. § 201(c)(2), we find there are no reasonable grounds to support

a referral on the allegations of bribery because there is no support for the assertion that Battista's

legal fees were paid "for or because of" Stelzer's testimony at the Exemptions Trial.[78]  The

record establishes the harassment and intimidation Stelzer faced at the hands of Movant and his

---

[77] With respect to the statutory scheme, 18 U.S.C. § 201(c)(2) focuses on the person
providing the benefit "for or because of" testimony whereas §201(c)(3) focuses on the person
receiving the benefit "for or because of" testimony.  In this case, the alleged recipient, Stelzer, is
not named as a Respondent in this proceeding. Nonetheless, we have considered the evidence
regarding §201(c)(3).

We note that Jeffrey Prosser separately filed a Motion for an Order of Referral to the
United States Attorney for Investigation of Perjury Committed by Arthur J. Stelzer and Cordell
Johnson, who was also a former employee of Prosser who testified at the Exemptions Trial. *See*
Case No. 06-30009, Doc. No. 2764. That motion was denied. *See* Case No. 06-30009, Doc. No.
2929. Prosser then filed a Motion for Reconsideration which was also denied. *See* Case No. 06-
30009, Doc. Nos. 2895 and 2979. The Memorandum Opinion and Order Denying Motion for
Reconsideration of the Order Denying the Motion to Refer Arthur J. Stelzer for Perjury was
appealed. *See* Doc. No. 2988. The appeal was dismissed "for Prosser's failure to file his
appellant's brief, or otherwise comply with this Court's Scheduling Order, in accordance with the
deadlines imposed by the Court." *See* District Court's 09/28/11 Order, Case No. 10-cv-107, Doc.
No. 6, at 16. The case is closed on the District Court's docket.

[78] Movant also asserts violations of aiding and abetting bribery pursuant to 18 U.S.C.
§2(a). *See* Motion for Evidentiary Hearing, Adv. Doc. No. 29, at 2. Without a basis to support
referral on the allegations of bribery, likewise there is no basis to support a referral on the
allegations of aiding and abetting bribery.

agents created an urgent situation for which Stelzer needed immediate legal counsel.[79]  LaRiviere

and Muller threatened to charge Stelzer with a variety of actions from obstruction of justice to

theft of "Dawn Prosser's computer" and then informed Stelzer that he needed an attorney. In fact,

the day after serving the subpoenas, the two investigators suggested that Stelzer call Norman

Abood. See, *supra*, note 25. We note that the Motion for Admission Pro Hac Vice filed by

Attorney Weiss on behalf of Norman Abood was not filed until August 12, 2008. Case No. 06-

30009, Doc. No. 1947. Therefore, Abood's involvement was not a matter of record at time of the

confrontation.

Under these circumstances, Stelzer reached out to Lee because of the confrontation with

the investigators and because of Lee's knowledge of both Jeffrey Prosser and the bankruptcy

cases.[80] Upon the recommendation of one of his colleagues, Lee identified a lawyer, Battista, in

response to Stelzer's request. Lee agreed to backstop the fees to allay any concerns Battista had

regarding compensation for the immediate work needed. We note also that Lee never spoke with

Stelzer about anything having to do with legal fees, that Stelzer's only discussions regarding

legal fees were with Battista, and that Stelzer's fee agreement with GJB stated that Stelzer was

ultimately responsible for all fees and expenses.[81]

---

[79] Indeed, the harassment began immediately upon Stelzer's leaving the courthouse after providing his testimony at the Exemptions Trial.  See, *supra*, at 15-16.  Then, despite the warning given by this Court to all parties not to harass any witnesses, Stelzer faced threatening confrontations from LaRiviere and Muller only two months later.

[80] "[Y]ou know better than anyone that Jeffrey [Prosser] loves to file motions & would love to hurt me.  Please don't leave me alone with this rattling around in my head." Respondents' Exhibit 8.

[81] See, *supra*, at 27-32.

Furthermore, to the extent it is alleged that the payment of legal fees was "for or because

of" any future testimony of Stelzer, including that which occurred on January 12, 2010, there is

similarly no support for that assertion. Stelzer was excused as a witness in the Exemptions Trial

with the consent of all counsel. Since being excused from the Exemptions Trial, Stelzer has not

testified in any proceeding before this Court. See, *supra*, note 18. Prior to that, Stelzer had been

deposed in February 2008 for purposes of the Turnover Proceeding. As provided in the Court's

Scheduling Order in the Turnover Proceeding, discovery obtained in that adversary proceeding

and in others was permitted to be used in pending or later filed adversary proceedings.[82]

Furthermore, in October 2008 the parties agreed that Stelzer's testimony from the Exemptions

Trial would be available for use in future proceedings.[83]  Thus, we find no possible motivation

for paying Battista's legal fees "for or because of" future testimony that Respondents could not

---

[82] *See* Scheduling Order Dated 07/08/08, Adv. No. 07-3010, Adv. Doc. No. 390. The same Scheduling Order was entered in several adversary proceedings.

[83] At the parties' suggestion, specifically as raised by counsel for Jeffrey Prosser at the omnibus hearing on October 22, 2008, an agreement was reached to permit the use of discovery obtained and testimony adduced in the Exemptions Trial in later proceedings to avoid unnecessary duplication. *See* Transcript of 10/22/08 Omnibus Hearing, Adv. No. 07-3011, Adv. Doc. No. 59, at 170-173. Scheduling Orders entered with the consent of all parties in the Discharge Proceedings provided:

> All discovery resulting from the bankruptcy cases related to these Adversary Proceedings (Case Nos. 06-30007, 06-30008, 06-30009, and 07-30012) (the "Bankruptcy Cases") or any closed or currently pending adversary proceeding stemming from the Bankruptcy Cases (together with the Bankruptcy Cases, the "Related Cases"), as well as any evidenced adduced at trial from the Related Cases, may be used in the Adversary Proceedings as if such discovery was conducted anew or such testimony was adduced at trial in these Adversary Proceedings.

*See*, *e.g.*, Adv. No. 07-3011, Adv. Doc. No. 79. Thus, Stelzer's June 2008 testimony, which was provided before any agreement to pay his legal fees, was available for the parties to use in other adversary proceedings. There is no support for the assumption that the Trustee and his counsel purchased Stelzer's availability.

have anticipated because they already had full access to his previous testimony. To the extent that

Stelzer testified in January of 2010 that he was to testify "truthfully," there is no evidence that he

was instructed to testify "truthfully" or any way by any of the Principal Actors. Inasmuch as

Stelzer's discussions were with his own attorney, there is no evidence of a quid pro quo.

As to 18 U.S.C. § 201(c)(3), we find that Stelzer did not seek or demand to have

Battista's fees paid on his behalf "for or because of" the testimony he had previously given or for

any other reason.  At no point in Stelzer's email to Lee on August 9th, nor on any other occasion

after that, did Stelzer ask Lee or anyone else to cover his legal fees.  *See* Respondents' Exhibit 8.

Subsequent to that email, Stelzer and Lee had no further communications regarding legal fees.

*See*, discussion, *supra.*  Again, we find that Stelzer was justified in reaching out to Lee because

he was frightened by the encounter with LaRiviere and Muller, who told him he urgently needed

counsel, and because he held a legitimate fear of civil litigation and criminal actions that could be

(and later were) filed against him by Jeffrey Prosser.[84]  Thus, referral is not warranted on the

basis of 18 U.S.C. § 201(c)(3).

We note that Stelzer came to Lee's attention because he was Prosser's valet, had

knowledge of Prosser's pre- and post-petition activities and testified at the Exemptions Trial.

However, there must be more than mere innuendo that, just because a person was a witness,

everything that happens when his witness status has concluded is "for or because of" his

testimony.  The Court finds insufficient evidence to establish a link between the payment of

---

[84] It is worth noting that, as discussed, *supra*, Stelzer's fears were eventually realized
when Prosser initiated criminal proceedings in Florida against him and also sued him in the U.S.
District Court of the Virgin Islands. *See* notes 27 and 66, *supra*.

Battista's legal fees and the testimony Stelzer provided at the Exemptions Trial and can find no

evidence of a bribery scheme.[85]  Moreover, there is nothing improper about a third party paying

legal fees for another person.[86]


*Allegations of Bankruptcy Fraud and Embezzlement*

Jeffrey Prosser also alleges that various Respondents have violated 18 U.S.C. §§152, 153,

---

[85] If anything, because Movant's actions made it necessary for Stelzer to immediately retain counsel, the instant situation is more analogous to a reimbursement for out-of-pocket expenses than receipt of a gratuitous payment by Stelzer. *Cf. Caldwell v. Cablevision Sys. Corp.*, 86 A.D.3d 46, 52 (N.Y. App. Div. 2011) ("Where a fact witness is compensated for losses, he or she does not stand to gain anything by giving testimony but, rather, is kept in the same position as if he or she had not been required to take the time to testify.") Stelzer would certainly sustain a "loss," i.e. payment of legal fees, without this agreement. He made and will make no profit from the arrangement by which V&E agreed to "backstop" Battista's legal fees and by which those fees are paid directly to GJB, not to Stelzer. By virtue of this agreement, Stelzer will be kept in the same financial position he was in before Jeffrey Prosser's counsel hired private investigators to "surveil" Stelzer and who suggested to Stelzer that he needed legal counsel, which Stelzer could not afford. The private investigators retained on Jeffrey Prosser's behalf went so far as to suggest that Stelzer contact Prosser's own counsel. Through a partner in his firm, Lee identified Battista as a lawyer who may be able to counsel Stelzer, but it was Stelzer who chose to retain GJB to represent his interests. Despite the backstop assurance, the fee agreement is clear that Stelzer is ultimately responsible for payment of Battista's fees. Therefore, at best, Stelzer will not face a "loss" in the form of out of pocket payments for legal fees occasioned solely by the conduct of Prosser's agents.

[86] Rule 1.8(f) of the Model Rules of Professional Conduct (adopted by the American Bar Association) provides:
> (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:
> (1) the client gives informed consent;
> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
> (3) information relating to representation of a client is protected as required by Rule 1.6.

As GJB is a firm located in Florida, we look to the Florida Rules of Professional Conduct, which set forth the same requirements. *See* Rule 4-1.8(f). *See also* note 90, *infra*.

and 157.

<u>18 U.S.C. §152</u>

Jeffrey Prosser cites to two subsections of 18 U.S.C. §152, which provide:

A person who--
(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any
money or property, remuneration, compensation, reward, advantage, or promise
thereof for acting or forbearing to act in any case under title 11;
(7) in a personal capacity or as an agent or officer of any person or corporation, in
contemplation of a case under title 11 by or against the person or any other person
or corporation, or with intent to defeat the provisions of title 11, knowingly and
fraudulently transfers or conceals any of his property or the property of such other
person or corporation;
shall be fined under this title, imprisoned not more than 5 years, or both.

Specifically, Jeffrey Prosser asserts that Lee, Stewart, Gerber, Trustee Springel, and Smyl

"knowingly and fraudulently" offered to pay Battista's legal fees for acting in this bankruptcy

case. *See* Jeffrey Prosser's Proposed Conclusions of Law, Adv. Doc. No. 255, at 59. As stated in

the bribery section, *supra*, we find no such quid pro quo as Movant alleges and therefore find no

basis for referral.

Further, Jeffrey Prosser contends that these same Principal Actors violated §152 by

"knowingly" transferring or concealing the payment of Battista's legal fees by the debtor's estate.

*See* Adv. Doc. No. 255, at 59. We find no evidence of knowing and fraudulent action by the

Principal Actors to transfer or conceal the New ICC payments. At the time Smyl forwarded the

GJB invoices for processing by New ICC, we find that the evidence does not support the

inference that Smyl fraudulently intended the estate to make an unauthorized payment, though he

knew GJB represented Stelzer and should have inquired as to whether the invoice was a proper

estate expense before taking action. Furthermore, upon learning of the New ICC payment, Lee

properly reported the matter to Stewart, who failed to follow up on the mistaken payment and reimbursement. While Stewart's lack of attention to this matter falls below the standard of professional conduct expected of someone in his position, it does not rise to the level of knowing and fraudulent conduct. Furthermore, the evidence substantiates the existence of the V&E backstop assurance and the thirds arrangement, indicating that the Principal Actors' intent was never to have the estate pay GJB's fees. The fact that the payment to GJB was a line item in an MOR filed on the public record is contrary to allegations of knowing and fraudulent concealment as is the report of the agreement and payment to the U.S. Trustee's Office. We find no basis for referral on these grounds.

<u>18 U.S.C. §153</u>

Section 153 of Title 18 prohibits embezzlement against the estate:

(a) Offense. A person described in subsection (b) who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both.

(b) Person to whom section applies. A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.

Jeffrey Prosser asserts that referral is warranted on the basis that Lee, Stewart, Trustee Springel, and Smyl "knowingly and fraudulently" transferred property of the estate in the amount of $13,197.17 in payment of Battista's legal fees. *See* Adv. Doc. No. 255, at 59. Only Smyl caused the payment by New ICC to GJB. For the reasons stated above with respect to 18 U.S.C. §152, the evidence does not support the existence of a knowing and intentional fraudulent transfer of

estate property, and referral is not warranted.

18 U.S.C. §157

The Amended Motion for Evidentiary Hearing also alleges bankruptcy fraud, a violation

of 18 U.S.C. §157, which provides:

> A person who, having devised or intending to devise a scheme or artifice to
> defraud and for the purpose of executing or concealing such a scheme or artifice
> or attempting to do so--
> (1) files a petition under title 11, including a fraudulent involuntary petition
> under section 303 of such title;
> (2) files a document in a proceeding under title 11; or
> (3) makes a false or fraudulent representation, claim, or promise concerning or
> in relation to a proceeding under title 11, at any time before or after the filing of
> the petition, or in relation to a proceeding falsely asserted to be pending under
> such title,
> shall be fined under this title, imprisoned not more than 5 years, or both.

Specifically, Jeffrey Prosser alleges bankruptcy fraud as "a scheme involving the apparent

bribery of a lay witness . . . ." *See* Adv. Doc. No. 43, at 12. As detailed, *supra*, we find no

evidence to substantiate the alleged scheme or bribery. Reasonable grounds for referral do not

exist.

18 U.S.C. §3057

As one of the bases for his Motion for Evidentiary hearing, Jeffrey Prosser alleges

violations of 18 U.S.C. §3057 for failure to report that reasonable grounds exist for a referral.

*See* Adv. Doc. No. 29, at 2. The statute provides:

> (a) Any judge, receiver, or trustee having reasonable grounds for believing that
> any violation under chapter 9 of this title or other laws of the United States
> relating to insolvent debtors, receiverships or reorganization plans has been
> committed, or that an investigation should be had in connection therewith, shall
> report to the appropriate United States attorney all the facts and circumstances of
> the case, the names of the witnesses and the offense or offenses believed to have
> been committed. Where one of such officers has made such report, the others need

90

not do so.

(b) The United States attorney thereupon shall inquire into the facts and report thereon to the judge and if it appears probable that any such offense has been committed, shall without delay, present the matter to the grand jury, unless upon inquiry and examination he decides that the ends of public justice do not require investigation or prosecution, in which case he shall report the facts to the Attorney General for his direction.

*See* 18 U.S.C. §3057. Section 3057 refers to violations under Chapter 9 of Title 18 (consisting of

§§151-158) and other laws relating to insolvent debtors, receiverships or reorganization plans.

For the reasons stated herein, this Court finds that no reasonable grounds exist to refer for

investigation of alleged bankruptcy crimes. Therefore, we find no violation of §3057 by any party

for failure to report to the United States Attorney. The U.S. Trustee notified the U.S. Attorney of

this matter at the request of this Court. Thus, the U.S. Trustee shall be ordered to report to the

U.S. Attorney that, upon the complete record, the Court finds no basis to refer under §3057.

Further, the U.S. Trustee shall provide the U.S. Attorney with a transcript of the May 24, 2010

evidentiary hearing and a copy of this Opinion and Order. Of course, the U.S. Attorney will react

as he deems fit.

### *Allegation of non-bankruptcy embezzlement*

Jeffrey Prosser also contends that referral of Lee, Stewart, Trustee Springel, and Smyl is

warranted pursuant to 18 U.S.C. §645, which provides:

Whoever, being a United States marshal, clerk, receiver, referee, trustee, or other officer of a United States court, or any deputy, assistant, or employee of any such officer, retains or converts to his own use or to the use of another or after demand by the party entitled thereto, unlawfully retains any money coming into his hands by virtue of his official relation, position or employment, is guilty of embezzlement and shall, where the offense is not otherwise punishable by enactment of Congress, be fined under this title or not more than double the value of the money so embezzled, whichever is greater, or imprisoned not more than ten

years, or both; but if the amount embezzled does not exceed $ 1,000, he shall be
fined under this title or imprisoned not more than one year, or both.
It shall not be a defense that the accused person had any interest in such moneys
or fund.

Jeffrey Prosser contends that the above-named Principal Actors are guilty of embezzlement

pursuant to this section. *See* Adv. Doc. No. 255, at 59.

As Smyl is the only Principal Actor who caused the transfer of funds out of the estate to

GJB, we address only his conduct as to this allegation. First, the statute applies to money coming

into the hands of an individual in his official capacity. Here, the estate funds were not in Smyl's

possession. Rather, his approval was given by email to another individual for the invoices to be

prepared for payment. *See* Respondents' Exhibit 60. Moreover, when Smyl forwards invoices to

be paid by the estate, he acts in accord with his duties as one of the operating managers who has

the authority to approve invoices for payment. *See* Testimony of Smyl, Hearing Transcript, at

300. Thus, in the normal course of business, Smyl authorizes numerous payments to be made by

the estates. In this instance, the GJB invoices should not have been approved for payment by

New ICC but that does not amount to embezzlement.[87] Upon notice of the error, the estate was

---

[87] Movant asserts that, by forwarding the invoices to Smyl, Lee must have intended that
Smyl would authorize payment by the estates:

Why would Mr. Lee send an e-mail to the paymaster of ICC with invoices for
payment unless he wanted and expected that payment to be made by ICC,
consistent with the retainer agreement. When you send a bill to a paymaster, you
expect it to get paid. If you don't want it to be paid, you say this is for your
information only, don't pay it.

*See* Closing Arguments, at 33. Movant identified Smyl as "paymaster" in his argument.
However, Smyl's involvement in these cases is not limited to authorizing payments. That is but
one of his functions. He also has executive oversight on all operations of the estates and
operating entities. Testimony of Smyl, Hearing Transcript, at 300. Contrary to Movant's
assertion, we find that it was not Lee's intent in forwarding the invoices to Smyl, among others,

(continued...)

92

reimbursed.  Thus, we do not find, on this record, anything other than a mistaken payment that was recovered when the error became known to Smyl.

Pursuant to 18 U.S.C. §645, the crime of embezzlement requires the retention or conversion of money, which comes into the hands of certain individuals by virtue of their employment, to the individual's own use or to the use of another. In this case, there was a disbursement of funds by Smyl, which he believed to be appropriate. For purposes of criminal law, conversion is defined as "[t]he wrongful possession or disposition of another's property as if it were one's own; an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." BLACK'S LAW DICTIONARY (9th ed. 2009). Although the estate was deprived of its property for a time by virtue of the mistaken payment, Smyl did not dispose of New ICC's property as if it were his own, and he did not willfully

---

[87](...continued)
that Smyl would then forward the invoices for payment by the estate. The evidence is to the contrary and we credit Lee's testimony as corroborated by other emails from Lee to the same recipients in this regard. Lee incorrectly assumed that Smyl knew of the thirds arrangement and he continued to seek payment by V&E after the payment by New ICC was made. Had Lee known that New ICC paid, there would have been no need for him to do so. The court's role is to reconcile the evidence when possible. The evidence supports Lee's testimony that he did not intend to have Smyl approve payment of the GJB invoices by the estate.

Furthermore, there is no explanation as to why Lee would expect Smyl to pay an invoice in an email from Lee. Smyl does not work for Lee; he works for Trustee Springel. Lee was responsible for communicating with his client and his client's representatives, and that is what he did. Consistent with Lee's testimony, Smyl was copied on a number of emails regarding Stelzer. There is no support for the assumption that by virtue of copying Smyl on the email with invoices attached that Lee intended Smyl to authorize payment by the estate. In hindsight, had Lee not merely assumed, without asking, that Smyl was aware of the thirds arrangement and had he included a message in the email stating that the invoices were for information only, then the payment by New ICC likely would not have been made. However, we must assess the facts as they were at the time, not through the lens of hindsight.

interfere with New ICC's property. He simply paid what appeared to be a bill owed by New ICC.

Moreover, upon learning of the error, the mistake was corrected and the estate was reimbursed.

We find that the evidence is insufficient to refer this action for criminal investigation.


   *Perjury Allegations*

   Based upon 18 U.S.C. §152(2), Jeffrey Prosser makes several allegations of perjury

against certain Principal Actors. Title 18 U.S.C. §152 provides as follows:

> A person who--
> (2) knowingly and fraudulently makes a false oath or account in or in relation to
> any case under title 11;
> shall be fined under this title, imprisoned not more than 5 years, or both.

   Jeffrey Prosser asserts that Trustee Springel perjured himself in August 2008 at the

Exemptions Trial when he testified that he knew of no agreements or understandings between

himself or his employees and Stelzer. We have found that there were no such agreements. The

backstop agreement in contention was made to Battista by Lee (on behalf of V&E), not to

Stelzer. Stelzer at no time confirmed with V&E that V&E would pay Battista's legal fees and

never mentioned A&M, Trustee Springel, or Gerber as those who would pay Battista's fees.

There is no evidence of record that Stelzer or GJB or Battista knew of the thirds arrangement.

Furthermore, the manner in which the agreement to pay Battista's legal fees was represented in

the engagement letter between GJB and the Stelzers was drafted by Battista without input from

V&E. The engagement letter makes no reference to Trustee Springel, A&M, or Gerber and GJB

did not look to any of those parties for payment. V&E was unaware of the engagement letter until

after the January 12, 2010, deposition of Stelzer. A&M was not involved in or party to V&E's

agreement with Battista and only became party to the thirds arrangement later. As to the thirds arrangement, it was an oral agreement between A&M, V&E, and Gerber that was independent of the backstop assurance. A&M and Gerber agreed to reimburse V&E in equal shares, but only V&E committed a payment to GJB. We find that referral for perjury is not warranted.

### _Subornation of Perjury_

Jeffrey Prosser asserts that Lee and Gerber should be referred for investigation for subornation of perjury related to Trustee Springel's August 27, 2008, testimony in the Exemptions Trial. Specifically, Movant contends that Lee and Gerber suborned perjury as they were present during the testimony of Trustee Springel, knew the Trustee's testimony to be false (when the Trustee testified that he had no agreement with Stelzer), and did nothing to correct the record. _See_ Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 255, at 59-60. We find that referral of Lee, who was present at trial on August 27, 2008, and Gerber, who was neither present nor participating by phone during Trustee Springel's Exemptions Trial testimony, is not warranted as there can be no subornation of perjury for failure to correct testimony that was not false. For the reasons stated above, we found Trustee Springel did not testify falsely and no reasonable grounds exist for referral of Trustee Springel for perjury.[88] Therefore, referral of Lee and Gerber is not warranted.

---

[88] The only evidence in the record that Mr. Gerber was present on August 27, 2008, is that he was registered to appear telephonically through the service provider, Court Call. "The testimony was and the evidence is, Mr. Gerber was not present in the court on August 27th. There's no evidence showing that Mr. Gerber was present in court or on Court Call or even knew what Mr. Springel testified to." _See_ Closing Arguments, Adv. Doc. No. 270, at 121. _See also id._ at 137-38:

MR. NEWMAN: -- I do not believe he was shown as present in the courtroom.
THE COURT: I can, I have to affirm that I call this Court Call list. I do not ask for

(continued...)

95

Furthermore, as we find referral is not warranted relating to Trustee Springel's August

2008 Exemptions Trial testimony, the timing of the thirds arrangement is immaterial. Regardless

of when the thirds arrangement was made, neither Trustee Springel, nor his employees, had an

agreement with Stelzer. Thus, we find referral is not warranted.

Jeffrey Prosser further contends that Smyl committed perjury by testifying that it was a

"mistake" for him to have forwarded the GJB invoices for the processing of payment by New

ICC when "it was Byron Smyl's specific intention to cause that payment to be made[.]"

*See* Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of

law, Adv. Doc. No. 255, at 60. We credit Smyl's testimony that he made a mistake. We find

Smyl's statement insufficient as a basis for referral.

Based upon Stewart's testimony before Judge Savage regarding the date Stewart became

aware of New ICC's payment to GJB, Prosser asserts that Stewart committed perjury before

Judge Savage and referral is therefore warranted. *See* Jeffrey J. Prosser's Post-Hearing Brief and

Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 255, at 61. In fact, Stewart

---

[88](...continued)
responses and many times all the people are not on the phone. If I call the Court
Call operator either before, during or after the hearing, and ask, for example, out
of my list of 30 is everyone on, I have very rarely, in fact, I'm not sure it's ever
happened, where everyone's been on. So, I don't know for a fact that he's been
on. His testimony was he was not.
MR. SCHOENBACH: Judge, I understand. His testimony wasn't, but the
transcript shows that he was. It's Page 7 of the August 27th, 2008 deposition
transcript.
THE COURT: Yes, it would show that, because I would have read the names of
people who signed up to be on Court Call.
*See also* Fulbright & Jaworski, L.L.P and Toby L. Gerber's Response to Jeffrey J.
Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc.
No. 262, at ¶¶ 15-17. We credit Gerber's testimony that he was not present.

testified consistently in this proceeding and in the matter before Judge Savage. He did not contest

that he first received notice of the New ICC payment to GJB in January 2009. He further

acknowledged that the only immediate step taken was to leave a message for Smyl. He conceded

that he then lost track of the matter until after the deposition of Stelzer in January 2010, when it

was once again brought to his attention. The fact is that Stewart recognized the need but did not

take the appropriate steps to reimburse the estate immediately. However, his failure to follow up

on the matter because he forgot about it until it was brought to his attention again in 2010, does

not equate to grounds for referral on allegations of perjury. We find no reasonable basis for

referral of Stewart based on his testimony before this Court or before Judge Savage.

<u>18 U.S.C. §1001</u>

Jeffrey Prosser asserts that certain Principal Actors violated 18 U.S.C. §1001 by making

fraudulent and false statements:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
>    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>    (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

> shall be fined under this title, imprisoned not more than 5 years . . . . If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

> (b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate [United States magistrate judge] in that proceeding.

*See* 18 U.S.C. §1001(a)-(b). Jeffrey Prosser asserts two violations pursuant to 18 U.S.C.

§1001. First, he contends that the statements made by Lee to the Court on January 12, 2010, and

January 26, 2010, were false, related to material issues of fact, and designed to mislead the Court.

*See* Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of

Law, Adv. Doc. No. 255, at 61. Jeffrey Prosser takes issue with three particular statements made

by Lee:

> (1) that Mr. Lee had no involvement in the arrangement of the [Battista] legal
> fees;
> (2) that V&E had no involvement in the negotiation of retainer agreement
> for Battista's legal fees; and
> (3) that payment of Battista's legal fees are made pursuant to a "thirds"
> agreement between and among V&E, A&M and Toby Gerber[.]

*Id.* As to the first statement, it must be read in context. Lee did not have any involvement in

negotiating or establishing fees Battista would charge for his representation of Stelzer. He did not

discuss these matters with Stelzer. Also, Lee explained that, as of the January 12, 2010

deposition, he had no current understanding of the fee arrangement because he had not been

involved recently. The scope of GJB's representation had expanded since Stelzer first retained

GJB in August 2008.

As to the second statement, counsel at V&E was unaware of the retention agreement

between Stelzer and GJB, and therefore had no involvement in its drafting. The fact that Battista

included an indication that ICC or V&E would backstop the fees does not mean that Lee, in

particular, or V&E was involved in negotiating the retention agreement, of which they were

unaware.

As to the third statement, despite the initial New ICC payment, the agreement was that

98

V&E, A&M, and Gerber were to each pay a third of Battista's legal fees. Reimbursement was made pursuant to the thirds arrangement. Lee explained the intent of the parties, the arrangement in place, and the payment as of that date and we credit his testimony. Furthermore, §1001 requires *knowing and willful* action, and there is no evidence of same. We find no reasonable grounds to conclude that a referral is warranted.

The second 18 U.S.C. §1001 violation asserted by Jeffrey Prosser involves the reimbursement made to New ICC. *See* Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc.  No. 255, at 61. He contends the reimbursement was a sham in violation of §1001 because V&E charged the amount to its client. This allegation is based on Respondents' Exhibit 109, which is the check request form submitted by Stewart seeking a check payable to New ICC for "Reimbursement/Payment of Legal Fees" on January 26, 2010. An "x" is marked in the box identified as "charge client." *See* Respondents' Exhibit 109. V&E represents that the check to New ICC does not appear in any V&E fee application, and Stewart testified that the estate would not be charged one cent.  *See* Respondents Vinson & Elkins LLP and James J. Lee's Response Brief to Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 263, at 11.[89]  We find Stewart's testimony was credible, and we accept that V&E's reimbursement check was not charged back to Trustee Springel and New ICC. *See* Respondents Vinson & Elkins LLP and James J. Lee's Response Brief to Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 263, at 11. We find that the designation made on

---

[89] *See* Testimony of Stewart, Hearing Transcript at 393:
Q      And are the monies being charged against the [e]state and –
A      Not at all. Not one penny. Not one cent, nor will they be.

the check request was an internal V&E accounting entry. Therefore, we find that referral is not warranted in the circumstances before us.

<u>*Allegations of Ethical Violations*</u>

Jeffrey Prosser also alleges that certain of the attorney Principal Actors have violated the American Bar Association Code of Professional Conduct.[90]

<u>Rule 3.4</u>

Movant alleges that Lee, Stewart, and Gerber violated Rule 3.4 by "offer[ing] a thing of value to Arthur Stelzer who *was* a lay witness in these proceedings, and thus, have violated the Attorney's Rules of Ethics." *See* Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 255, at 61 (emphasis added). First, we note that

---

[90] Pursuant to LBR 9010-1(D), "The local rules of the District Court as amended from time to time shall apply as to discipline of attorneys." The Local Rules of Civil Procedure of the District Court of the Virgin Islands address attorney discipline. The applicable rule, LRCi 83.2 (amended effective November 4, 2011) provides:

> In order to maintain the effective administration of justice and the integrity of the Court, each attorney admitted or permitted to practice before this Court shall comply with the standards of professional conduct required by the Model Rules of Professional Conduct (the "Model Rules"), adopted by the American Bar Association, as amended. Attorneys who are admitted or permitted to practice before this Court are expected to be thoroughly familiar with the Model Rules' standards.

*See* LRCi 83.2(a)(1). The Local Rule further provides:

> (1) The remedies for misconduct provided by this rule are in addition to the remedies available to individual judges under applicable law with respect to lawyers appearing before them. Misconduct of any attorney in the presence of a judge or in any manner with respect to any matter pending before the Court may be dealt with directly by the judge in charge of the matter or, at the judge's option, referred to the Chief Judge, or both.
>
> (2) Nothing in this rule shall limit the Court's power to punish contempt or to sanction counsel in accordance with the federal rules of procedure or the Court's inherent authority to enforce its rules and orders.

Stelzer *was* a witness in June 2008, but that the conduct upon which this Motion for Evidentiary

Hearing is based, developed from facts which occurred *after* Stelzer was released as a witness.

Rule 3.4(b) provides as follows:

> A lawyer shall not:
> (b) falsify evidence, counsel or assist a witness to testify falsely, or offer an
> inducement to a witness that is prohibited by law[.]

Comment 3 to Rule 3.4 provides, "With regard to paragraph (b), it is not improper to pay a

witness's expenses . . . . The common law rule in most jurisdictions is that it is improper to pay

an occurrence witness any fee *for* testifying . . . ." (emphasis added).[91] Respondents rely upon an

advisory opinion issued by the Delaware State Bar Association Committee on Professional

Ethics ("Delaware Committee") which recognizes that "it seems clear that it is reasonably

foreseeable that one of the expenses that a witness could incur in 'attending' or 'testifying' in a

legal proceeding is the fees of retaining an attorney to represent the witness's interests."

*See* Opinion 1994-1, at 5, available at the Delaware State Bar Association's website:

http://www.dsba.org/ethics_index.htm.[92] Therefore, in prior instances, payment of a witness's

---

[91] *See also* Comment (b) of the RESTATEMENT (THIRD) OF THE LAW GOVERNING
LAWYERS § 117, which provides, "A lawyer may not offer or pay to a witness any consideration:
(1) in excess of the reasonable expenses of the witness incurred and the reasonable value of the
witness's time spent in providing evidence, except that an expert witness may be offered and paid
a noncontingent fee;
(2) contingent on the content of the witness's testimony or the outcome of the litigation; or
(3) otherwise prohibited by law.

[92] In Opinion 1994-1, the Delaware Committee analyzed former Delaware Rule of
Professional Conduct ("DRPC") 3.4(b), which provided "A lawyer shall not: (b) pay, offer to
pay, or acquiesce in the payment of compensation, or participate in offering any inducement, to a
witness contingent upon the content of his testimony or the outcome of the case. But a lawyer
may advance, guarantee or acquiesce in the payment of: [(i)]Expenses reasonably incurred by a
witness in attending or testifying; (ii) Reasonable compensation to a witness for his loss of time

(continued...)

attorney's fees has been determined to be a legitimate expense.

Here, as previously stated, the timing of events makes it impossible for V&E to have induced Stelzer to testify by offering to pay Battista's legal fees relating to subpoenas which had not been issued or served at the time of Stelzer's Exemptions Trial testimony. The payment of Battista's attorney's fees was not *for or because of* Stelzer's testimony. Stelzer was excused as a witness and was not subject to recall at the time he retained GJB. Referral on this basis is therefore not warranted.

Rule 4.1

Movant also contends that a referral should be made based upon alleged violations of Rule 4.1, which addresses truthfulness in statements to others:

> In the course of representing a client a lawyer shall not knowingly:
>     (a) make a false statement of material fact or law to a third person; or
>     (b) fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6 [addressing confidential information].

Jeffrey Prosser contends that Lee, Stewart, and Gerber "knowingly made false statements of

---

[92](...continued)
in attending or testifying; (iii) A reasonable fee for the professional services of an expert witness." The language of the rule was subsequently changed in 2003 to reflect verbatim the language of ABA Model Rule 3.4 and did not effect a substantive change. *See* Opinion 2003-3, at 3-5. Therefore, the Delaware Committee applied the analytic framework set forth in Opinion 1994-1 to address the application of the new version of Rule 3.4(b) to propriety of witness reimbursement in Opinion 2003-3. *See* Opinion 2003-3, at 6-7. In Opinion 1994-1, the Delaware Committee (applying the former version of DRPC 3.4(b)), noted that "[g]iven the apparent purpose of the second sentence of Rule 3.4(b) to remove the financial burden on a witness from giving testimony (without creating an incentive to testify in a particular manner), it would be odd to interpret Rule 3.4(b) so as to leave the witness responsible for a substantial expense that might be incurred in giving testimony. Moreover, such a rule would discourage a witness from retaining independent counsel to represent his interests." *See* Opinion 1994-1, at 5; *see also* Opinion 2003-2 (quoting Opinion 1994-1).

material fact[.]" *See* Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and

Conclusions of Law, Adv. Doc. No. 255, at 61-62. To the extent Movant asserts that these

Principal Actors violated this rule by failing to disclose the Stelzer fee arrangement to this Court

or the other parties, we note that the Principal Actors did disclose the fee arrangement to the U.S.

Trustee. While disclosure to this Court in August 2008 would likely have avoided the

unauthorized payment by New ICC and countless hours that have been dedicated to this

adversary proceeding, what Rule 4.1 prohibits is failure to disclose a material fact when

disclosure is necessary to avoid assisting in a criminal or fraudulent act by a client. We have

already articulated why no criminal or fraudulent conduct appears on this record.  Thus, we find

there is no reasonable basis for this Court to conclude that investigation of the Principal Actors

for criminal or fraudulent conduct is warranted.

### Rule 3.3

Rule 3.3 requires candor toward the tribunal. Movant asserts that this Rule was violated

by Lee when he "failed to correct the August 27, 2008 false testimony of Trustee Springel . . . ."

*See* Jeffrey J. Prosser's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of

Law, Adv. Doc. No. 255, at 62. In the discussion *supra*, regarding Movant's perjury allegations,

we found that Trustee Springel did not testify falsely as there was no agreement between Trustee

Springel and/or his employees and Stelzer. Referral for violation of Rule 3.3 is not warranted.

### Rules 1.2(d) and 8.4

Movant asserts that Rule 1.2(d), addressing scope of representation and allocation of

103

authority between client and lawyer,[93] and Rule 8.4, addressing misconduct,[94] have been violated

by V&E on the basis that V&E counseled its client with regard to the alleged bribery scheme.

*See* Motion for Evidentiary Hearing, Adv. Doc. No. 29, at 30-31. First, we have no evidence of

what counsel, if any, V&E provided to Trustee Springel. Second, the evidence does not support

Prosser's contention of bribery. Thus, as we find no support for the bribery allegations, we

likewise find no basis for referral for violations of Rules 1.2(d) and 8.4.


   <u>*Attorney's fees and Reimbursement of the Estate*</u>

   Although we find that referral is not appropriate based on the allegations made by

Movant, the missteps which led to an evidentiary hearing in this matter resulted from

carelessness and lack of oversight. Had the payment of Battista's legal fees not been raised at his

---

[93] Rule 1.2(d) provides:
A lawyer shall not counsel a client to engage, or assist a client, in conduct that the
lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal
consequences of any proposed course of conduct with a client and may counsel or
assist a client to make a good faith effort to determine the validity, scope, meaning
or application of the law.


[94] Rule 8.4 provides:
It is professional misconduct for a lawyer to
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly
assist or induce another to do so, or do so through the acts of another; (b) commit
a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or
fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty,
fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the
administration of justice;
(e) state or imply an ability to influence improperly a government agency or
official or to achieve results by means that violate the Rules of Professional
Conduct or other law; or
(f) knowingly assist a judge or judicial officer in conduct that is a violation of
applicable rules of judicial conduct or other law.

deposition, the payment by New ICC could have been overlooked indefinitely.  Nevertheless, this adversary proceeding was commenced, resulting in countless hours of the parties' and the Court's time, a number of depositions, a variety of motions, objections, discovery, trial, and an adversary docket exceeding three hundred entries. The matter has created delay and distraction in the bankruptcy cases.[95]

To the extent V&E, A&M, and Trustee Springel asked for professional fees associated with the Motion for Evidentiary Hearing in their quarterly fee applications, the Court postponed determination pending the outcome of this proceeding. A hearing on the outstanding portions of the fee applications will be scheduled.

Furthermore, we find that the reimbursement to the estate in January 2010 in the exact amount of New ICC's check issued in November 2008 did not fully compensate the estate. V&E was notified of the duplicate payment less than two months after New ICC's payment was made and could have corrected the error almost immediately had Stewart taken the appropriate steps. Therefore, A&M and V&E shall be required to reimburse the estate for accrued and unpaid interest for the period of time the estate was without these funds.  Gerber was not involved and is not responsible for the interest that must be paid to the estate.


Respondents' Request for an Order to Show Cause

In Respondents' Proposed Findings of Fact and Conclusions of Law, Respondents seek an order requiring Jeffrey Prosser and his counsel to show cause why referral to the United

---

[95] The Court will address, separately, whether the conduct described herein warrants examination to determine whether it is so far below the level of professionalism expected of those who bill at these hourly rates that a general reduction in fees is warranted.

Attorney for investigation of their conduct is not warranted. *See* Adv. Doc. No. 256, at ¶¶171-76.

The basis of the request is Respondents' assertion that "Prosser has continued to re-urge

meritless allegations concerning the computer hard drives and American Express statements and

continued attacks on Trustee Springel, V&E, Lee, and Stelzer, even though these matters have

been resolved adversely to Prosser and (in some instances) are on appeal." *Id.* at ¶171 (providing

a list of examples).  Raising a new request for affirmative relief in Proposed Findings of Fact and

Conclusions of Law is not a proper procedural step.

On May 21, 2010, this Court entered its Order Granting Motion to Strike Portions of

Prosser's Evidentiary Hearing Brief. *See* Adv. Doc. No. 232. In relevant part, the Order provided:

> IT IS FURTHER ORDERED the following assertions in Jeffrey J. Prosser's
> Evidentiary Hearing Brief [BC Adv. Proc. No. 10-3001, Dkt No. 197], are outside
> the scope of this proceeding and are HEREBY STRICKEN:
>> • Assertions relating to a Perjury Claim based on allegations concerning
>> the computer hard drives and other factual issues outside the scope of this
>> proceeding, citing 18 U.S.C. § 152(2) (pages 18-29, 37-40);
>> • Assertions relating to a Bankruptcy Fraud Claim based on allegations
>> concerning the computer hard drives and other factual issues outside the
>> scope of this proceeding, citing 18 U.S.C. § 157 (pages 21-28, 40-45); and
>> • Assertions relating to a Computer Fraud Claim based on allegations
>> concerning the computer hard drives and other factual issues outside the
>> scope of this proceeding, citing 18 U.S.C. § 1030 (pages 28-32, 45-48).
> IT IS FURTHER ORDERED that the facts regarding these assertions have been
> made by Jeffrey J. Prosser in other proceedings and will be considered by the
> court in those proceedings, Jeffrey Prosser's Motion for an Order of Referral to
> the United States Attorney For Investigation of Perjury Committed by Arthur J.
> Stelzer and Cordell Johnson, Case No. 06-30009, Doc. No. 2764, and Jeffrey J.
> Prosser's Supplemental Motion to Vacate October 9, 2009 Exemption Order,
> Case No. 06-30009, Doc. No. 2771. In the event a reference to the United States
> Attorney is required based on those proceedings, the court will address the
> reference at that time.
> IT IS FURTHER ORDERED that Jeffrey J. Prosser is precluded from offering
> any evidence or argument relating to these assertions during the Evidentiary
> Hearing scheduled for May 24, 2010.

*See* Adv. Doc. No. 232. The Court notes that Jeffrey Prosser has raised identical matters

numerous times in multiple proceedings. Once a matter is decided the proper avenue to raise

errors in the decision is an appeal. Continual requests for reconsideration or efforts to adjudicate

the same allegations in multiple proceedings are not appropriate and are within the purview of 28

U.S.C. §1927 regarding counsel's liability for excessive costs where counsel multiplies

proceedings unreasonably and vexatiously.[96]

The Respondents urge the Court to conclude "that the Motion for Evidentiary Hearing

makes reckless assertions about all of the Respondents and the Assistant U.S. Trustee[97] without a

factual or legal basis" in violation of Fed.R.Civ.P. 11. *See* Respondents' Proposed Findings of

Fact and Conclusions of Law, Adv. Doc. No. 256, at ¶172. We note that, although done in error

and subsequently reimbursed, an unauthorized payment was made out of the estate. Nonetheless,

now that the entirety of the evidence has been examined, we find no reasonable basis to make the

requested referral.

---

[96] "Any attorney or other person admitted to conduct cases in any court of the United
States or any Territory thereof who so multiplies the proceedings in any case unreasonably and
vexatiously may be required by the court to satisfy personally the excess costs, expenses, and
attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. §1927.

[97] Assistant U.S. Trustee Guy Gebhardt was not named as a Respondent to this Motion
despite Movant's several references to Gebhardt in his Evidentiary Hearing Brief. *See* Adv. Doc.
No. 197, at 37, n. 23; *id.* at 40, n. 29; *id.* at 45, n. 41 ("Deposition testimony by Daniel Stewart, if
credited, shows that Assistant U.S. Trustee, Guy G. Gebhardt, was aware of the Stelzer payment
scheme and thus, may be implicated in it, and further suggests that he failed in his supervisory
and oversight role over the estate which requires Mr. Gebhardt to review the MORs. Had Mr.
Gebhardt done so, he would have uncovered unlawful payment to Genovese by ICC.") We have
found no reasonable basis to conclude that there was a bribery or that the payment by V&E (or
the subsequent thirds arrangement) is grounds for referral. At the time the U.S. Trustee's Office
was informed of the payment by the estate, it was also informed that reimbursement had been
made.

Respondents assert that referral to the U.S. Attorney of Jeffrey Prosser and his counsel may be appropriate due to alleged abuses of the bankruptcy system and their continued pursuit of Stelzer from 2008 until the present. *See* Respondents' Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 256, at ¶174-76. If the Trustee has reasonable grounds to believe that a report to the U.S. Attorney is appropriate pursuant to 18 U.S.C. §3057 then he shall refer the matter to the U.S. Attorney accordingly. If the Trustee is seeking a referral by this Court, he shall file an appropriate motion in which the alleged criminal violations are detailed.

Conclusion

For the reasons stated above, we find no reasonable grounds to support the referral sought by Movant. The Court will order A&M and V&E to reimburse the estate with unpaid interest on the $13,197.17 at the monthly federal interest rates in effect from the date New ICC was deprived of the use of its funds (November 25, 2008) until the reimbursement was deposited (January 28, 2010).

An appropriate order will be entered.

Dated: December 20, 2011

*Judith K. Fitzgerald*

**kdv**

Judith K. Fitzgerald
United States Bankruptcy Judge

108

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
BANKRUPTCY DIVISION
DIVISION OF ST. THOMAS AND ST. JOHN**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| JEFFREY J. PROSSER, | ) | Case No. 06-30009 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| JEFFREY J. PROSSER, | ) | Adv. Pro. 10-3001 |
| | ) | |
| Movant, | ) | |
| | ) | Related to Doc. Nos. 29, 30, 43 |
| v. | ) | |
| | ) | |
| TOBY GERBER; FULBRIGHT & JAWORSKI, | ) | |
| L.L.P.; JAMES J. LEE; VINSON & ELKINS, | ) | |
| L.L.P.; STAN SPRINGEL; JAMES P. | ) | |
| CARROLL; FOX ROTHSCHILD, L.L.P.; | ) | |
| GENOVESE, JOBLOVE & BATTISTA, P.A.; | ) | |
| PAUL BATTISTA; THERESA VAN VLIET; | ) | |
| ALVAREZ & MARSAL, LLC, | ) | |
| | ) | |
| Respondents. | ) | |

**ORDER**

**AND NOW**, this 20th day of December, **2011,** for the reasons expressed in the foregoing Memorandum Opinion, it is **ORDERED**:

1.      The Amended Motion for Evidentiary Hearing is **DENIED** to the extent Movant seeks referral for criminal or disciplinary investigation and/or disqualification; and

2.      Daniel Stewart, James Lee, Byron Smyl and Trustee Stan Springel shall file affidavits on or before February 1, 2012, verifying (1) that the payments to Genovese, Joblove, & Battista made by Vinson & Elkins and Alvarez & Marsal, pursuant to the thirds arrangement, in no way have been billed to the estates

1

and/or paid through the approval of their respective fee applications and (2) that any future payments to Genovese, Joblove, & Battista will not be billed to the estates and included in fee applications; and

3.  On or before February 1, 2012, Alvarez & Marsal and Vinson & Elkins shall reimburse the estate for the unreimbursed interest at the federal rate applicable in each month that New ICC was deprived of the use of the funds (i.e., from November 25, 2008) until reimbursement was made on January 28, 2010; and

4.  On or before February 1, 2012, Trustee Springel shall personally review each operating report filed to date in the three cases in which he serves as trustee and each operating report thereafter that will be filed (and prior to the time that each is filed). No fees or expenses shall be allowed to Trustee or anyone in his employ or his professionals for this review. Trustee shall report to the Court not later than February 15, 2012, any errors, omissions, corrections, etc. that may be required as to any and all operating reports.


It is **FURTHER ORDERED** that counsel for Debtor Jeffrey J. Prosser shall immediately serve a copy of this Memorandum Opinion and Order on all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.

It is **FURTHER ORDERED** that the U.S. Trustee shall serve a copy of this Memorandum Opinion and Order and a transcript of the May 24, 2010 evidentiary hearing on the U.S. Attorney and file a certificate of service forthwith.

*Judith K. Fitzgerald*          **kdv**

Judith K. Fitzgerald
United States Bankruptcy Judge

2